## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, a corporation established pursuant to 12 U.S.C. §§ 1716 *et seq.*, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 1976 |
| v. | ) ) | Hon. Charles R. Norgle |
| KENNETH J. WISNIEWSKI, an individual, LILLIAN F. WISNIEWSKI, an individual, and EAGLE HOMES, LLC, an Illinois limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Federal National Mortgage Association, a corporation established pursuant to 12 U.S.C. §§ 1716 *et seq.* ("Fannie Mae"), by its attorneys Foley & Lardner LLP, for its First Amended Complaint against Kenneth J. Wisniewski ("Kenneth"), Lillian Wisniewski ("Lillian"), and Eagle Homes, LLC ("Eagle") (collectively, the "Defendants"), states as follows:

### Nature of Proceeding

1.     Fannie Mae brings this action to enforce a certain Guaranty Agreement made by and among the Defendants on November 26, 2003 (the "Guaranty"), a true and accurate copy of which is attached as Exhibit A.

2.     Fannie Mae further seeks reasonable attorneys' fees and costs under the Guaranty.

### Parties

3.     Fannie Mae is a federally chartered corporation with its headquarters and principal place of business in the District of Columbia pursuant to 12 U.S.C. § 1717(a)(2)(B).

4.    Defendants Kenneth and Lillian are citizens of Illinois.  They reside, and for jurisdictional purposes are domiciled, at 21735 Brentwood, Lake Villa, Illinois 60046.

5.    Eagle is an Illinois limited liability company with its principal place of business located at 303 Main Street, Suite 100, Antioch, Illinois 60002.

6.    Eagle has two members – Defendants Kenneth and Lillian – each of whom holds a 50% membership interest in Eagle.

## Jurisdiction and Venue

7.    Pursuant to 28 U.S.C. § 1332(a)(1), the Court has diversity jurisdiction over this case because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because at least one of the Defendants resides in this District.

9.    In addition, each of the Defendants consented "to the exercise of personal jurisdiction over it by the Courts of the States of Illinois and agrees that venue shall be proper in the United States District Court for the Northern District of Illinois . . . ." as provided by the Guaranty.  (Ex. A, at p. 5).

## Background Facts

10.    Fannie Mae restates and incorporates Paragraphs 1 through 10 of the Complaint as is if fully stated herein.

11.    On or about March 15, 2005, Eagle Homes – Prairie Springs, LLC (the "Borrower") and Fannie Mae entered into, *inter alia*, a certain Amended and Restated Promissory Note (the "Note") and a certain Amended and Restated Loan and Security Agreement ("the Loan Agreement"), true and accurate copies of which are attached hereto as Exhibits B and C, respectively.

-2-

12.     Pursuant to the Note and the Loan Agreement, Fannie Mae made a credit facility available to the Borrower with an outstanding amount as of March 15, 2005 of $1,822,790.  As of February 1, 2008, the total amount due and owing to Fannie Mae under the Note is $1,764,482.00, which amount is comprised of principal and interest totaling $1,750,546.00 and interest, at a default rate, from October 1, 2007 of $13,936.00.  In addition to this amount, interest continues to accrue at the default interest rate and expenses of collection, asset management fees, and other costs and expenses, including attorney's fees, continue to be incurred.

13.     Pursuant to the Guaranty, the Defendants fully, absolutely, unconditionally and irrevocably, and jointly and severally guaranteed the payment of certain obligations under the Note and the Loan Agreement, including, but not limited to, the full and prompt payment of all amounts due with respect to the Note as well as the observance and performance by the Borrower of all of the Borrower's obligations under the Note and the Loan Agreement.  (Ex. A, at p. 2).

14.     The Borrower has failed to make payment of the Asset Management Fee required by the Note.  Such failure constitutes an Event of Default under Section 6.1(a) of the Loan Agreement.  (Ex. C, at p. 11).

15.     In addition, there has been an event of default under the Borrower's loans with the American National Bank of DeKalb County, which has not been cured within the applicable cure period (the "ANB Default").  The ANB Default constitutes an Event of Default under Section 6.1(d) of the Loan Agreement.  (*Id.* at p. 11).

CHIC_2632705.2

16.    The Borrower's obligations to Fannie Mae under the Note and the Loan Agreement are due and, pursuant to the Guaranty, the Defendants are liable to Fannie Mae for payment of the obligations under the Note and the Loan Agreement. (Ex. A, at pp. 2-3).

17.    On January 24, 2008, Fannie Mae issued a Notice of Default, Acceleration and Demand for Payment – Amended and Restated Promissory Note Dated as of March 15, 2005 (the "Demand Letter"), a true and accurate copy of which is attached as Exhibit D.

18.    The Defendants have not made any payment to Fannie Mae to reduce or satisfy the Borrower's obligations, and the Defendants have not satisfied their obligations under the Guaranty.

19.    The Defendants waived defenses with regard to presentment and demand for payment of any sum due from the Borrower and protest of nonpayment; notice of default by the Borrower; and demand for performance by the Borrower. (Ex. A, at p. 3).

20.    Pursuant to the Guaranty, Fannie Mae is entitled to recover from the Defendants all of the costs incurred by Fannie Mae related to the enforcement of the Defendants' obligations to Fannie Mae, including, but not limited to, attorneys' fees and expenses. (Ex. A, at p. 3).

## COUNT I

### (Claim for Breach of Guaranty Agreement)

21.    Fannie Mae restates and incorporates Paragraphs 1 through 21 of the Complaint as if fully stated herein.

22.    The Guaranty is a legally valid, binding and enforceable agreement.

23.    Fannie Mae has fully performed all of its obligations under the Guaranty.

-4-

24.    Defendants materially breached the Guaranty by failing to make any payment(s) to Fannie Mae to reduce or satisfy the Borrower's obligations under the Note and the Loan Agreement.

25.    Defendants have no legally recognized justification or excuse for breaching the Guaranty.

26.    As a direct and proximate result of Defendants' breach of the Guaranty, Fannie Mae has suffered damages in an amount no less than $1,764,482.00, exclusive of interest, fees and costs.

WHEREFORE, Fannie Mae prays that the Court enter judgment in its favor and against the Defendants, jointly and severally, in an amount no less than $1,764,482.00, plus all additional interest, fees and costs, including, but not limited to, attorneys' fees and expenses, through the date of judgment, and grant such other and further relief as the Court deems just and proper.

Dated:  August 6, 2008

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By: _____Michael S. Baig_____
        One of Its Attorneys

Jill Murch (Il Bar No. 6257217)
Michael Baig (Il Bar No. 6269355)
Joanne Lee (Il Bar No. 6283350)
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, Illinois  60610
Ph: (312) 832-4500
Fax: (312) 832-4700

-5-

## CERTIFICATE OF SERVICE

I, Michael S. Baig, an attorney, hereby certify that on Wednesday, August 6, 2008 I caused a true and correct copy of **PLAINTIFFS' FIRST AMENDED COMPLAINT** to be served by the court's electronic filing system and by depositing same in the U.S. mail, first class postage prepaid at 321 North Clark Street, Chicago, IL 60610 to the following attorney:

>Robert E. Richards
>Sonnenschein Nath & Rosenthal, LLP
>233 South Wacker Drive
>Suite 7800
>Chicago, IL 60606

/s/ Michael S. Baig_____

2

# EXHIBIT A

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty Agreement") is made as of the 26 day of November, 2003, by and among **EAGLE HOMES, LLC**, an Illinois limited liability company ("Eagle Homes") **KENNETH J. WISNIEWSKI** ("K. Wisniewski") and **LILLIAN F. WISNIEWSKI** ("L. Wisniewski") (K. Wisniewski, L. Wisniewski and Eagle Homes are individually and collectively, the "Guarantor"), and **FANNIE MAE**, a corporation organized and existing under the laws of the United States of America ("Fannie Mae").

## RECITALS

WHEREAS, Fannie Mae has agreed to make a loan to Eagle Homes-Prairie Springs, LLC, an Illinois limited liability company (the "Borrower") in the maximum principal sum of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600) (the "Loan"), which Loan shall be evidenced by a Promissory Note in the amount of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600) (the "Note") and which shall be advanced by Fannie Mae pursuant to the terms and conditions of a Loan and Security Agreement of even date herewith by and between the Borrower and Fannie Mae (the "Loan Agreement"); and

WHEREAS, Fannie Mae is willing to make the Loan available to the Borrower upon the terms and conditions set forth in the Note and the Loan Agreement, but only if the Guarantor guarantees the Borrower's repayment of all sums due and owing under the Note and the Borrower's performance of its obligations under the Loan Agreement and the Credit Facility Documents described therein (the "Credit Facility Documents") in accordance with the terms and conditions of this Guaranty Agreement; and

WHEREAS, the Guarantor will benefit from the availability of the Loan to the Borrower and is willing to give the guaranty requested so as to induce Fannie Mae to make the Loan available to the Borrower.

NOW THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor gives the following guaranty of payment and of performance to Fannie Mae on behalf of the Borrower.

Section 1. Representations and Warranties of the Guarantor. Each Guarantor represents and warrants that:

(a)    He, she or it has a financial interest in the Borrower and the assumption of his obligations and liabilities hereunder will result in substantial financial benefits to him;

(b)    He, she or it has read or has had an opportunity to read all documents referred to herein or otherwise relating to the Note and the Credit Facility Documents, and this

Guaranty Agreement is his binding obligation and is fully enforceable against him in accordance with its terms;

(c)     There are (i) no provisions of any existing mortgage, indenture, contract or agreement binding on him, her or it or affecting his, her or its property (other than any such agreements with Fannie Mae), and (ii) to his, her or its knowledge no provision of law or order of court or of any administrative officer or administrative agency, binding upon him, her or its or his, or its property, either of which would conflict with or in any way prevent the execution, delivery or performance of the terms of this Guaranty Agreement or which would be in default or breached as a result of such execution, delivery or performance;

(d)     To each Guarantor's knowledge, his, her or its most recent financial statement heretofore delivered to Fannie Mae is true and correct as of the date thereof; except as disclosed to Fannie Mae, all assets listed thereon are held by the Guarantor personally and not in joint ownership (that is, subject to a right of survivorship) with his or her spouse or any other person; to the Guarantor's knowledge there has been no material adverse change in his financial position since the date of such financial statement and no such material adverse change is pending or threatened, except as otherwise disclosed to Fannie Mae;

(e)     To each Guarantor's knowledge, there are no proceedings pending, or so far as the Guarantor knows, threatened, before any court or administrative agency or officer which will adversely affect his financial position;

(f)     Eagle Homes is a limited liability company (i) validly existing in good standing under the laws of the State of Illinois, (ii) with the necessary power, authority and legal right to own its property and carry on the business now being conducted by it and to engage in the transactions contemplated by this Guaranty Agreement and the Credit Facility Documents, (iii) which has duly authorized the execution and delivery of this Guaranty Agreement, the Credit Facility Documents to which it is a party and the performance and observation of the terms, covenants, agreements and provisions thereof, and (iv) which will at all times perform all acts necessary to maintain its legal existence and continue its authority to act in accordance with the representations contained in this paragraph; and

(g)     To each Guarantor's knowledge, all of the Guarantor's representations and those of the Borrower made in obtaining the Loan from Fannie Mae are true and correct and not knowingly misleading and the Guarantor agrees to indemnify Fannie Mae from any loss or expense as a result of a breach of the foregoing warranty; and

(h)     The combined net worth of the Guarantor has been and will continue to equal at least Fifteen Million Dollars ($15,000,000).

Section 2.     Guaranty.  Each Guarantor hereby fully, absolutely, unconditionally and irrevocably, jointly and severally guarantees to Fannie Mae all of the following obligations (collectively referred to as the "Guaranteed Obligations"):

(a)     the full and prompt payment (not merely the collection) of all amounts due with respect to the Note, and the observance and performance by the Borrower of all of the Borrower's obligations under the Credit Facility Documents, including, but not limited to, the completion of the improvements described in the Loan Agreement;

(b)     the full and prompt payment of any development and construction costs related to the Project which exceed the budgets approved by Fannie Mae;

(c)     the full and prompt payment (not merely the collection) of all present and future liabilities and obligations of the Borrower to Fannie Mae of every kind and description, now existing or hereafter owing, matured or unmatured, direct or indirect, absolute or contingent or joint or several and the observance and performance by the Borrower of all of the Borrower's obligations with respect to the foregoing; and

(d)     The payment of all expenses and charges (including all court costs and reasonable attorneys' fees) paid or incurred by Fannie Mae in realizing upon any of the obligations guaranteed above or in enforcing any of the Credit Facility Documents.

Section 3.  Nature of the Guaranty.  The guaranty of the Guarantor hereunder shall be direct, immediate, and primary and is one of payment and not just collection.  The liability of each Guarantor hereunder shall be both joint and several.  The liability of Guarantor hereunder shall remain unaffected by the provisions of the Intercreditor Agreement between Fannie Mae and Harris Bank dated of even date herewith.

Section 4.  Fannie Mae Need Not Pursue Against Borrower or Collateral.  Fannie Mae shall be under no obligation to pursue Fannie Mae's rights against the Borrower or any of the Borrower's collateral or any pledge agreement or any other instrument securing the Loan before pursuing Fannie Mae's rights against the Guarantor.

Section 5.  Rights of Fannie Mae to Deal with Borrower and Collateral.  Fannie Mae may without compromising, impairing, or in any way releasing the Guarantor from the Guarantor's obligations hereunder and without obtaining the prior approval of the Guarantor at any time or from time to time: (a) waive or excuse a default or defaults by the Borrower; (b) grant extensions of time for payment or performance by the Borrower; (c) release, substitute, or add collateral of the Borrower; (d) release the Borrower; and (e) modify, change or amend in any respect Fannie Mae's agreement with the Borrower.

Section 6.  Waivers by the Guarantor.  The Guarantor waives (a) presentment and demand for payment of any sum due from the Borrower and protest of nonpayment; (b) notice of default by the Borrower; (c) demand for performance by the Borrower; and (d) any right to a jury trial in any action brought at any time or from time to time on this Guaranty Agreement or any other Credit Facility Document.

Section 7.  Liability of Guarantor Unaffected by Third Party Bankruptcy and Insolvency Proceeding.  To the extent permitted by law, no modification, limitation or discharge of liability of any other guarantor of the Guaranteed Obligations or of the Borrower under any of the Credit

# 229413 V3 NJP
010656-0181

Facility Documents arising out of, or by virtue of, any bankruptcy, arrangement, reorganization or similar proceedings for release of debtors under federal or state law shall affect the liability of the Guarantor hereunder in any manner whatsoever, and the Guarantor hereby waives all rights and benefits which might accrue to him by reason of any such proceeding.

Section 8. <u>Covenants</u>. Each Guarantor hereby covenants and agrees:

(a)    To promptly notify Fannie Mae of any material adverse change in the financial condition of any Guarantor;

(b)    With respect to K. Wisniewski and L. Wisniewski to deliver to Fannie Mae (i) in a form approved by Fannie Mae within sixty (60) days after the close of each calendar year beginning with the calendar year ending on December 31, 2003, personal financial statements certified by the applicable Guarantor as accurate, and (ii) copies of the Guarantor's state and federal tax returns within ten (10) days after the same are filed;

(c)    With respect to Eagle Homes, To deliver to Fannie Mae (i) in a form approved by Fannie Mae within ninety (90) days after the close of each fiscal year beginning with the fiscal year ending on December 31, 2003, a balance sheet for itself as of the close of such fiscal year and statements of income and retained earnings and source and application of funds for the year then ended, in a form reasonably acceptable to Fannie Mae, prepared in conformity with generally accepted accounting principles, applied on a basis consistent with that of the preceding year (or containing a disclosure of the effect on financial position or results of operations of any change in the application of generally accepted accounting principles during the year), which financial reports shall be (A) prepared by a firm of independent certified public accountants acceptable to Fannie Mae, and (ii) copies of each Guarantor's state and federal tax returns within ten (10) days after the same are filed;

(c)    Upon obtaining knowledge thereof, promptly to give notice in writing to Fannie Mae of any litigation, pending or threatened, and of any proceeding before any governmental or regulatory agency or officer which might have a material, adverse effect on his financial position (any suit or suits in which the amount in controversy is less than $10,000 in the aggregate being hereby deemed not to be material);

(d)    To pay and discharge, or cause to be paid or discharged, all taxes, assessments and governmental charges or levies imposed upon any of the properties of the Guarantor, all claims for labor, supplies, rent and any other obligations, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a lien or charge upon any such properties; provided, however, that the Guarantor shall not be required to pay any such tax, assessment, charge, levy or claim so long as Fannie Mae has been given notice of the Guarantor's intention to institute any contest thereof and so long as, in the opinion of Fannie Mae, (i) the payment is being diligently contested in good faith by appropriate proceedings, (ii) the security for the Guaranteed Obligations hereunder is not impaired, and (iii) the Guarantor has effectively stayed or prevented the sale of such properties;

(e)    Not to acquire or hold any of his assets in, or to transfer the same to, joint ownership with his spouse or any other person; provided, however, that Fannie Mae shall not unreasonably withhold its consent to any transfer made for bona fide estate planning purposes, so long as (in the opinion of Fannie Mae) the security for the Guaranteed Obligations would not be impaired as a result of such transfer; and

(f)    Guarantor shall at all times maintain a combined net worth equal to at least Fifteen Million Dollars ($15,000,000).

Section 9.    Events Authorizing Acceleration of Guaranty.    Should any of the following Events of Default occur with respect to the Guarantor or with respect to the Borrower, Fannie Mae may, in Fannie Mae's sole and absolute discretion, immediately and without notice or demand accelerate and call due as to the Guarantor all Guaranteed Obligations:  (a) the entry of a decree or order for relief by a court having jurisdiction against or with respect to the Guarantor or the Borrower in an involuntary case under the federal bankruptcy laws or any state insolvency or similar laws ordering the liquidation of the Guarantor or the Borrower or a reorganization of the Borrower or the Borrower's business and affairs or the appointment of a receiver, liquidator, assignee, custodian, trustee, or similar official for the Guarantor or the Guarantor's property or for the Borrower or any of the Borrower's property and the failure to have such decree, order, or appointment discharged or dismissed within sixty (60) days from the date of entry; (b) the commencement by the Guarantor or the Borrower of a voluntary case under the federal bankruptcy laws or any state insolvency or similar laws or the consent by the Guarantor or the Borrower to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, or similar official for the Guarantor or any of the Guarantor's property or for the Borrower or any of the Borrower's property or the making by the Guarantor or the Borrower of any assignment for the benefit of creditors; (c) the entry of a judgment in excess of $10,000 against the Guarantor or the Borrower and the failure to satisfy such judgment within thirty (30) days (either by payment or by the filing of a supersedeas bond) unless such judgment has been appealed in good faith and the legal effect of such appeal is to stay the obligation to satisfy such judgment until resolution of the appeal; (d) a default by the Borrower in payment or in performance of the Borrower's obligations under any of the Credit Facility Documents (together with the expiration of any applicable grace period); (e) a default by the Guarantor in any of the terms or provisions of this Guaranty Agreement not specifically referred to in paragraphs (a) through (d) above; provided, however, that with respect to curable defaults only the Guarantor shall have failed to cure the same within thirty (30) days following written notice from Fannie Mae; (f) the occurrence of any Event of Default as defined in any of the Credit Facility Documents.

Section 10.    Jurisdiction and Venue.    In any action brought by Fannie Mae under this Guaranty Agreement, Guarantor consents to the exercise of personal jurisdiction over it by the Courts of the State of Illinois and agrees that venue shall be proper in the United States District Court for the Northern District of Illinois, in addition to any other court where venue may be proper. The Guarantor waives and releases, to the extent permitted by law, all errors and all rights of exemption, appeal, stay of execution, inquisition and extension upon any levy on real estate or personal property to which the Guarantor may otherwise be entitled under the laws of the United States of America or of any State or Possession of the United States of America now in force or which may hereafter be passed, as well as the benefit of any and every statute, ordinance, or rule of

# 229413 V3 NJP
010656-0181

5

court which may be lawfully waived conferring upon the Guarantor any right or privilege of exemption, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against the Guarantor shall be exercisable concurrently in one or more jurisdictions and shall not be exhausted or extinguished by one or more exercises thereof, or by any imperfect exercise thereof or by any judgment entered pursuant thereto. Such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as Fannie Mae shall deem necessary or desirable, for all of which this Guaranty Agreement shall be sufficient warrant.

Section 11.   Expenses of Collection.   Should this Guaranty Agreement or any claim hereunder be referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, the Guarantor shall pay all of Fannie Mae's actual costs, fees (including actual attorneys' fees) and expenses resulting from such referral.

Section 12.   Binding Nature.   This Guaranty Agreement shall inure to the benefit of and be enforceable by Fannie Mae and Fannie Mae's successors and assigns, and shall be binding upon and enforceable against the Guarantor and the Guarantor's personal representatives, heirs and assigns.

Section 13.   Fannie Mae May Assign; Termination of Guaranty.   This Guaranty Agreement may be assigned by Fannie Mae, and shall terminate upon the performance by the Borrower and the Guarantor of all Guaranteed Obligations to Fannie Mae's full and complete satisfaction as evidenced by a written confirmation from Fannie Mae.

Section 14.   Restrictions on Becoming a Creditor of the Borrower.   The Guarantor hereby waives any claim, as that term is defined in the United States Bankruptcy Code, which the Guarantor might now have or might hereafter acquire against the Borrower, including, but not limited to, claims arising by way of subrogation, reimbursement, indemnity, exoneration, contribution, extensions of credit or equity contributions, it being the intent of the parties that the Guarantor shall not be a creditor of the Borrower under the United States Bankruptcy Code.

Section 15.   Notices.   All notices required or permitted hereunder shall be in writing and shall be personally delivered or mailed by certified or registered mail, return receipt requested, to the following addresses:

# 229413 V3 NJP
010656-0181

6

If to the Guarantor:

<div style="margin-left:2em">

Kenneth J. and Lillian F. Wisniewski
Eagle Homes, LLC
40424 N. Deep Lake Road
Antioch, Illinois

</div>

With a copy to:

<div style="margin-left:2em">

David Witheft
Boyle, Cordes, Witheft & Brown, LLC
301 East Lincoln Highway
DeKalb, Illinois 60115

</div>

If to Fannie Mae, to:

<div style="margin-left:2em">

Fannie Mae
3900 Wisconsin Avenue, N.W.
Mail Stop: 8H-306
Washington, DC 20016
Attention:    Portfolio Administration
              American Communities Fund

</div>

With a copy to:

<div style="margin-left:2em">

General Counsel
Fannie Mae
Mail Stop: 8H-306
American Communities Fund
3900 Wisconsin Avenue, N.W.
Washington, DC 20016

</div>

Any party may change the address to which notices are to be sent by a writing directed to the other party in the manner aforesaid. Unless otherwise specifically provided, all notices hereunder delivered personally shall be deemed delivered upon such personal delivery, and all notices hereunder given by mail, as aforesaid, shall be deemed delivered three (3) days after deposited in a United States Post Office, general or branch, or an official mail depository, maintained by the U.S. Postal Service, enclosed in a registered or certified prepaid wrapper addressed as above provided, except notice of change of address shall be deemed served when received.

In connection with the delivery of any notice as described herein, the party giving such notice agrees to use reasonable efforts to also send such notice by facsimile transmission; provided, however, that delivery of notice by facsimile transmission shall not be a requirement in order to give *effective notice hereunder.*

Section 16. <u>Waiver</u>. No waiver of any power, privilege, right or remedy (hereinafter collectively referred to as "Rights") hereunder shall be effective unless in writing. No delay on the part of Fannie Mae in exercising any Rights hereunder, or under any other instrument executed by the Borrower or any other person in connection with the transaction (including the Credit Facility Documents) shall operate as a waiver thereof, and no single or partial exercise of any such Rights shall preclude other or further exercise thereof, or the exercise of any other Rights. Waiver by

Fannie Mae of any default by the Borrower, the Guarantor or any other person shall not constitute a waiver of any subsequent defaults, but shall be restricted to the default so waived. If any provision or part of any provision of this Guaranty Agreement shall be contrary to any law which Fannie Mae might seek to apply or enforce, or should otherwise be defective, the other provisions, or parts of such provisions, of this Guaranty Agreement shall not be affected thereby, but shall continue in full force and effect. All Rights of Fannie Mae hereunder are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all Rights given hereunder or in or by any other instruments or any laws now existing or hereafter enacted.

Section 17. <u>Choice of Law</u>. This Guaranty Agreement shall be construed, interpreted and enforced in accordance with the law of the State of Illinois.

Section 18. <u>Tense, Gender, Captions</u>. As used herein, the plural shall refer to and include the singular, and the singular, the plural and the use of any gender shall include and refer to any other gender as the context may require. All captions are solely for the purpose of convenience.

Section 19. <u>Terms of Documents</u>. The Guarantor has read the Loan Agreement and other Credit Facility Documents and fully understands the terms thereof and the extent of his obligations in guaranteeing payment and performance by the Borrower thereunder.

**IN WITNESS WHEREOF**, and intending to be legally bound, the Guarantor has hereunto set his hand and seal as of the day and year first above written.

**WITNESS:**                                      **GUARANTORS:**

_____          _____ (SEAL)
                                                 Kenneth J. Wisniewski

_____          _____ (SEAL)
                                                 Lillian F. Wisniewski

                                                 **EAGLE HOMES, LLC**

_____          By: _____ (SEAL)
                                                 Name: Kenneth J. Wisniewski
                                                 Tile:    Manager

# 229413 V3 NJP
010656-0181

9

**STATE OF ILLINOIS, COUNTY/CITY OF** _Lake/Antioch_ **to wit:**

I HEREBY CERTIFY, that on this _____ day of _____, 2003, before me, the undersigned Notary Public of the State of Illinois, in and for the County/City of _____, personally appeared KENNETH J. WISNIEWSKI, known to me (or satisfactorily proved) to be the person who executed the foregoing Guaranty Agreement, and acknowledged that he executed the same in the capacity and for the purposes therein recited.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

```
"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires  10/10/04
```

Notary Public

My commission expires: _10/10/2004_

**STATE OF ILLINOIS, COUNTY/CITY OF** _Lake/Antioch_ **to wit:**

I HEREBY CERTIFY, that on this _____ day of _____, 2003, before me, the undersigned Notary Public of the State of Illinois, in and for the County/City of _____, personally appeared LILLIAN F. WISNIEWSKI, known to me (or satisfactorily proved) to be the person who executed the foregoing Guaranty Agreement, and acknowledged that he executed the same in the capacity and for the purposes therein recited.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

```
"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires  10/10/04
```

Notary Public

My commission expires: _10/10/2004_

STATE OF ILLINOIS, *County* OF *Lake*, TO WIT:

    I hereby certify that on this _____ day of _____, 2003, before me, the undersigned Notary Public of the State of Illinois, personally appeared Kenneth J. Wisniewski, Manager of Eagle Homes, LLC, and that he/she as such _____, being authorized so to do, executed the foregoing Power of Attorney on behalf of such limited liability company for the purposes therein contained by signing the name of said limited liability company by himself/herself as such Manager.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Notary Public

My commission expires: *10/10/2004*

"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires  10/10/04

# 229413 V3 NJP
010656-0181

11

**EXHIBIT D**

ASSIGNMENT OF PROJECT DOCUMENTS

See Attached

# EXHIBIT B

862

## AMENDED AND RESTATED PROMISSORY NOTE

THIS AMENDED AND RESTATED PROMISSORY NOTE (this "Note") is made as of March 15, 2005 by EAGLE HOMES – PRAIRIE SPRINGS, LLC, an Illinois limited liability company (the "Borrower").

## RECITALS

A.       Pursuant to that certain Loan and Security Agreement between the Borrower and Fannie Mae, a corporation organized and existing under the laws of the United States of America ("Fannie Mae") dated as of November 26, 2003 (the "Original Loan Agreement"), as amended and restated pursuant to the terms of that certain Amended and Restated Loan and Security Agreement dated of even date herewith (the "Agreement"), the Borrower issued to Fannie Mae its Promissory Note in the original principal amount of One Million Six Hundred Thirty Three Thousand Six Hundred Dollars ($1,633,600) dated as of November 26, 2003 (the "Original Note"). As of the date hereof, Fannie Mae advanced the principal amount of One Million Eight Hundred Twenty Two Thousand Seven Hundred Ninety Dollars ($1,822,790) to the Borrower.

B.       The Borrower has requested that Fannie Mae modify the Original Note, and Fannie Mae has agreed to, provided that Borrower executes and delivers, among other documents, this Amended and Restated Promissory Note.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower agrees that as of the date hereof the Original Note shall be AMENDED AND RESTATED IN ITS ENTIRETY AS FOLLOWS:

## PROMISSORY NOTE

March 18, 2005                                                                            $1,822,790

FOR VALUE RECEIVED, the undersigned (the "Borrower") promises to pay to the order of FANNIE MAE, a corporation organized and existing under the laws of the United States of America ("Fannie Mae"), at 3900 Wisconsin Avenue, N.W., Washington, DC 20016, or at such other place in the United States of America as Fannie Mae may designate, the principal sum of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600), or so much of the principal sum as may have been advanced from time to time hereafter by Fannie Mae on behalf of the Borrower under the terms and conditions of a Loan and Security Agreement dated November 26, 2003 by and between Fannie Mae and the Borrower, as amended and restated by that certain Amended and Restated Loan and Security Agreement dated of even date herewith by and between Fannie Mae, the Borrower and certain guarantors dated of even date herewith (collectively, the "Agreement"), together with such amounts necessary to provide an internal rate of return to Fannie Mae at the rate hereinafter provided, and any and all other sums which may be owing to the holder of this Note by the Borrower, on the applicable final and absolute maturity date hereinafter

described, or on such earlier date specified by Fannie Mae if this Note is accelerated pursuant to Section 11 hereof. The following terms shall apply to this Note.

1.    Repayment.  Beginning with the first sale of a residential unit constructed on the Property, one hundred percent (100%) of Net Sales Proceeds shall be paid to Fannie Mae until such time as the principal amount of this Note has been repaid to Fannie Mae together with such amount necessary for Fannie Mae to realize an Internal Rate of Return (as defined below) of twenty six percent (26%) on such principal amount (the "Fannie Mae Return"). The term "Net Sales Proceeds" shall mean the purchase price of each residential unit shown on the HUD-1 settlement statement less (a) a release price payable to American National Bank (the "Construction Lender") in the amount of Forty Thousand Dollars ($40,000) per residential unit, (b) one hundred percent (100%) of costs funded by Construction Lender according to the Sworn Cost Statement for such residential unit and sales commissions owed by Borrower in connection with the sale of such residential unit, which in no event shall exceed one hundred seven percent (107%) of the originally-budgeted cost attributable to such residential unit, (c) the GC/Overhead Fee (as defined in the Agreement), and (d) Construction Lender's processing fee in the amount of One Hundred Fifty Dollars ($150.00). The final and absolute maturity date of this Note is March 31, 2008.

2.    Calculation of Internal Rate of Return.  The Internal Rate of Return is the annual discount rate that results in a net present value equal to zero (0) when the discount rate is applied to all advances made by Fannie Mae to Borrower pursuant to the Agreement and this Note. The Internal Rate of Return shall be calculated (with all distributions and Capital Contributions being deemed made on the first (1st) day of the month when actually made), using the methodology used in the Microsoft EXCEL software (and its "XIRR" Function or its equivalent). An example of the calculation of the Internal Rate of Return is attached hereto as Exhibit A.

3.    Application of Payments; Manner of Payment.  All payments made hereunder shall be applied first to Enforcement Costs and late charges or other sums owing to the holder of this Note including, but not limited to any unpaid placement, asset management, legal and due diligence fees, next to accrued Fannie Mae Return, and then to principal. All amounts payable hereunder shall be paid in lawful money of the United States of America in immediately available funds, without deduction, set-off, defense or counterclaim, not later than 2:00 p.m. (District of Columbia time) on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day) by wire transfer or by mail pursuant to the following instructions:

If by wire transfer:        FNMA/NYC
                            ABA No. 021 039 500
                            GR371 ($1,633,600 Loan from FNMA ACF to Eagle Homes-
                            Prairie Springs, LLC)
                            ATTN: HCDFunds@MFAS

If by mail:        Fannie Mae
                   3900 Wisconsin Avenue, N.W.
                   Mail Stop: 11H-905
                   Washington, D.C. 20016
                   Attention: Tymika Luckey

4.    Optional Prepayment.   The Borrower may prepay this Note at any time after September 30, 2006 in whole or in part.

5.    Late Payment Charge.  Should any payment of Fannie Mae Return, or principal and Fannie Mae Return, due hereunder be received by the holder of this Note more than fifteen (15) days after its due date, the Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due to the extent not paid as and when due until paid in full.

6.    Asset Management Fee.  The Borrower shall pay Fannie Mae, or Fannie Mae's designee, an asset management fee (the "Asset Management Fee") of One Thousand Dollars ($1,000) per calendar month beginning on the date hereof and continuing until all sums due to Fannie Mae under the terms of this Note have been paid in full. Payments of the Asset Management Fee shall be made on first (1st) day of each calendar month. If the Asset Management Fee is not paid within fifteen (15) days of the applicable payment date, there shall also be due a late charge with respect to such payment in the amount of five percent (5%) of the quarterly amount of such fee until such time as all sums due to Fannie Mae under the terms of this Note have been paid in full.

7.    Security for the Note.  This Note is secured as provided in the Agreement.

8.    Acceleration Upon Default.  At any time after a default in the payment of any installment of Fannie Mae Return or of principal and Fannie Mae Return, or in the payment of any other sums due hereunder within fifteen (15) days after the due date, or upon the occurrence of an Event of Default as defined in the Agreement, Fannie Mae may, in Fannie Mae's sole and absolute discretion and without notice or demand (unless otherwise specifically required under an applicable Credit Facility Document), declare the entire unpaid balance of principal plus accrued Fannie Mae Return and any other sums due hereunder immediately due and payable.

9.    Default Return Rate.  At any time after a default in the payment of any installment of Fannie Mae Return, or of principal and Fannie Mae Return, or in the payment of any other sums due hereunder within thirty (30) days after the due date, or upon the occurrence of any Event of Default as defined in the Agreement and continuing until such Event of Default is cured to Fannie Mae's satisfaction, the rate of the Fannie Mae Return accruing on the disbursed unpaid principal balance shall automatically, and without any action or notice by Fannie Mae, be increased by three (3) percentage points above the rate of Fannie Mae Return otherwise applicable (the "Default Rate"), independent of whether Fannie Mae elects to accelerate the unpaid principal balance as a result of such default.

10.   Jurisdiction and Venue.  In any action brought by Fannie Mae under this Note, Borrower consents to the exercise of personal jurisdiction over it by the courts of the District of

Columbia and agrees that venue shall be proper in the District of Columbia or in the United States District Court for the District of Columbia, in addition to any other court where venue may be proper. The Borrower waives and releases, to the extent permitted by law, all errors and all rights of exemption, appeal, stay of execution, inquisition and extension upon any levy on real estate or personal property to which the Borrower may otherwise be entitled under the laws of the United States of America or of any State or Possession of the United States of America now in force or which may hereafter be passed, as well as the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon the Borrower any right or privilege of exemption, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against the Borrower shall be exercisable concurrently in one or more jurisdictions and shall not be exhausted or extinguished by one or more exercises thereof, or by any imperfect exercise thereof or by any judgment entered pursuant thereto. Such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as the Fannie Mae shall deem necessary or desirable, for all of which this Agreement shall be sufficient warrant.

11.    Rate of Return After Judgment. If judgment is entered against the Borrower on this Note, the amount of the judgment entered (which may include principal, Fannie Mae Return, default return, late charges, fees and costs) shall bear interest at the highest rate of return authorized under this Note as of the date of entry of the judgment.

12.    Expenses of Collection. The Borrower agrees to pay to Fannie Mae on demand (a) all Enforcement Costs paid, incurred or advanced by or on behalf of Fannie Mae, and (b) return on such Enforcement Costs from the date paid, incurred or advanced until paid in full at a per annum rate of return equal at all times to the Default Rate. As used herein, the term "Enforcement Costs" shall mean and include collectively and include all expenses, charges, recordation or other taxes, costs and fees (including reasonable attorneys' fees and expenses) of any nature whatsoever advanced, paid or incurred by or on behalf of Fannie Mae in connection with (i) the collection or enforcement of the Agreement or this Note, (ii) the creation, perfection, maintenance, preservation, defense, protection, realization upon, disposition, collection, sale or enforcement of all or any part of the collateral securing this Note, and (iii) the exercise by Fannie Mae of any rights or remedies available to it under the provisions of the Agreement or this Note.

13.    Waiver of Protest and Trial By Jury. The Borrower, and all parties to this Note, whether maker, indorser, or guarantor, waive presentment, notice of dishonor and protest. The Borrower hereby voluntarily and intentionally waives any right the Borrower may have to a trial by jury in any action, proceeding or litigation directly or indirectly arising out of, under or in connection with this Note, the Agreement or any of the other documents executed and delivered by the Borrower or Fannie Mae in connection therewith. This waiver is knowingly, willingly and voluntarily made by the Borrower and the Borrower hereby represents that no representations of fact or opinion have been made by any individual to induce this waiver and Borrower further represents and warrants that it has been represented in the signing of this Note and in the making of this waiver by independent legal counsel.

14.    <u>Extensions of Maturity</u>.   All parties to this Note, whether maker, indorser, or guarantor, agree that the maturity of this Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party; provided, however, that nothing in this Section 16 shall be construed as entitling Borrower to any such extension.

15.    <u>Waiver</u>.   No waiver of any power, privilege, right or remedy (hereinafter collectively referred to a s "Rights") h ereunder s hall b e e ffective u nless i n w riting.  N o d elay o n t he p art o f Fannie M ae i n e xercising a ny R ights h ereunder, or u nder a ny o ther i nstrument e xecuted by t he Borrower or any other party in connection with the transaction (including the Credit Facility Documents) shall operate as a waiver thereof, and no single or partial exercise of any such Rights (including acceptance of late payments by Fannie Mae) shall preclude other or further exercise thereof, or the exercise of any other Rights.  Waiver by Fannie Mae of any default by the Borrower, or any other party, shall not constitute a waiver of any subsequent defaults, but shall be restricted to the default so waived.  If any provision or part of any provision of this Note shall be contrary to any law which Fannie Mae might seek to apply or enforce, or should otherwise be defective, the other provisions, or part of such provisions, of this Note shall not be affected thereby, but shall continue in full force and effect.  All Rights of Fannie Mae hereunder are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all Rights given hereunder or in or by any other instrument or any laws now existing or hereafter enacted.

16.    <u>Notices</u>.  Any notice or communication given pursuant hereto by either of the parties hereto to the other party hereto shall be in writing and delivered by hand or mailed by first class mail, or by courier, postage prepaid (mailed notices shall be deemed given when duly mailed), as follows:

| | |
|---|---|
| If to the Borrower, to: | Eagle Homes-Prairie Springs, LLC<br>40424 N. Deep Lake Road<br>Antioch, Illinois 60002<br>Attention: Kenneth J. Wisniewski |
| With a copy to: | David Witheft, Esquire<br>Boyle, Cordes, Lwitheft & Brown, LLC<br>301 East Lincoln Highway<br>DeKalb, Illinois 60115 |
| If to Fannie Mae, to: | Fannie Mae<br>3900 Wisconsin Avenue, N.W.<br>Mail Stop 8H-306<br>Washington, DC 20016<br>Attention:     Portfolio Administration<br>American Communities Fund |

# 269226 v3 KMA
010656-0255

5

With a copy to:             General Counsel
Fannie Mae
American Communities Fund
3900 Wisconsin Avenue, N.W.
Mailstop 8H-306
Washington, DC  20016

or to such other address or addresses as hereafter shall be furnished as provided in this Section 19 by either of the parties hereto to the other party hereto in writing.

17.    Choice of Law.  This Note shall be governed, construed and enforced in accordance with the law of the State of Illinois.  The parties agree that personal jurisdiction and venue shall be proper only in the United States District Court for the Northern District of Illinois.

18.    Invalidity of Any Part.  If any provision or part of any provision of this Note, or the application thereof to any facts or circumstances, shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions or the remaining part of any effective provisions of the Note, or the application of any provisions hereof to other facts or circumstances, and this Note shall be construed as if such invalid, illegal, or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

19.    Certification.  It is hereby certified and recited that all conditions, acts, and things required by applicable laws to exist, to have happened or to have been performed precedent to and in connection with incurrence of debt of the Borrower, exist, have happened and have been performed and the indebtedness evidenced hereby is within every debt limitation prescribed by applicable laws.

20.    Amendment and Modification Only.  This Note is an amendment and restatement of the Original Note.  The Borrower hereby ratifies and confirms all of its obligations, liabilities and indebtedness under the provisions of the Original Note as amended and restated by this Note. Fannie Mae and the Borrower agree it is their intention that nothing herein shall be construed to extinguish, r elease o r d ischarge o r c onstitute, c reate o r e ffect a n ovation of, o r a n a greement to extinguish, any of the obligations, indebtedness and liabilities of the Borrower under the provisions of the Original Note, or any assignment or pledge to Fannie Mae of, or any security interest or lien granted to Fannie Mae in or on, any collateral and security for such obligations, indebtedness and liabilities.   Notwithstanding the foregoing, in the event of a conflict between the terms and provisions of the Original Note and this Note, this Note shall govern and take precedence.

[Signature page follows.]

# 269226 v3 KMA
010656-0255

6

**IN WITNESS WHEREOF,** intending to be legally bound hereby, the Borrower has caused this Note to be executed in its name, under its seal and on its behalf by its duly authorized officer, as of the day and year first written above with the intention that it constitutes an instrument under seal.

WITNESS/ATTEST:

BORROWER:

EAGLE HOMES-PRAIRIE SPRINGS, LLC

By _____ (SEAL)
Kenneth J. Wisniewski
Manager of Managing Committee

# EXHIBIT A

Calculation of Internal Rate of Return

Exhibit A - Amended and Restated Promissory Note

Calculation of IRR using Microsoft XIRR Function

| | |
|---|---|
| Average Net Monthly Proceeds to ACF | $  99,108 |
| Absorption Per Month | 4.00 |
| Average ACF Net Proceed per Home | $34,777 |
| Average Price per Home | $191,104 |
| Developer's Avg Price Per Home | $202,025 |
| ACF Discount Per Home | $10,821 |

| | |
|---|---|
| ACF Equity | 1,633,500 |
| Breakeven (Months) | 24 |
| Breakeven - # Closings | 66 |

| | Original | Eaquhow | ACF Base | ACF #2 | ACF #3 |
|---|---|---|---|---|---|
| Base Price | $130,000 | $182,025 | $182,025 | $182,025 | $182,025 |
| Less Discount | 0 | 0 | (10,921) | (10,921) | (22,407) |
| Total Base Price | 130,000 | 182,025 | 171,104 | 171,104 | 159,618 |
| Plus Options | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Average Sales Price | 145,000 | 202,025 | 191,104 | 191,104 | 179,618 |
| ACF Price Offer ($) | | | $10,921 | $10,921 | $22,407 |
| ACF Price Discount | | 6.41% | | | 11.09% |

| Homes | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Closings Per Month | | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| Cumulative Closings | | 4.00 | 8.00 | 12.00 | 16.00 | 20.00 | 24.00 | 28.00 | 32.00 | 36.00 | 40.00 | 44.00 |
| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| Date | 3/3/05 | 4/1/05 | 5/1/05 | 6/1/05 | 7/1/05 | 8/1/05 | 9/1/05 | 10/1/05 | 11/1/05 | 12/1/05 | 1/1/06 | 2/1/06 | 3/1/06 | 4/1/06 | 5/1/06 | 6/1/06 | 7/1/06 | 8/1/06 |
| ACF Accrued at Closing | (109,136) | 0 | 0 | 0 | 0 | 0 | | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 |
| ACF Mezz Debt Amount | (1,933,500) | | | | | | | | | | | | | | | | | |
| Sale Proceeds to ACF | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 |
| Total ACF CF | (1,822,736) | $0 | $0 | $0 | $0 | $0 | $0 | | | | | | | | | | | |

| | |
|---|---|
| IRR | 26.00% |
| Profits | $ 708,818 |
| Net Proceeds | 2,641,558 |

5.41%

| ACF #4 |
|---|
| $182,025 |
| (22,407) |
| 156,618 |
| 20,000 |
| 176,618 |

| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 1.00 | 4.00 | 4.00 |
| | 44.00 | 52.00 | 56.00 | 60.00 | 64.00 | 68.00 | 72.00 | 76.00 | 80.00 | 84.00 | 88.00 | 92.00 | 96.00 | 100.00 | 104.00 | | 108.00 | 113.00 |
| | 9/1/06 | 10/1/06 | 11/1/06 | 12/1/06 | 1/1/07 | 2/1/07 | 3/1/07 | 4/1/07 | 5/1/07 | 6/1/07 | 7/1/07 | 8/1/07 | 9/1/07 | 10/1/07 | 11/1/07 | 12/1/07 | 1/1/08 | 2/1/08 |
| | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | | | |
| | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $4,500 | $0 | $0 |

# EXHIBIT C

862

## AMENDED AND RESTATED
## LOAN AND SECURITY AGREEMENT

      **THIS AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "Agreement") is made this 15th day of March, 2005, by and between **FANNIE MAE**, a corporation organized and existing under the laws of the United States of America, with offices at 3900 Wisconsin Avenue, N.W., Washington, DC 20016 ("Fannie Mae"), and **EAGLE HOMES-PRAIRIE SPRINGS, LLC**, an Illinois limited liability company with its offices located at 303 Main Street, Suite 100, Antioch, Illinois 60002 (the "Borrower").

## RECITALS

      A.    The Borrower and Fannie Mae are parties to that certain Loan and Security Agreement dated November 26, 2003 (the "Original Loan Agreement") and to certain other loan documents referred to therein (together with the Original Loan Agreement, the "Original Credit Facility Documents") pursuant to which Fannie Mae made a credit facility available to the Borrower in the maximum principal amount of One Million Six Hundred Thirty Three Thousand Six Hundred Dollars ($1,633,600) (the "Credit Facility"). The Credit Facility is evidenced by a Promissory Note in the face amount of One Million Six Hundred Thirty Three Thousand Six Hundred Dollars ($1,633,600) dated November 26, 2003 payable by the Borrower to Fannie Mae (the "Original Note"). The outstanding amount of the Credit Facility as of the date hereof is One Million Eight Hundred Twenty Two Thousand Seven Hundred Ninety Dollars ($1,822,790).

      B.    Kenneth J. Wisniewski ("K. Wisniewski"), Lillian F. Wisniewski ("L. Wisniewski") and Eagle Homes, LLC, an Illinois limited liability company ("Eagle Homes") (K. Wisniewski, L. Wisniewski and Eagle Homes are sometimes hereinafter collectively referred to as the "Guarantors") guaranteed the payment and performance of the Credit Facility pursuant to a Guaranty Agreement by the Guarantors for the benefit of Fannie Mae dated November 26, 2003 (the "Guaranty Agreement"). The Guaranty Agreement is attached hereto as Exhibit "C".

      C.    The Borrower and the Guarantors have requested that Fannie Mae modify certain terms and conditions of the Credit Facility, and Fannie Mae has agreed to do so, provided that, among other things, the provisions of the Original Loan Agreement are amended and restated in accordance with the terms of this Agreement.

      D.    The Guarantors are executing and delivering this Agreement to evidence their agreement to comply with the terms, conditions and provisions hereof which are binding upon them and to reaffirm the provisions of the Guaranty Agreement.

      NOW THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Original Loan Agreement shall be **AMENDED AND RESTATED** in its entirety, as of the date hereof, as follows:

# 269443 v3 KMA
010656-0255

# ARTICLE I
## THE CREDIT FACILITY

**1.1    Establishment of the Credit Facility.** Fannie Mae hereby establishes the Credit Facility subject to the terms and conditions of this Agreement and agrees, upon satisfaction by the Borrower of the requirements of Section 3.1 of this Agreement, to make advances (each, an "Advance") to the Borrower for the purposes described in Section 1.4 below. The term of the Credit Facility began on November 26, 2003 and ends on March 31, 2008, provided however the absolute and final maturity date for each Advance shall be as provided in the Note.

**1.2    Note.** The Borrower's obligation to repay the Credit Facility shall be evidenced by an Amended and Restated Promissory Note dated of even date herewith in the form attached hereto as Exhibit "A" (as the same may from time to time be extended, replaced, substituted, amended, restated or otherwise modified, the "Note").

**1.3    Prepayment Permitted.** The Borrower shall have the right to prepay the Note in accordance with the terms of the Note.

**1.4    Use of Credit Facility.** Fannie Mae and the Borrower agree that the Credit Facility shall be used by the Borrower to acquire two (2) parcels of land located in Malta, Illinois and to develop five hundred twelve (512) for-sale units in two (2) phases as follows: "Phase One" shall include approximately 72.57 acres of land as described on Schedule 1 attached hereto and incorporated herein by this reference ("Phase One Land") upon which Borrower shall develop one hundred thirty eight (138) single family detached for-sale homes and "Phase Two" shall include approximately 73 acres of land as described on Schedule 2 attached hereto and incorporated herein by this reference (the "Phase Two Land") upon which Borrower shall develop three hundred seventy four (374) residential units, the product mix and model mix of which are to be determined. The Phase One Land and the Phase Two Land together with improvements constructed thereon shall be collectively referred to herein as the "Property".

**1.5    Placement Fee.** Borrower paid a placement fee (the "Placement Fee") to Fannie Mae in the amount of Twenty-Four Thousand Five Hundred Four Dollars ($24,504) (1.5% of the maximum principal amount of the Credit Facility) upon execution of the Original Loan Agreement.

**1.6    Asset Management Fee.** The Borrower shall pay Fannie Mae, or Fannie Mae's designee, an asset management fee of One Thousand Dollars ($1,000) per calendar month beginning on the date hereof and continuing until all sums due to Fannie Mae under the terms of the Note and this Agreement have been paid in full. Payments of the Asset Management Fee shall be made on the first (1st) day of each calendar month. If the Asset Management Fee is not paid within fifteen (15) days of the applicable payment date, there shall also be due a late charge with respect to such payment in the amount of five percent (5%) of the quarterly amount of such fee until such time as all sums due to Fannie Mae under the terms of this Note and this Agreement have been paid in full.

## ARTICLE II
## SECURITY FOR THE CREDIT FACILITY

**2.1    Collateral.**

(a)    The Credit Facility shall be secured by a pledge of one hundred percent (100%) of the membership interests in the Borrower, in accordance with the terms and conditions of this Article II. Fannie Mae and Borrower hereby expressly agree and acknowledge that Fannie Mae's recourse in respect of Borrower's obligations hereunder and under the Note is a full obligation of the Borrower. The payment of the Credit Facility and the performance of this Agreement, the Note, the Member Interest Pledge Agreement, or any other instrument, document or agreement both now and hereafter executed, delivered or furnished by the Borrower or any Guarantor evidencing, securing or in connection with the terms of this Agreement (hereinafter collectively referred to as the "Credit Facility Documents") by the Borrower are secured by the provisions of, and the property described in that certain Member Interest Pledge and Security Agreement dated of November 26, 2003 herewith by and between Fannie Mae and Eagle Homes, LLC in the form attached hereto as Exhibit "B" (the "Member Interest Pledge Agreement").

(b)    The Credit Facility shall also be secured by a pledge of Borrower's right, title a nd i nterest i n a nd to a ny a nd a ll p ermits, a pprovals, l icenses, t itle i nsurance, b inders o r policies, letters of credit, performance and payment bonds, easements, restrictive covenants, utility connection agreements, site plans, construction contracts, design agreements, plans and specifications and appraisals (collectively, the "Project Documents") by the Borrower pursuant to an Assignment of Project Documents in the form attached hereto as Exhibit "D" (the "Assignment of Project Documents").

(c)    The Borrower and the Guarantors hereby grant, regrant and confirm the grant of all liens and security interest in and to all collateral described in the Original Credit Facility Documents, including but not limited to the Member Interest Pledge Agreement and the Assignment of Project Documents, as collateral and security for the Credit Facility on the terms set forth in the Original Credit Facility Documents.

**2.2    Guaranty.** The payment of the Credit Facility, the performance of this Agreement, the Note and the other Credit Facility Documents by the Borrower and the Completion (as hereinafter defined) of the Project by the Borrower are jointly and severally guaranteed by the Guarantors. The Guarantors hereby reaffirm their guaranty of the Credit Facility on the same terms as provided in the Guaranty Agreement.

## ARTICLE III
## ADVANCES UNDER THE CREDIT FACILITY

**3.1    Conditions Precedent to Phase One Advance.** Section 3.1 of the Original Loan Agreement i s h ereby d eleted i n i ts e ntirety. F annie M ae a nd t he B orrower a cknowledge a nd agree that such conditions have been satisfied.

**3.2    Conditions Precedent to Final Advance.** Fannie Mae shall not make the final advance of the Credit Facility in the amount of Five Hundred Twenty Thousand Dollars ($520,000) (the "Final Advance") unless the following conditions have been satisfied in a manner acceptable to Fannie Mae:

(a)    Deliveries.    Delivery to Fannie Mae of the following items:

(i)    copies of all loan documents evidencing, securing or otherwise executed in connection with the $7,600,000 acquisition and development loan (the "A&D Loan") from American National Bank (the "Construction Lender") and the $2,500,000 revolving construction loan (the "Construction Loan") from the Construction Lender (the A&D Loan and the Construction Loan are collectively referred to as the "American National Loans");

(ii)    evidence that Borrower has made a minimum equity contribution for Phase Two in the amount of One Hundred Thirty Thousand Dollars ($130,000), which amount shall not be reimbursed from the American National Loans;

(iii)    2004 annual financial statements evidencing a combined net worth of the Guarantors exceeding $15,000,000;

(iv)    final development budget for Phase One that has been reviewed and approved by Fannie Mae;

(v)    copies of title insurance policies insuring both Phase One and Phase Two together with a Mezzanine Financing Endorsement and copies of all exception documents and ALTA surveys for Phase One and Phase Two;

(vi)    evidence that the site plan has been approved by all necessary governmental authorities and that all necessary approvals have been obtained to construct three hundred seventy four (374) residential units on the Phase Two Land;

(vii)    satisfactory evidence that the Property (including both Phase One and Phase Two) is zoned for the intended use and has received all of the necessary approvals from the applicable jurisdictions and other related agencies and adequate assurances that such zoning (including variances), subdivision maps, and other land use entitlements and other permits and/or authorizations (including, but not limited to, water and sewer availability) that may be necessary to permit the intended development and construction of the Project and, as and when required, will be received by Borrower;

(viii)    original key-person life insurance policy in the amount of $1,633,600 upon the life of K. Wisniewski;

(ix)    one (1) original of the Intercreditor Agreement between Fannie Mae and the Construction Lender in the form of Exhibit "F" attached hereto;

(x)    copies of all permits required to develop the on-site and off-site infrastructure associated with the A&D Loan; and

(xi)    such other information as shall be reasonably requested by Fannie Mae.

(b)    No Default.  There shall be no Event of Default which has occurred and is continuing under this Agreement or the Note, under the American National Loans or Borrower's operating agreement, nor shall there exist any event or condition which with the giving or notice of the passage of time would constitute an Event of Default.

(c)    Covenants and Conditions.  The Borrower shall be in compliance with all of the terms, covenants and conditions of this Agreement which are binding upon it.

3.3    Intentionally deleted.

3.4    Intentionally deleted.

3.5    **Repayment.**  Repayment of a portion or all of the Credit Facility by the Borrower shall be made in accordance with the terms of the Note directly into Fannie Mae's account by bank wire transfer or by mail pursuant to the following instructions:

> FNMA/NYC
> ABA No. 021 039 500
> GR371 ($1,633,600 loan from FNMA ACF/Debt to Eagle Home-Prairie Springs, LLC)
> Attn:    HCDFunds@MFAS

By Mail:

> Fannie Mae
> 3900 Wisconsin Avenue, N.W.
> Mail Stop: 11H-905
> Washington, DC 20016
> Attn: Tymika Luckey

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to Fannie Mae that:

4.1    **Organization and Powers**.  The Borrower is a limited liability company, and is duly organized, validly existing and in good standing under the laws of the State of Illinois (the "State").  The Borrower has the power and authority to own its assets and properties, to carry on its activities as now conducted by it, to execute, deliver and perform this Agreement, the Note and the other Credit Facility Documents and to borrow under the Credit Facility Documents.  The

Borrower is not in default under any provisions of the laws of the State which would affect its existence or the powers referred to in this Section 4.1.

**4.2    Authorization; Binding Agreement**. The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note and the borrowing under this Agreement have been duly authorized by all requisite organizational action. Upon execution and delivery by the Borrower, this Agreement and the Note will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or other similar laws of general application or equitable principles relating to or affecting the enforcement of creditors' rights from time to time in effect. All conditions acts and things required by applicable laws to exist, to have happened or to have been performed precedent to and in connection with the incurrence of debt by the Borrower exist, have happened and have been performed, and the indebtedness evidenced hereby is within every debt limitation prescribed by applicable laws.

**4.3    Litigation**. Except for any matters set forth on Exhibit "F" attached hereto, there is no action, suit or proceeding pending or threatened before any court or government or administrative body or agency which may reasonably be expected to (a) result in a material adverse change in the activities, operations, assets or properties or in the condition, financial or otherwise, of the Borrower, or (b) impair the ability of the Borrower to perform its obligations under this Agreement and the Note. The Borrower is not in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or any governmental or administrative body or agency. There is no action, suit or proceeding pending or threatened, challenging the validity of the Note or this Agreement.

**4.4    No Conflicts**. The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note and the borrowing hereunder will not violate any provision of law, any order, rule or regulation of any court or governmental or regulatory body, or any provision of law creating or governing the Borrower, or any indenture or deed of trust, agreement or instrument to which the Borrower is a party or to which the Borrower or its assets or properties are bound, or conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any such indenture or deed of trust, agreement or instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of the Borrower, except as otherwise permitted, required or contemplated by this Agreement.

**4.5    No Default or Event of Default**. The Borrower is in compliance with all of the terms and provisions set forth in this Agreement on its part to be observed or performed, and no Event of Default specified in Article VI, or any event which upon notice or lapse of time or both would constitute any such Event of Default, has occurred and is continuing.

**4.6    Financial Condition**. Eagle Homes, LLC has heretofore furnished to Fannie Mae a balance sheet of the Borrower's financial position, activities and cash flows for each of the three (3) preceding fiscal years of Eagle Homes, LLC then ended, audited by an accounting firm acceptable

to Fannie Mae in its sole discretion. Such financial statements and all other financial statements and information furnished or to be furnished to Fannie Mae hereunder have been and will be prepared in accordance with generally accepted accounting principles and fairly present the financial condition of Eagle Homes, LLC as of the dates thereof and the results of Eagle Homes, LLC operations for the periods covered thereby. No material adverse change in the business, financial condition, prospects or operations of Eagle Homes, LLC has occurred since the date of such financial statements.

   **4.7** **Title to Properties**. The Borrower has good and marketable title to all of the Borrower's assets and properties, including, without limitation, any assets described in Article II (the "Collateral Assets") and the Property, such Collateral Assets and the Property are subject to no liens, security interests or other encumbrances except for those of Fannie Mae, the Construction Lender, or those expressly permitted by the provisions of this Agreement.

   **4.8** **Accuracy of Information**. No information, exhibit, report, statement, certificate or document furnished by the Borrower or any other person to Fannie Mae in connection with the Credit Facility, this Agreement or the negotiation thereof contains any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained herein or therein not misleading.

## ARTICLE V
## COVENANTS OF THE BORROWER

   The Borrower covenants and agrees that, so long as this Agreement shall remain in effect or the Note shall be unpaid, unless Fannie Mae shall otherwise consent in writing, the Borrower will:

   **5.1** **Use of Proceeds; Source of Repayment of the Credit Facility**. Use the proceeds of the Credit Facility solely and exclusively for the purposes set forth in Section 1.4 of this Agreement. No Fannie Mae Foundation grants, loans, investments or other financial assistance of any kind will be used to repay, or facilitate the repayment of, the Credit Facility.

   **5.2** **Payment of Obligations**. Punctually pay the principal of and interest on or the Fannie Mae Return (as defined in the Note), as applicable, the Credit Facility and any other fees due hereunder at the times and places, in the manner and in accordance with the terms of this Agreement, the Note and any other document executed in connection with the Credit Facility.

   **5.3** **Corporate Existence**. Do or cause to be done all things necessary to maintain its corporate or other organizational existence as an Illinois limited liability company, and comply in all material respects with all laws and regulations applicable to it.

   **5.4** **Payment of Indebtedness and Taxes**. Pay all of its indebtedness and obligations promptly and in accordance with their respective terms, file or cause to be filed all federal, state and local tax or information returns, if any, which are required to be filed by it and pay and discharge or cause to be paid and discharged promptly any taxes or assessments and governmental charges or levies, if any, imposed upon it or upon its income or profits, or upon

any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a lien o r c harge u pon s uch p roperty, o r a ny p art t hereof; provided, however, t hat t he B orrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings.

**5.5**   **Financial Statements**. Furnish, or cause to be furnished, to Fannie Mae within sixty (60) days after the end of each calendar year, an audited balance sheet as of the end of such fiscal year and the related statements of support, revenue, expenses and changes in balance and statements of changes in financial position of the Borrower, which shall be certified by an independent public accountant selected by the Borrower and acceptable to Fannie Mae.

**5.6**   **Notification of Default Under the Credit Facility or the American National Loans**. Notify Fannie Mae in writing of any event or circumstance which constitutes (or, with notice or lapse of time or both, would constitute) an Event of Default hereunder or under either of the American National Loans within three (3) business days after the Borrower has knowledge of such event or circumstance.

**5.7**   **Actions, Suits or Proceedings**. Within thirty (30) business days after the commencement of any action, suit or proceeding which could have a material adverse effect on the business, operations, properties, programs, projects or condition (financial or otherwise) of the Borrower or on the ability of the Borrower to perform its obligations under this Agreement or the Note, provide written notice to Fannie Mae of such action, suit or proceeding.

**5.8**   **Other Information**. With reasonable promptness, provide Fannie Mae with such other information respecting the business, operations, properties, programs, projects (including the Acceptable Projects) or condition (financial or otherwise) of the Borrower as Fannie Mae may reasonably request from time to time; provided, however, in no event shall such information be delivered to Fannie Mae later than ninety (90) days after the end of each fiscal year of the Borrower.

**5.9**   **Compliance with Laws**. Comply with all laws, orders, rules or regulations of any court, governmental or regulatory body applicable to the Borrower or its properties.

**5.10**   **Keeping of Books and Records/Examination**.

(a)   Keep proper books of records and accounts, containing complete and accurate entries of all financial and business transactions relating to the business, operations, properties, programs, projects or condition (financial or otherwise) of the Borrower in conformity with generally accepted accounting principles and all requirements of any laws, rules or regulations applicable to the Borrower.

(b)   Permit any representative of Fannie Mae to examine the books and records of the Borrower relating to the Credit Facility and to make copies and take extracts therefrom,

and to discuss the condition (financial or otherwise) or prospects of the Borrower with the authorized staff of the Borrower and independent public accountants thereof, all at such reasonable times during normal business hours upon reasonable notice and as often as Fannie Mae may reasonably request.

     **5.11**  **Contractual Obligations.** Comply with any agreement or undertaking to which the Borrower is a party and maintain in full force and effect all contracts and leases to which the Borrower is or becomes a party unless the failure to do so would not have a material adverse effect on the business, operation, properties or financial condition of the Borrower.

     **5.12**  **American National Loan Reports.** Furnish, or cause to be furnished, to Fannie Mae a copy of each borrowing base report, draw request compliance certificate or any other certificate or report within five (5) days of submission of such report to the Construction Lender. Each of the foregoing reporting requirements shall be satisfactory to Fannie Mae in both form and substance.

     **5.13**  **Monthly Project Status Reports.** Furnish, or cause to be furnished, to Fannie Mae, the following reports within thirty (30) days of the end of each calendar month:

        (a)   a sales report identifying the current number of reservations of homes, the current number of executed purchase agreements for Housing Units and the total number of Housing Units sold as of the date of the report;

        (b)   a budget deviation report comparing the project budget previously submitted to and approved by Fannie Mae to the current projected development budget, inclusive of then-current expenditures;

        (c)   a sales proceeds forecast identifying the monthly cash flow projections for the Project, the anticipated construction schedule, the absorbtion schedule and the projected net cash flow to be collected by the Borrower during (i) the upcoming calendar quarter and (ii) the remaining term of the Credit Facility;

        (d)   as required in connection with the development and construction of the Project and/or upon requested by Fannie Mae, furnish or cause to be furnished to Fannie Mae updated budgets, searches and sales and marketing plans related to the Project.

     **5.14**  **Publicity.** Cooperate with Fannie Mae with respect to any publicity relating to the Credit Facility or any Acceptable Project and Borrower shall not schedule any publicity-related events relating thereto without prior written notice to Fannie Mae. Borrower shall offer Fannie Mae the opportunity to participate in any such publicity-related events. If requested by Fannie Mae, Borrower, at Fannie Mae's cost and expense, shall erect and maintain on a suitable location at the site during the construction of the Acceptable Project a sign indicating that financing for the Acceptable Project is being provided by Fannie Mae, the location and content of which sign shall be subject to the approval of Fannie Mae. Borrower shall not disclose to any third parties or to the public the terms of this Agreement or any other information related to the Credit Facility without Fannie Mae's prior written consent. Borrower shall not use the terms

"Fannie Mae", "American Communities Fund", "ACF" or any combination thereof without Fannie Mae's prior written consent.

**5.15    No Further Encumbrances of Borrower's Property; No Additional Debt; No Sale.** The Borrower shall not hereafter mortgage, assign, convey, sell, lease, pledge or otherwise dispose of or encumber its interest in the Property or any other security or collateral granted by the Borrower to Fannie Mae pursuant to the terms and conditions hereof, or any part thereof, or the income stream therefrom, or permit any such action or similar action to be taken except (a) with respect to the first priority liens on the Property in favor of the Construction Lender and (b) in the normal course of sales of homes within the Project to third party buyers. The Borrower shall not hereafter incur any debt, whether secured or unsecured, except for the American National Loans and the Credit Facility, including, without limitation, any line of credit or additional debt from the Construction Lender, without the prior written consent of Fannie Mae which will not be unreasonably withheld, conditioned or delayed.

**5.16    Further Assurances.** Upon request by Fannie Mae, the Borrower and/or each Guarantor shall do (or cause to be done) any act or execute (or cause to be executed) any additional documents (including, but not limited to, security agreements and financing statements on the Collateral Assets [as defined in the Member Interest Pledge Agreement]) as may be reasonably required by Fannie Mae to confirm the lien and security interest of the Member Interest Pledge Agreement or any other Credit Facility Documents.

**5.17    Fees.** The Borrower shall pay all reasonable costs, charges, taxes and other expenses incurred by Fannie Mae in connection with making the Credit Facility whether or not the loan closes, including, without limitation, fees of Fannie Mae's legal counsel.

**5.18    Financial Statements of Guarantors.** Within sixty (60) days of the end of each calendar year, furnish, or cause to be furnished to Fannie Mae, personal financial statements for each Guarantor certified by such Guarantor as accurate.

**5.19    GC/Overhead Fee.** Borrower shall be entitled to an overhead fee in the amount of Nine Thousand Dollars ($9,000) per home constructed on the Property (the "GC/Overhead Fee"). The G/C Overhead Fee for each home shall be paid in three (3) equal draws from the Construction Lender (two (2) draws during construction and one (1) upon completion).

**5.20    Sale of Homes.** Within seven (7) days of closing, the sale of any home to a third-party buyer, Borrower shall deliver, or shall cause the Construction Lender to deliver to Fannie Mae a copy of the HUD-1 Settlement Statement executed in connection with the sale of such home. All payments due under the Note shall be included on HUD-1 Settlement Statements and shall be paid to Fannie Mae as part of the settlement of each home.

**5.21    Key Person Insurance.** The Borrower shall maintain, at the Borrower's expense, "Key Person" life insurance naming the Borrower as beneficiary, insuring Kenneth J. Wisniewski in the amount of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600).

**5.22    Appraisal of Unit Models.**  The Borrower shall deliver to Fannie Mae an appraisal for each model unit type in the Project acceptable to Fannie Mae in its sole discretion within one hundred eighty (180) days of the date of this Agreement.

**5.23    Constructability Review.**  The Borrower shall deliver to Fannie Mae copies of all budgets, construction contracts, plans and specifications, engineering and soils reports to be reviewed by a consultant engaged by Fannie Mae.  Fannie Mae may, at its option, engage a consultant to complete a constructability analysis of the Project, including infrastructure and vertical construction, in which event Borrower shall cooperate fully in completing such constructability analysis.

## ARTICLE VI
## EVENTS OF DEFAULT

**6.1    Events of Default.** The following events shall constitute Events of Default under this Agreement:

(a)    the failure by Borrower to make any payment of principal and Fannie Mae Return and any other sums due hereunder or under the Note when due and payable and on the stated maturity date, or by declaration or acceleration or otherwise, including, without limitation, the failure by Borrower to make any payment of the Placement Fee or Asset Management Fee;

(b)    the failure by the Borrower to perform the covenants in Sections 5.20, 5.22 or 5.23 within the time periods set forth therein;

(c)    other than those referred to in paragraph (a) above, default shall be made in the due observance or performance of any covenant, condition or agreement contained in any of the Credit Facility Documents, and such default shall not have been cured within ten (10) days after notice by Fannie Mae to the Borrower of such default;

(d)    the occurrence of any default or Event of Default under any documents executed, delivered or furnished by the Borrower or Guarantors, evidencing, securing or in connection with either of the American National Loans, after the expiration of applicable grace or cure periods;

(e)    any representation or warranty made in writing by or on behalf of the Borrower herein or pursuant hereto shall have been incorrect in any material respect on the date as of which it was made;

(f)    the Borrower shall (i) cease operations; (ii) apply for or consent to the appointment of a custodian, receiver, trustee or liquidator for it or for all or a substantial part of its assets or properties; (iii) generally not pay its debts as they become due or admit in writing its inability to pay its debts as they become due; (iv) make an assignment for the benefit of creditors; or (v) file a petition commencing a voluntary case under any chapter of the Bankruptcy Code, 11 U.S.C. Section 101, et seq., or a petition seeking for itself any reorganization or arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of

debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law; or corporation action shall be taken by the Borrower for the purpose of effecting any of the foregoing;

(g)     an order for relief, judgment or decree against the Borrower or any Guarantor shall be entered by any court of competent jurisdiction approving a petition seeking reorganization, arrangement, readjustment, dissolution or liquidation of all or a substantial part of the Borrower's or either Guarantor's assets or properties, or appointing a custodian, receiver, trustee or liquidator for the Borrower or any Guarantor, and such order, judgment or decree shall continue unsatisfied and in effect for a period of sixty (60) consecutive days without a stay of execution;

(h)     the entry of a judgment in excess of $10,000 against the Borrower or any Guarantor and the failure to satisfy such judgment within thirty (30) days (either by payment or by the filing of a supersedeas bond), unless such judgment has been appealed in good faith and the legal effect of such appeal is to stay the obligation or to satisfy such judgment until the resolution of the appeal;

(i)     the misapplication, misappropriation or other use not expressly permitted hereunder of the proceeds of the Credit Facility by the Borrower or any Guarantor;

(j)     the occurrence of any change in the financial condition of the Borrower or Guarantors which, in the good faith judgment of Fannie Mae, is materially adverse, and any such change is not cured to the satisfaction of Fannie Mae within thirty (30) days after the date of written notice thereof by Fannie Mae to the Borrower;

(k)     suspension of construction for more than fifteen (15) days, unless the cause of such suspension is out of the control of the Borrower, in which case a suspension for more than forty-five (45) days shall constitute an Event of Default;

(l)     any material modification of the Project Documents without the prior consent of Fannie Mae; and

(m)     the occurrence of cost overruns based on the budget approved by Fannie Mae for Phase One and the failure of the Guarantors to cover such costs.

6.2     **Remedies on Occurrence of an Event of Default**. If any Event of Default shall occur, Fannie Mae may exercise all or any of the following remedies:

(a)     Fannie Mae may, by written notice to the Borrower, declare the entire outstanding balance of the Note, together with Fannie Mae Return and all other charges authorized hereunder, to be immediately due and payable, whether or not the indebtedness evidenced by the Note shall be otherwise due and payable and whether or not Fannie Mae shall have initiated any other action for the enforcement of the Note, and whereupon the Note shall become immediately due and payable pursuant to its terms, as to principal, Fannie Mae Return

and any other amounts payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower; and/or

(b)     Fannie Mae may protect and enforce its rights by any appropriate proceedings, judicial or otherwise, including, in appropriate cases, seeking an award for specific performance or other equitable remedy in aid of the exercise of power granted in or pursuant to this Agreement, the Member Interest Pledge Agreement and the other Credit Facility Documents; and/or

(c)     Fannie Mae may exercise any other remedy available to it pursuant to applicable law and/or principles of equity.

6.3    **Payment of Enforcement Costs**. The Borrower agrees to pay to Fannie Mae on demand (a) all Enforcement Costs paid, incurred or advanced by or on behalf of Fannie Mae, and (b) return on such Enforcement Costs from the date paid, incurred or advanced until paid in full at a per annum rate of interest equal at all times to the Default Rate (as defined in the Note). As used herein, the term "Enforcement Costs" shall mean and include collectively and include all actual expenses, charges, recordation or other taxes, costs and fees (including reasonable attorneys' fees and expenses) of any nature whatsoever advanced, paid or incurred by or on behalf of Fannie Mae in connection with (i) the collection or enforcement of this Agreement or the Note, (ii) the creation, perfection, maintenance, preservation, defense, protection, realization upon, disposition, collection, sale or enforcement of all or any part of the collateral securing the Note, and (iii) the exercise by Fannie Mae of any rights or remedies available to it under the provisions of this Agreement or the Note.

## ARTICLE VII
## MISCELLANEOUS

7.1    **Entire Agreement**. This Agreement and the Exhibits annexed hereto constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements or understandings, written or oral, in respect thereof, and, except as provided for herein as the result of an Event of Default, shall not be terminated, extended, amended or modified in any fashion except by instrument in writing signed by both parties. The Exhibits annexed hereto are incorporated in and made a part of this Agreement.

7.2    **Notices**. Any notice or communication given pursuant hereto by either of the parties hereto to the other party hereto shall be in writing and delivered by hand or mailed by first class mail, or by courier, postage prepaid (mailed notices shall be deemed given when duly mailed), as follows:

If to the Borrower, to:

                    Eagle Homes-Prairie Springs, LLC
                    303 Main Street
                    Suite 100
                    Antioch, Illinois 60002
                    Attention: Kenneth J. Wisniewski

With a copy to:      David Witheft, Esquire
                    Boyle, Cordes, Witheft & Brown, LLC
                    301 East Lincoln Highway
                    DeKalb, Illinois 60115

If to Fannie Mae, to:  Fannie Mae
                    3900 Wisconsin Avenue, N.W.
                    Mail Stop 8H-306
                    Washington, DC 20016
                    Attention:     Portfolio Administration
                                      American Communities Fund

With a copy to:      General Counsel
                    American Communities Fund
                    Fannie Mae
                    3900 Wisconsin Avenue, N.W.
                    Washington, DC  20016

or to such other address or addresses as hereafter shall be furnished as provided in this Section 7.2 by either of the parties hereto to the other party hereto in writing.

       7.3    **Waiver; Remedies**. No delay on the part of either party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of either party hereto of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege under this Agreement nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege under this Agreement.

       7.4    **No Assignment**. The Borrower may not assign all or any portion of its rights under this Agreement without the prior written consent of Fannie Mae.

       7.5    **Captions**. All Article and Section titles or captions contained in this Agreement are for convenience only and shall not be deemed a part of this Agreement.

       7.6    **Variation of Pronouns**. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

**7.7**   **Counterparts**. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement, and either party hereto may execute this Agreement by signing one or more counterparts thereof.

**7.8**   **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely within the State of Illinois. The parties agree that personal jurisdiction and venue shall be proper only in the United States District Court for the Northern District of Illinois.

**7.9**   **Severability**. In case any one or more provisions contained in this Agreement or the other Credit Facility Documents should be deemed invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein or therein shall in no way be affected or impaired thereby and shall be enforceable to the maximum extent permitted by law.

**8.0**   **No Novation**. This Amended and Restated Loan and Security Agreement is only an amendment and restatement of the Original Loan Agreement. It is the Borrower's and Guarantors' intention that nothing herein contained shall be construed to extinguish, release or discharge, or constitute, c reate o r e ffect a n ovation o f, o r an a greement t o e xtinguish, any o f t he o bligations, indebtedness and liabilities of the Borrower or the Guarantors under the provisions of the Original Loan Agreement and the Original Credit Facility Documents, including, without limitation, the Guaranty Agreement, as such documents were in effect until the date hereof. Notwithstanding the foregoing, in the event of a conflict between the terms and provisions of the Original Credit Facility Documents and this Amended and Restated Loan and Security Agreement, this Amended and Restated Loan and Security Agreement and the other Credit Facility Documents shall govern and take precedence.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the day and year first above written.

WITNESS:                                    **EAGLE HOMES-PRAIRIE SPRINGS, LLC**

By: _____ (SEAL)
                                            Kenneth J. Wisniewski,
                                            Manager of Managing Committee


                                            **FANNIE MAE**


_____          By: _____ (SEAL)
                                            Name: _____
                                            Title: _____


                                            Acknowledged and Agreed:


                                            EAGLE HOMES, LLC


                                            By: _____
                                            Kenneth J. Wisniewski,
                                            Managing Member


                                            _____
                                            Kenneth J. Wisniewski


                                            _____
                                            ~~Linda~~ Wisniewski
                                            LILLIAN F

# 269443 v3 KMA
010656-0255                                         16

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the day and year first above written.

WITNESS:                              EAGLE HOMES-PRAIRIE SPRINGS, LLC


_____        By: _____(SEAL)
                                     Kenneth J. Wisniewski,
                                     Manager of Managing Committee


                                FANNIE MAE

                                By: _____(SEAL)
                                    Name: _____
                                    Title: _____


                                Acknowledged and Agreed:

                                EAGLE HOMES, LLC


_____        By: _____
                                    Kenneth J. Wisniewski,
                                    Managing Member


_____        _____
                                Kenneth J. Wisniewski


_____        _____
                                Linda Wisniewski


# 269443 v3 KMA
010656-0255                          16

## LIST OF EXHIBITS

Exhibit "A" – Amended and Restated Promissory Note

Exhibit "B" – Member Interest Pledge Agreement

Exhibit "C" – Guaranty Agreement

Exhibit "D" – Form of Assignment of Project Documents

Exhibit "E" – List of Pending Litigation

Exhibit "F" – Form of Intercreditor Agreement

Exhibit "G" – Insurance Requirements

Exhibit "H" – Environmental Indemnification Agreement

Schedule 1 – Phase One Land

Schedule 2 – Phase Two Land

**EXHIBIT A**

AMENDED AND RESTATED PROMISSORY NOTE

See Attached

<u>**AMENDED AND RESTATED PROMISSORY NOTE**</u>

**THIS AMENDED AND RESTATED PROMISSORY NOTE** (this "Note") is made as of March 15, 2005 by EAGLE HOMES – PRAIRIE SPRINGS, LLC, an Illinois limited liability company (the "Borrower").

**RECITALS**

A.   Pursuant to that certain Loan and Security Agreement between the Borrower and Fannie Mae, a corporation organized and existing under the laws of the United States of America ("Fannie Mae") dated as of November 26, 2003 (the "Original Loan Agreement"), as amended and restated pursuant to the terms of that certain Amended and Restated Loan and Security Agreement dated of even date herewith (the "Agreement"), the Borrower issued to Fannie Mae its Promissory Note in the original principal amount of One Million Six Hundred Thirty Three Thousand Six Hundred Dollars ($1,633,600) dated as of November 26, 2003 (the "Original Note"). As of the date hereof, Fannie Mae advanced the principal amount of One Million Eight Hundred Twenty Two Thousand Seven Hundred Ninety Dollars ($1,822,790) to the Borrower.

B.   The Borrower has requested that Fannie Mae modify the Original Note, and Fannie Mae has agreed to, provided that Borrower executes and delivers, among other documents, this Amended and Restated Promissory Note.

**AGREEMENTS**

**NOW, THEREFORE,** in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower agrees that as of the date hereof the Original Note shall be **AMENDED AND RESTATED IN ITS ENTIRETY AS FOLLOWS:**

<u>**PROMISSORY NOTE**</u>

**March 18, 2005**                                                                                    **$1,822,790**

**FOR VALUE RECEIVED,** the undersigned (the "Borrower") promises to pay to the order of **FANNIE MAE,** a corporation organized and existing under the laws of the United States of America ("Fannie Mae"), at 3900 Wisconsin Avenue, N.W., Washington, DC 20016, or at such other place in the United States of America as Fannie Mae may designate, the principal sum of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600), or so much of the principal sum as may have been advanced from time to time hereafter by Fannie Mae on behalf of the Borrower under the terms and conditions of a Loan and Security Agreement dated November 26, 2003 by and between Fannie Mae and the Borrower, as amended and restated by that certain Amended and Restated Loan and Security Agreement dated of even date herewith by and between Fannie Mae, the Borrower and certain guarantors dated of even date herewith (collectively, the "Agreement"), together with such amounts necessary to provide an internal rate of return to Fannie Mae at the rate hereinafter provided, and any and all other sums which may be owing to the holder of this Note by the Borrower, on the applicable final and absolute maturity date hereinafter

# 269226 v3 KMA
010656-0255

described, or on such earlier date specified by Fannie Mae if this Note is accelerated pursuant to Section 11 hereof. The following terms shall apply to this Note.

1.    Repayment.  Beginning with the first sale of a residential unit constructed on the Property, one hundred percent (100%) of Net Sales Process shall be paid to Fannie Mae until such time as the principal amount of this Note has been repaid to Fannie Mae together with such amount necessary for Fannie Mae to realize an Internal Rate of Return (as defined below) of twenty six percent (26%) on such principal amount (the "Fannie Mae Return"). The term "Net Sales Proceeds" shall mean the purchase price of each residential unit shown on the HUD-1 settlement statement less (a) a release price payable to American National Bank (the "Construction Lender") in the amount of Forty Thousand Dollars ($40,000) per residential unit, (b) one hundred percent (100%) of costs funded by Construction Lender according to the Sworn Cost Statement for such residential unit and sales commissions owed by Borrower in connection with the sale of such residential unit, which in no event shall exceed one hundred seven percent (107%) of the originally-budgeted cost attributable to such residential unit, (c) the GC/Overhead Fee (as defined in the Agreement), and (d) Construction Lender's processing fee in the amount of One Hundred Fifty Dollars ($150.00).  The final and absolute maturity date of this Note is March 31, 2008.

2.    Calculation of Internal Rate of Return.  The Internal Rate of Return is the annual discount rate that results in a net present value equal to zero (0) when the discount rate is applied to all advances made by Fannie Mae to Borrower pursuant to the Agreement and this Note.  The Internal Rate of Return shall be calculated (with all distributions and Capital Contributions being deemed made on the first (1st) day of the month when actually made), using the methodology used in the Microsoft EXCEL software (and its "XIRR" Function or its equivalent).  An example of the calculation of the Internal Rate of Return is attached hereto as Exhibit A.

3.    Application of Payments; Manner of Payment.  All payments made hereunder shall be applied first to Enforcement Costs and late charges or other sums owing to the holder of this Note including, but not limited to any unpaid placement, asset management, legal and due diligence fees, next to accrued Fannie Mae Return, and then to principal. All amounts payable hereunder shall be paid in lawful money of the United States of America in immediately available funds, without deduction, set-off, defense or counterclaim, not later than 2:00 p.m. (District of Columbia time) on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day) by wire transfer or by mail pursuant to the following instructions:

If by wire transfer:    FNMA/NYC
                        ABA No. 021 039 500
                        GR371 ($1,633,600 Loan from FNMA ACF to Eagle Homes-
                        Prairie Springs, LLC)
                        ATTN:  HCDFunds@MFAS

If by mail:        Fannie Mae
                   3900 Wisconsin Avenue, N.W.
                   Mail Stop: 11H-905
                   Washington, D.C. 20016
                   Attention: Tymika Luckey

    4.    <u>Optional Prepayment</u>.  The Borrower may prepay this Note at any time after September 30, 2006 in whole or in part.

    5.    <u>Late Payment Charge</u>.  Should any payment of Fannie Mae Return, or principal and Fannie Mae Return, due hereunder be received by the holder of this Note more than fifteen (15) days after its due date, the Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due to the extent not paid as and when due until paid in full.

    6.    <u>Asset Management Fee</u>.  The B orrower s hall p ay Fannie M ae, o r F annie M ae's designee, an asset management fee (the "Asset Management Fee") of One Thousand Dollars ($1,000) per calendar month beginning on the date hereof and continuing until all sums due to Fannie Mae under the terms of this Note have been paid in full.  Payments of the Asset Management Fee shall be made on first (1st) day of each calendar month.  If the Asset Management Fee is not paid within fifteen (15) days of the applicable payment date, there shall also be due a late charge with respect to such payment in the amount of five percent (5%) of the quarterly amount of such fee until such time as all sums due to Fannie Mae under the terms of this Note have been paid in full.

    7.    <u>Security for the Note</u>.  This Note is secured as provided in the Agreement.

    8.    <u>Acceleration Upon Default</u>.  At any time after a default in the payment of any installment of Fannie Mae Return or of principal and Fannie Mae Return, or in the payment of any other sums due hereunder within fifteen (15) days after the due date, or upon the occurrence of an Event of Default as defined in the Agreement, Fannie Mae may, in Fannie Mae's sole and absolute discretion and without notice or demand (unless otherwise specifically required under an applicable Credit Facility Document), declare the entire unpaid balance of principal plus accrued Fannie Mae Return and any other sums due hereunder immediately due and payable.

    9.    <u>Default Return Rate</u>.  At any time after a default in the payment of any installment of Fannie Mae Return, or of principal and Fannie Mae Return, or in the payment of any other sums due hereunder within thirty (30) days after the due date, or upon the occurrence of any Event of Default as defined in the Agreement and continuing until such Event of Default is cured to Fannie Mae's satisfaction, the rate of the Fannie Mae Return accruing on the disbursed unpaid principal balance shall automatically, and without any action or notice by Fannie Mae, be increased by three (3) percentage points above the rate of Fannie Mae Return otherwise applicable (the "Default Rate"), independent of whether Fannie Mae elects to accelerate the unpaid principal balance as a result of such default.

    10.    <u>Jurisdiction and Venue</u>.  In any action brought by Fannie Mae under this Note, Borrower consents to the exercise of personal jurisdiction over it by the courts of the District of

# 269226 v3 KMA
010656-0255

Columbia and agrees that venue shall be proper in the District of Columbia or in the United States District Court for the D istrict of C olumbia, in a ddition to a ny o ther c ourt w here v enue m ay b e proper. The Borrower waives and releases, to the extent permitted by law, all errors and all rights of exemption, appeal, stay of execution, inquisition a nd extension upon any levy on real estate or personal property to which the Borrower may otherwise be entitled under the laws of the United States of America or of any State or Possession of the United States of America now in force or which may hereafter be passed, as well as the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon the Borrower any right or privilege of exemption, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against the Borrower shall be exercisable concurrently in one or more jurisdictions and shall not be exhausted or extinguished by one or more exercises thereof, or by any imperfect exercise thereof or by any judgment entered pursuant thereto. Such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as the Fannie Mae shall deem necessary or desirable, for all of which this Agreement shall be sufficient warrant.

11.    Rate of Return After Judgment.  If judgment is entered against the Borrower on this Note, the amount of the judgment entered (which may include principal, Fannie Mae Return, default return, late charges, fees and costs) shall bear interest at the highest rate of return authorized under this Note as of the date of entry of the judgment.

12.    Expenses of Collection. The Borrower agrees to pay to Fannie Mae on demand (a) all Enforcement Costs paid, incurred or advanced by or on behalf of Fannie Mae, and (b) return on such Enforcement Costs from the date paid, incurred or advanced until paid in full at a per annum rate of return equal at all times to the Default Rate. As used herein, the term "Enforcement Costs" shall mean and include collectively and include all expenses, charges, recordation or other taxes, costs and fees (including reasonable attorneys' fees and expenses) of any nature whatsoever advanced, paid or incurred by or on behalf of Fannie Mae in connection with (i) the collection or enforcement of the Agreement or this Note, (ii) the creation, perfection, maintenance, preservation, defense, protection, realization upon, disposition, collection, sale or enforcement of all or any part of the collateral securing this Note, and (iii) the exercise by Fannie Mae of any rights or remedies available to it under the provisions of the Agreement or this Note.

13.    Waiver of Protest and Trial By Jury.  The Borrower, and all parties to this Note, whether maker, i ndorser, or guarantor, waive presentment, notice of dishonor and protest. The Borrower hereby voluntarily and intentionally waives any right the Borrower may have to a trial by jury in any action, proceeding or litigation directly or indirectly arising out of, under or in connection with this Note, the Agreement or any of the other documents executed and delivered by the B orrower o r F annie Mae i n c onnection t herewith. T his w aiver i s k nowingly, w illingly and voluntarily made by the Borrower and the Borrower hereby represents that no representations of fact or opinion have been made by any individual to induce this waiver and Borrower further represents and warrants that it has been represented in the signing of this Note and in the making of this waiver by independent legal counsel.

14.    <u>Extensions of Maturity</u>.  All parties to this Note, whether maker, indorser, or guarantor, agree that the maturity of this Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party; provided, however, that nothing in this Section 16 shall be construed as entitling Borrower to any such extension.

15.    <u>Waiver</u>.  No waiver of any power, privilege, right or remedy (hereinafter collectively referred t o a s "Rights") h ereunder s hall b e e ffective u nless i n w riting.  N o d elay o n t he p art of Fannie M ae i n e xercising a ny R ights h ereunder, or u nder a ny o ther i nstrument e xecuted by t he Borrower or any other party in connection with the transaction (including the Credit Facility Documents) shall operate as a waiver thereof, and no single or partial exercise of any such Rights (including acceptance of late payments by Fannie Mae) shall preclude other or further exercise thereof, or the exercise of any other Rights.  Waiver by Fannie Mae of any default by the Borrower, or any other party, shall not constitute a waiver of any subsequent defaults, but shall be restricted to the default so waived.  If any provision or part of any provision of this Note shall be contrary to any law which Fannie Mae might seek to apply or enforce, or should otherwise be defective, the other provisions, or part of such provisions, of this Note shall not be affected thereby, but shall continue in full force and effect.  All Rights of Fannie Mae hereunder are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all Rights given hereunder or in or by any other instrument or any laws now existing or hereafter enacted.

16.    <u>Notices</u>.  Any notice or communication given pursuant hereto by either of the parties hereto to the other party hereto shall be in writing and delivered by hand or mailed by first class mail, or by courier, postage prepaid (mailed notices shall be deemed given when duly mailed), as follows:

| | |
|---|---|
| If to the Borrower, to: | Eagle Homes-Prairie Springs, LLC |
| | 40424 N. Deep Lake Road |
| | Antioch, Illinois 60002 |
| | Attention: Kenneth J. Wisniewski |
| | |
| With a copy to: | David Witheft, Esquire |
| | Boyle, Cordes, Lwitheft & Brown, LLC |
| | 301 East Lincoln Highway |
| | DeKalb, Illinois 60115 |
| | |
| If to Fannie Mae, to: | Fannie Mae |
| | 3900 Wisconsin Avenue, N.W. |
| | Mail Stop 8H-306 |
| | Washington, DC 20016 |
| | Attention:      Portfolio Administration |
| | American Communities Fund |

# 269226 v3 KMA
010656-0255

5

With a copy to:          General Counsel
                         Fannie Mae
                         American Communities Fund
                         3900 Wisconsin Avenue, N.W.
                         Mailstop 8H-306
                         Washington, DC 20016

or to such other address or addresses as hereafter shall be furnished as provided in this Section 19 by either of the parties hereto to the other party hereto in writing.

17.   Choice of Law.  This Note shall be governed, construed and enforced in accordance with the law of the State of Illinois.  The parties agree that personal jurisdiction and venue shall be proper only in the United States District Court for the Northern District of Illinois.

18.   Invalidity of Any Part.  If any provision or part of any provision of this Note, or the application thereof to any facts or circumstances, shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions or the remaining part of any effective provisions of the Note, or the application of any provisions hereof to other facts or circumstances, and this Note shall be construed as if such invalid, illegal, or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

19.   Certification.  It is hereby certified and recited that all conditions, acts, and things required by applicable laws to exist, to have happened or to have been performed precedent to and in connection with incurrence of debt of the Borrower, exist, have happened and have been performed and the indebtedness evidenced hereby is within every debt limitation prescribed by applicable laws.

20.   Amendment and Modification Only.  This Note is an amendment and restatement of the Original Note.  The Borrower hereby ratifies and confirms all of its obligations, liabilities and indebtedness under the provisions of the Original Note as amended and restated by this Note. Fannie Mae and the Borrower agree it is their intention that nothing herein shall be construed to extinguish, r elease o r d ischarge o r c onstitute, c reate o r e ffect a n ovation of, o r a n a greement to extinguish, any of the obligations, indebtedness and liabilities of the Borrower under the provisions of the Original Note, or any assignment or pledge to Fannie Mae of, or any security interest or lien granted to Fannie Mae in or on, any collateral and security for such obligations, indebtedness and liabilities.  Notwithstanding the foregoing, in the event of a conflict between the terms and provisions of the Original Note and this Note, this Note shall govern and take precedence.

[Signature page follows.]

**IN WITNESS WHEREOF,** intending to be legally bound hereby, the Borrower has caused this Note to be executed in its name, under its seal and on its behalf by its duly authorized officer, as of the day and year first written above with the intention that it constitutes an instrument under seal.

WITNESS/ATTEST:                    BORROWER:

                                   EAGLE HOMES-PRAIRIE SPRINGS, LLC

_____ By_____(SEAL)
                                   Kenneth J. Wisniewski
                                   Manager of Managing Committee

**EXHIBIT A**

Calculation of Internal Rate of Return

Exhibit A - Amended and Restated Promissory Note

Calculation of IRR using Microsoft XIRR Function

| ACF BASE CASE ASSUMPTIONS | |
|---|---|
| Average Net Monthly Proceeds to ACF | $ 99,108 |
| Absorption Per Month | 4.00 |
| Average ACF Net Proceed per Home | $24,777 |
| Average Price per Home | $191,104 |
| Developer's Avg Price Per Home | $202,026 |
| ACF Discount Per Home | $10,921 |

| | |
|---|---|
| ACF Equity | 1,833,000 |
| Breakeven (Months) | 24 |
| Breakeven - # Closings | 66 |

5.41%

| | Original | ExpelNew | ACF Base | ACF #2 | ACF #1 |
|---|---|---|---|---|---|
| Base Price | $130,000 | $182,025 | $182,025 | $182,025 | $182,025 |
| Less Discount | 0 | 0 | (10,921) | (10,921) | (22,407) |
| Total Base Price | 130,000 | 182,025 | 171,104 | 171,104 | 159,618 |
| Plus Options | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Average Sales Price | 145,000 | 202,025 | 191,104 | 191,104 | 179,618 |
| ACF Price Offer ($$) | | | (10,921) | (10,921) | ($22,407) |
| ACF Price Discount | | | 5.41% | | 11.09% |

Notes

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 5/2005 | 4/05 | 5/05 | 6/05 | 7/05 | 8/05 | 9/05 | 10/1/05 | 11/1/05 | 12/1/05 | 1/1/05 | 2/1/05 | 3/1/06 | 4/1/06 | 5/1/06 | 6/1/06 | 7/1/06 | 8/1/06 |

| Closings Per Month | | | | | | | | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| Cumulative Closings | | | | | | | | 4.00 | 8.00 | 12.00 | 16.00 | 20.00 | 24.00 | 28.00 | 32.00 | 36.00 | 40.00 | 44.00 |

| ACF Accrued at Closing | (191,190) | | | | | | | 0 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 |
| ACF Mezz Debt Amount | (1,633,000) | | | | | | | 0 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 |
| Sale Proceed to ACF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | |
| Total ACF CF | (1,822,790) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 |

| IRR | 26.00% |
|---|---|
| Profits | $ 798,518 |
| Net Proceeds | 2,561,308 |

Restated and Amended Note - Exhibit A - IRR - Final.xls

| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9/1/06 | 10/1/06 | 11/1/06 | 12/1/06 | 1/1/07 | 2/1/07 | 3/1/07 | 4/1/07 | 5/1/07 | 6/1/07 | 7/1/07 | 8/1/07 | 9/1/07 | 10/1/07 | 11/1/07 | 12/1/07 | 1/1/08 | 2/1/08 |
| | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 1.00 | 4.00 | 4.00 |
| | 48.00 | 52.00 | 56.00 | 60.00 | 64.00 | 68.00 | 72.00 | 76.00 | 80.00 | 84.00 | 88.00 | 92.00 | 96.00 | 100.00 | 104.00 | | 108.00 | 113.00 |
| | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 99,108 | 4,500 | | |
| | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $99,108 | $4,500 | $0 | $0 |

ACF #4
$1,182,025
(22,407)
150,618
20,000
170,618

**EXHIBIT B**

MEMBER INTEREST PLEDGE AND SECURITY AGREEMENT

See Attached

## MEMBER INTEREST PLEDGE AND SECURITY AGREEMENT

**THIS MEMBER INTEREST PLEDGE AND SECURITY AGREEMENT** (this "Agreement") is made this 26 day of November, 2003, by and between **EAGLE HOMES, LLC,** an Illinois limited liability company ("Pledgor") and **FANNIE MAE,** a corporation organized and existing under the laws of the United States of America ("Fannie Mae").

RECITALS

Fannie Mae and Eagle Homes-Prairie Springs, LLC, an Illinois limited liability company (the "Company") have entered into a Loan and Security Agreement dated the date hereof (which Loan and Security Agreement, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified is herein called the "Loan Agreement").

In order to induce Fannie Mae to enter into the Loan Agreement, Pledgor has agreed to pledge and grant to Fannie Mae a continuing security interest in and to the Collateral (as hereafter defined) to secure the payment of the Obligations (as hereinafter defined) and the performance of the Loan Agreement, the Guaranty and the other Credit Facility Documents.

AGREEMENTS

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Pledgor and Fannie Mae agree as follows:

ARTICLE I

DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 1.1. Definitions. All capitalized terms which are not specifically defined in this Agreement shall have the meanings assigned to such terms in the Loan Agreement. In addition, the *terms defined in the Preamble and Recitals hereto shall have the respective meanings specified* therein, and the following terms shall have the following meanings:

"Collateral" has the meaning set forth in Section 2.1.

"Company" means Eagle Homes-Prairie Springs, LLC, an Illinois limited liability company.

"Credit Facility Documents" means collectively and includes this Agreement, the Loan Agreement, the Guaranty, the Assignment of Project Documents and any other instrument, document or agreement included in the "Credit Facility Documents" as such term is defined and described in the Loan Agreement.

#229413 v3 NJP
010656-0181

"Default" means an event which, with the giving of notice or the lapse of time, or both, could or would constitute an Event of Default under the provisions of this Agreement.

"Enforcement Costs" means any and all funds, costs, expenses and charges of any nature whatsoever (including, without limitation, attorney's fees and expenses) advanced, paid or incurred by or on behalf of Fannie Mae under or in connection with the administration or enforcement of this Agreement, including, without limitation, (a) the compliance of the Pledgor with any covenant, warranty, representation or agreement of the Pledgor made in or pursuant to this Agreement or any of the other Credit Facility Documents, and (b) the exercise, preservation, maintenance, protection, operation, management, enforcement, collection, sale or other disposition of, or realization upon, this Agreement, all or any part of the Collateral and the rights and remedies of Fannie Mae hereunder, under applicable law and otherwise.

"Event of Default" has the meaning set forth in Article V.

"Guaranty" means the Guaranty Agreement dated of even date herewith to Fannie Mae from Eagles Homes, LLC, Kenneth J. Wisniewski and Lillian F. Wisniewski, as such Guaranty Agreement may from time to time thereafter be amended, restated, supplemented or otherwise modified.

"Lien" means any pledge, security interest, assignment, encumbrance, judgment, lien, claim or charge of any kind in, on, of or in respect of, any asset or property or any rights to any asset or property, including, without limitation, the filing of, or any agreement to give, any financing statement relating to any such asset or property under the Uniform Commercial Code of any jurisdiction, including any option to purchase and any right of first refusal.

"Member Interests" means member interests in the Company, both now and hereafter existing, and any and all rights, powers and remedies resulting from, or in connection with, such member interests, including, without limitation, all rights, powers and remedies of any nature under or by reason of the Operating Agreement, and all claims, causes of action and rights of suit resulting therefrom, or in connection therewith and, all of the Company's right, title and interest in and to all of its assets including but not limited to one hundred percent (100%) of the member interests of the Borrower.

"Obligations" means all past, present and future indebtedness, liabilities, and obligations of the Company, the Pledgor and/or any other Person to Fannie Mae of any kind, nature or description whatsoever under, arising as a result of, pursuant to, and/or in connection with, the provisions of this Agreement, the Loan Agreement and/or any of the other Credit Facility Documents, including, without limitation, (a) such indebtedness, liabilities, and obligations of the Company to Fannie Mae which consist of principal, interest, fees, late charges, attorneys' fees, Enforcement Costs, collection costs, due or to become due, future advances, direct, indirect, primary, secondary, joint, several, joint and several, fixed or contingent, liquidated or unliquidated, regardless of how they arise or by what agreement or instrument they may be evidenced or whether they are evidenced by any agreement or instrument, and whether incurred as maker, endorser, surety, guarantor or otherwise, (b) any and all renewals, extensions, and rearrangements of any such indebtedness, liabilities, and

obligations, and (c) the "Guaranteed Obligations" of the Pledgor as such term is defined in the Guaranty.

"Operating Agreement" means the Operating Agreement of Eagle Homes-Prairie Springs, LLC dated as of August 4, 2003, and all amendments thereto and restatements thereof.

"Permitted Liens" means the Liens on the Collateral in favor of Fannie Mae.

"Person" means and includes an individual, a corporation, a company, a partnership, a joint venture, a limited liability company, a trust, an unincorporated association, a government or political subdivision or agency thereof, or any other entity.

"Pledged Member Interests" has the meaning set forth in Section 2.1(a).

"Records" shall have the meaning ascribed to it in the UCC and shall include all agreements, books, ledgers, instruments, correspondence, memoranda or other documents comprising, covering or relating to the Collateral.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Illinois.

SECTION 1.2.  Rules of Construction.  Unless otherwise defined herein, all terms used herein which are defined by the UCC shall have the same meanings as are assigned to them by the UCC unless and to the extent varied by this Agreement.  The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule, and exhibit references are references to sections or subsections of, or schedules or exhibits to, as the case may be, this Agreement unless otherwise specified.  As used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders, as the context may require.

ARTICLE II

THE COLLATERAL

SECTION 2.1.  The Pledge and Grant.  In order to secure (a) the full and punctual payment when due of the Obligations in accordance with the terms thereof, and (b) the performance of this Agreement and the other Credit Facility Documents, each Person comprising the Pledgor hereby transfers, pledges, assigns and conveys to Fannie Mae, and hereby grants to Fannie Mae a continuing security interest in and lien on all of the following property of each such Pledgor, both now owned and existing and hereafter created, acquired or arising (all such property being herein collectively referred to as the "Collateral") and all right, title and interest of each such Pledgor in and to the Collateral:

(a)    such Pledgor's Member Interests in the Company and any additional Member Interests and other equity interests in the Company obtained by such Pledgor in the future (the "Pledged Member Interests").

(b)    all monies and/or property (including, without limitation, general intangibles, accounts (including payment intangibles), documents, instruments, investment property, commercial tort claims, and chattel paper) due or to become due to such Pledgor under or in connection with the Pledged Member Interests, including, without limitation, (i) any income, bonuses, profits or fees, (ii) any distribution of cash or property, including, without limitation, any and all distributions of cash flow and profits, (iii) any return of capital contributions, (iv) any proceeds resulting from the refinancing, sale or other disposition of all or any part of the assets or property of the Company, (v) any cash or property resulting from the dissolution, termination, winding up, and/or liquidation of the Company, and (vi) any other right to receive monies and/or property on account of, or in connection with, the interests of such Pledgor as a member of the Company;

(c)    all cash and non-cash proceeds and products of the Collateral described in clauses (a) and (b) above, together with all substitutions, replacements and renewals thereof; and

(d)    all Records relating or pertaining to the Collateral described in clauses (a), (b) and (c) above.

SECTION 2.2.    Pledge and Security Interest for Security Only.    The pledge and security interest granted hereby are intended as security only and shall not subject Fannie Mae to, or transfer or in any way affect or modify, any obligation or liability of any Person comprising the Pledgor with respect to any of the Collateral or any transaction in connection therewith.

SECTION 2.3.    Delivery and Possession of Collateral.    Except as otherwise expressly permitted herein, all certificates, if any, for the Pledged Member Interests, distributions, cash, property and securities comprising part of the Collateral shall be promptly delivered to Fannie Mae, accompanied by proper instruments of assignment substantially in the form attached hereto as Exhibit 2.3 duly executed and endorsed by the applicable Pledgor and by such other instruments or documents as Fannie Mae may reasonably request sufficient to transfer the title thereto to Fannie Mae or its nominee. Fannie Mae is hereby authorized to hold any and all of the Collateral delivered to it in the name of Fannie Mae or at its option to cause such items to be transferred to and held in the name of a nominee.

SECTION 2.4.    Voting Rights, Distributions; Etc.

(a)    So long as no Default shall have occurred and be continuing:

(i)    The Pledgor shall have the right, from time to time, and for any purpose not inconsistent with the Credit Facility Documents and this Agreement, to exercise all voting and ownership rights with respect to the Pledged Member Interests and to consent to or ratify action taken at, or waive notice of, any meeting of, or action taken by, members of the Company with the same force and effect as if such Pledged Member Interests were not pledged hereunder, provided

*however*, that such action would not materially and adversely affect the rights or remedies of Fannie Mae hereunder;

(ii)    Fannie Mae shall, from time to time upon written request of the Pledgor, give any necessary waivers of notice, consents and powers of attorney or proxies necessary to enable the Pledgor to exercise any of the foregoing rights;

(iii)    The Pledgor shall be entitled to receive, retain and use any and all distributions paid on the Collateral to the extent and only to the extent that such distributions are permitted by, and otherwise paid in accordance with, the terms and conditions of the Loan Agreement and applicable laws; and

(iv)    The Pledgor shall be entitled to exercise any subscription or conversion privileges accruing as the owner of the Pledged Member Interests, to the extent permitted in the other Credit Facility Documents, provided that any additional interests obtained or purchased on account of any such subscription or conversion privileges shall be subject to this Agreement and shall constitute part of the Collateral.

(b)    Upon the occurrence and during the continuance of a Default, all rights of the Pledgor to receive and retain distributions which the Pledgor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.4 shall cease, and all such rights shall thereupon become vested in Fannie Mae, which shall have the sole and exclusive right and authority to receive and retain such distribution payments.    All distributions which are received by the Pledgor contrary to the provisions of this Section 2.4 shall be received in trust for the benefit of Fannie Mae, shall be segregated from other property or funds of the Pledgor and shall be forthwith delivered to Fannie Mae in the same form as so received (with any necessary endorsement which the Pledgor agrees to make).    Any and all money and other property paid over to or received by Fannie Mae pursuant to the provisions of this subparagraph (b) shall be retained by Fannie Mae in an account to be established by Fannie Mae upon receipt of such money or other property and shall be applied to the Obligations in accordance with the provisions of Section 6.2 hereof.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Pledgor represents and warrants to Fannie Mae that the following statements are true, correct and complete:

SECTION 3.1.    Title and Authority.    The Pledgor is the owner of the Collateral and has good and marketable title to the Collateral.    The Pledgor has full power and authority to pledge, and/or grant the security interest in, the Collateral to Fannie Mae pursuant hereto and to execute, deliver and perform the obligations of the Pledgor in accordance with the terms of this Agreement without the consent or approval of any Person other than any consent or approval which has been obtained and provided to Fannie Mae.    The Collateral is free and clear of any Liens except for Permitted Liens.    The security interest granted by the Pledgor to Fannie Mae pursuant to this Agreement is a first priority and indefeasible security interest in the Collateral.

SECTION 3.2.  The Company.  The Company is a limited  liability company duly organized and existing under the laws of the State of Illinois.  The Lien on the Collateral granted to Fannie Mae hereby does not contravene any of the provisions of the Operating Agreement, and no consent or approvals of any member of the Company or any other Person are required in connection herewith or if required have been obtained and provided to Fannie Mae.  The principal office and principal place of business of the Company is located in Lake County, Illinois.  Upon the transfer of the Pledged Member Interests or other Collateral, or any portion thereof, to the Lender, its designee or any other party pursuant to this Agreement, the Company shall continue in existence and the Operating Agreement provides for such continuance.

SECTION 3.3.  The Pledged Member Interests.  The Collateral pledged hereunder represents, in the aggregate, one hundred percent (100%) of the Member Interests as of the date hereof.  There are no agreements for the issuance of (a) any additional Member Interests; (b) any securities convertible voluntarily by the holder thereof or automatically upon the occurrence or nonoccurrence of any event or condition into, or exchangeable for, any Member Interests; or (c) any warrants, options, rights, or other commitments entitling any person to purchase or otherwise acquire any Member Interests.  The Collateral is not subject to any voting trust agreement or other agreement relating to the ownership or voting control of the Collateral.  The Pledged Member Interests have been duly and validly authorized and issued by the Company and are fully paid and non-assessable.  There are no certificates, instruments, or documents evidencing any of the Pledged Member Interest.

SECTION 3.4.  Pledgor's Principal Place of Business.  Pledgor is a "registered organization", as defined in Section 9-102 of the UCC and the location of Pledgor is the State of Illinois.  Pledgor's organization identification number, as referred to in Section 9-516 of the UCC is 00192708. The correct legal name of Pledgor is that specified on the signature page of this Agreement and Pledgor has not conducted business under any other legal name within the last twelve (12) years.

SECTION 3.5.  Perfected Security Interest.  Upon the filing of financing statements and the delivery of the Collateral, Fannie Mae will have a valid, enforceable and perfected first priority security interest in the Collateral.

ARTICLE IV

COVENANTS OF PLEDGOR

The Pledgor covenants and agrees with Fannie Mae as follows:

SECTION 4.1.  Title, Liens and Taxes.  The Pledgor shall, at the cost and expense of the Pledgor, take any and all such actions necessary to defend such Pledgor's title to the Collateral against all Persons and against any adverse Lien of any nature whatsoever except Permitted Liens and to defend the Lien of Fannie Mae in the Collateral and the priority (or intended priority) thereof. Except to the extent contested in good faith, the Pledgor will pay all taxes and assessments levied or

placed on the Collateral prior to the date when any interest or penalty would accrue for the nonpayment thereof.

SECTION 4.2. <u>Further Assurances</u>. The Pledgor will defend title to the Collateral against all Persons and will, upon request of Fannie Mae, (a) furnish such further assurances of title as may be required by Fannie Mae, and (b) deliver and execute or cause to be delivered and executed, in form and content satisfactory to Fannie Mae, any assignment, security agreement, or other document as Fannie Mae may request in order to perfect, preserve, maintain, or continue the perfection of Fannie Mae's security interest in the Collateral and/or its priority. The Pledgor will pay to Fannie Mae on demand by Fannie Mae the costs of preparing and filing any financing, continuation or termination statement as well as any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such statement. The Pledgor hereby covenants to save harmless and indemnify Fannie Mae from and against any liability resulting from the failure to pay any required documentary stamps, recordation and transfer taxes and recording costs incurred by Fannie Mae in connection with this Agreement or the Collateral which covenant shall survive the termination of this Agreement and the payment of all other Obligations. The Pledgor hereby authorizes Fannie Mae at any time and from time to time to file in any appropriate filing office any initial financing statements and amendments thereto and continuations thereof covering the Collateral and any additional collateral for the Obligations. The Pledgor shall not file any amendments, corrections statements or termination statements concerning the Collateral or any additional collateral for the Obligations without the prior written consent of Fannie Mae. The Pledgor authorizes Fannie Mae to request other secured parties of the Pledgor to provide accountings, confirmations of collateral and confirmations of statements of account concerning any Pledgor. The Pledgor hereby designates and appoints Fannie Mae and its designees as attorney-in-fact of the Pledgor, irrevocably and with power of substitution, with authority to endorse any Pledgor's name on requests to other secured parties of such Pledgor for accountings, confirmations of collateral and confirmations of statements of account made pursuant to Section 9-210 of the UCC. Upon request of Fannie Mae, the Pledgor shall deliver to Fannie Mae all evidence of their ownership of the Collateral as may be required by Fannie Mae. The Pledgor will immediately give written notice to Fannie Mae of (a) any event which affects the value of the Collateral or the ability of such Pledgor or of Fannie Mae to dispose of the Collateral, or the rights and remedies of Fannie Mae in relation thereto, including but not limited to, the levy of any legal process against the Collateral and the adoption of any order, arrangement or procedure affecting the Collateral, whether governmental or otherwise, and (b) any actions, suits, or proceedings pending, or to the Pledgor's knowledge, threatened, against such Pledgor, the Pledgor's property or against the Company, which may, either in any one case or in the aggregate, materially adversely affect the Collateral. The Pledgor shall also immediately give written notice to Fannie Mae of any change in such Pledgor's location or the location of the principal place of business of the Company.

SECTION 4.3. <u>Transfer and other Liens</u>. The Pledgor will not sell, assign, contract for sale, transfer, exchange, grant a security interest in, or otherwise encumber or dispose of the Collateral, or any part thereof, without the prior written consent of Fannie Mae. The Pledgor will not permit any Lien (other than Permitted Liens) to attach to the Collateral, or any part thereof.

SECTION 4.4. <u>Records</u>. The Pledgor will (a) at all times maintain, in accordance with generally accepted accounting principles, consistently applied, accurate and complete Records, and

(b) at all reasonable times and without hindrance or delay, permit Fannie Mae or any person designated by Fannie Mae to enter any places of business of the Pledgor or any other premises where any Records may be kept and to examine, audit, inspect, and make extracts from and photocopies of any such Records.

SECTION 4.5. Company Affairs, etc. The Pledgor will perform, observe and carry out all of the provisions of the Operating Agreement to be performed, observed and carried out by the Pledgor. The Pledgor will not consent to or approve of any material amendments or changes to the Operating Agreement without the prior written approval of Fannie Mae. The Pledgor will promptly furnish to Fannie Mae such information concerning the operations, business, affairs and financial condition of the Company as Fannie Mae may reasonably request. The Pledgor will immediately, upon obtaining knowledge thereof, give written notice to Fannie Mae of (a) any default by the Company in the payment or performance of any instrument or agreement relating to any indebtedness or liabilities of the Company, the effect of which is to cause or permit the holder or holders of such indebtedness or liabilities to cause, with the giving of notice or lapse of time or both, if applicable, such indebtedness or liabilities to become due and payable prior to stated or scheduled maturity, and (b) any sale or other disposition of any or a substantial part of the property and assets of the Company.

SECTION 4.6. Indemnification. The Pledgor agrees to indemnify Fannie Mae against, and hold it harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by or asserted against it arising out of, in any way connected with, or as a result of, the execution, delivery or performance of this Agreement or any claim, litigation, investigation or proceeding relating hereto or to the Collateral, whether or not Fannie Mae is a party thereto; provided, however, that such indemnity shall not be available to the extent that such losses, claims, damages, liabilities or related expenses have resulted from the gross negligence or willful misconduct of Fannie Mae.

ARTICLE V

EVENTS OF DEFAULT

The term "Event of Default" shall mean, whenever it is used in this Agreement, any one or more of the following events (and the term "Default" shall mean, whenever it is used in this Agreement, any one or more of the following events, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied):

SECTION 5.1. Payment of Obligations. If any of the Obligations are not paid as and when due and payable in accordance with the provisions of this Agreement, the Guaranty, the Loan Agreement and/or any of the other Credit Facility Documents after giving effect to any applicable cure or grace periods, if any;

SECTION 5.2. Perform, etc. Certain Provisions of this Agreement. The failure of the Pledgor to perform, observe or comply with any of the provisions of Sections 4.3 and 4.4 of this Agreement;

SECTION 5.3.  Perform, etc. Other Provisions of This Agreement.  The failure of any Person comprising the Pledgor to perform, observe or comply with any of the provisions of this Agreement other than those covered by Sections 5.1 and 5.2 above, and, such failure is not cured to the satisfaction of the  Fannie Mae within a period of thirty (30) days after the date of written notice thereof by Fannie Mae to the Pledgor;

SECTION 5.4.  Representations and Warranties.  If any representation and warranty contained herein or any statement or representation made in any officer's certificate or any other information at any time given by or on behalf of the Pledgor or furnished in connection with this Agreement or any of the other Credit Facility Documents shall prove to be false or incorrect in any material respect on the date as of which made;

SECTION 5.5.  Default under Other Credit Facility Documents.  The failure of any of the Pledgor or Borrower to perform, observe or comply with any of the provisions of the Guaranty any of the Credit Facility Documents to which the Pledgor is a party and such failure is not cured within applicable cure or grace periods, if any, or if a "Default" (as defined and described therein) occurs under the provisions of the  Loan Agreement or the Guaranty or any of the other Credit Facility Documents which is not cured within applicable cure or grace periods, if any;

SECTION 5.6.  Liquidation, Termination, Dissolution, etc.  If the Pledgor shall liquidate, dissolve or terminate its existence or any change occurs in the ownership or control of the Pledgor without the prior written consent of Fannie Mae;

SECTION 5.7.  Inability to Pay Debts, etc.  If the Pledgor shall admit the inability to pay its debts as they mature or shall make any assignment for the benefit of any of its creditors;

SECTION 5.8.  Bankruptcy.  If proceedings in bankruptcy, or for reorganization of any Person comprising the Pledgor, or for the readjustment of any debts of the Pledgor, under the Bankruptcy Code, as amended, or any part thereof, or under any other applicable laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced against or by the Pledgor and, except with respect to any such proceedings instituted by the Pledgor, shall not be discharged within thirty (30) days of their commencement;

SECTION 5.9.  Receiver, etc.  A receiver or trustee shall be appointed for the Pledgor or for any substantial part of the assets of the Pledgor, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of the Pledgor and, except with respect to any such appointments requested or instituted by the Pledgor, such receiver or trustee shall not be discharged within thirty (30) days of his or her appointment, and, except with respect to any such proceedings instituted by the Pledgor, such proceedings shall not be discharged within thirty (30) days of their commencement.

ARTICLE VI

RIGHTS AND REMEDIES

SECTION 6.1. <u>Rights and Remedies of Fannie Mae</u>. Upon and after the occurrence of an Event of Default, Fannie Mae may, without notice or demand other than expressly provided for under the provisions of this Agreement, exercise in any jurisdiction in which enforcement hereof is sought, the following rights and remedies, in addition to the rights and remedies available to Fannie Mae under the other provisions of this Agreement and the other Credit Facility Documents, the rights and remedies of a secured party under the UCC and all other rights and remedies available to Fannie Mae under applicable law, all such rights and remedies being cumulative and enforceable alternatively, successively or concurrently:

(a)     Fannie Mae may sell the Collateral, or any part thereof, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as Fannie Mae shall deem appropriate, and at such price or prices satisfactory to Fannie Mae. Fannie Mae shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers of any of the Collateral to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale Fannie Mae shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any of the Pledgor, and the Pledgor hereby waives all rights of redemption, stay, valuation and appraisal which each such Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

Fannie Mae shall give the Pledgor ten (10) days written notice (which the Pledgor agrees is reasonable notice within the meaning of the UCC) of Fannie Mae's intention to make any sale or other disposition of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange and, in the case of a private sale or other disposition, shall state the date after which such sale or other disposition may be made. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Fannie Mae may fix and state in the notice of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as Fannie Mae may (in its sole and absolute discretion) determine. Fannie Mae shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. Fannie Mae may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Fannie Mae until the sale price is paid in full by the purchaser or purchasers thereof, but Fannie Mae shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public sale made pursuant to this Section 6.1, Fannie Mae may bid for or purchase, free from any right of redemption, stay or appraisal on the part of the Pledgor (all of such rights being also hereby waived and released by such Pledgor), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to

Fannie Mae from the Pledgor as a credit against the purchase price, and Fannie Mae may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Pledgor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof and Fannie Mae shall be free to carry out such sale pursuant to such agreement, and the Pledgor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after Fannie Mae shall have entered into such an agreement all Events of Default or Defaults shall have been remedied and the Obligations paid in full.

The Pledgor acknowledges that compliance with applicable federal and state securities laws (including, without limitation, the Securities Act of 1933, as amended, Blue Sky or other state securities laws or similar laws now or hereafter existing analogous in purpose or effect) might very strictly limit or restrict the course of conduct of Fannie Mae if Fannie Mae were to attempt to sell or otherwise dispose of all or any part of the Collateral which is comprised of securities, and might also limit or restrict the extent to which or the manner in which any subsequent transferee of any such securities could sell or dispose of the same. The Pledgor further acknowledges that under applicable laws, Fannie Mae may be held to have certain general duties and obligations to the Pledgor, as pledgor of the Collateral, to make some effort toward obtaining a fair price for the Collateral even though the Obligations may be discharged or reduced by the proceeds of sale at a lesser price. The Pledgor understands and agrees that Fannie Mae is not to have any such general duty or obligation to the Pledgor, and the Pledgor will not attempt to hold Fannie Mae responsible for selling all or any part of the Collateral comprised of securities at an inadequate price even if Fannie Mae shall accept the first offer received or does not approach more than one possible purchaser. Without limiting their generality, the foregoing provisions would apply if, for example, Fannie Mae were to place all or any part of such securities for private placement by an investment banking firm, or if such investment banking firm purchased all or any part of such securities for its own account, or if Fannie Mae placed all or any part of such securities privately with a purchaser or purchasers.

(b)     As an alternative to exercising the power of sale herein conferred upon it, Fannie Mae may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver.

(c)     In conjunction with any sale of all or any part of the Collateral which is comprised of securities, the Pledgor (i) will, at any time and from time to time, upon the request of Fannie Mae, use its best efforts to take or cause the issuer of such securities to take such action and prepare, distribute and/or file such documents and papers, as are required or advisable in the opinion of Fannie Mae and/or its counsel to permit the sale of such securities whether at public sale, private sale or otherwise, (ii) will use its best efforts to qualify, file or register, or cause the issuer of such securities to qualify, file or register, any of such securities under federal and state securities laws and regulations (including, without limitation, the Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission and state Blue Sky or other securities laws) as may be requested by Fannie Mae, and to keep effective, or cause to be kept effective, all such qualifications, filings or registrations, (iii) agrees to hold harmless, indemnify and defend Fannie Mae and any underwriter from and against all loss, liability, expenses, costs, fees, disbursements

(including, without limitation, the fees and disbursements of Fannie Mae's legal counsel) and claims which may be incurred insofar as such loss, liability, expense or claim arises out of or is based upon any alleged untrue statement of a material fact contained in any prospectus (or any amendment or supplement thereto) or in any notification or offering circular, or arises out of or is based upon any alleged omission to state a material fact required to be stated therein or necessary to make the statements in any thereof not misleading but except to the extent that any such loss, liability, expense or claim may have been caused by any untrue statement or omission based upon information furnished in writing to the Pledgor or the issuer of such securities by Fannie Mae or any underwriter expressly for use therein, (iv) will bear all costs and expenses of carrying out its obligations under this subsection which shall be a part of the Enforcement Costs and the Obligations secured hereby, and (v) acknowledges that there is no adequate remedy at law for the failure by the Pledgor to comply with the provisions of this subsection and that such failure would not be adequately compensable in damages, and therefore agrees that the joint and several agreements of the Pledgor contained in this subsection may be specifically enforced against the Pledgor.

(d)     Upon the occurrence of an Event of Default, Fannie Mae shall have the right but not the obligation, to exercise all voting rights of the Pledgor in the Company, all without liability of any kind to Fannie Mae except to account for any property actually received by Fannie Mae. Fannie Mae shall have no duty to exercise any of the aforesaid rights and shall not be responsible for any failure to do so or delay in so doing.

SECTION 6.2. <u>Application</u>. The proceeds of collection, sale or other disposition of all or any part of the Collateral coming into Fannie Mae's possession may be applied by Fannie Mae to any of the Obligations, whether matured or unmatured, in such order and manner as Fannie Mae may determine in its sole discretion.

SECTION 6.3. <u>No Waiver, Etc.</u> No failure or delay by Fannie Mae to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement or of the other Credit Facility Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant or agreement or of any such breach, or preclude Fannie Mae from exercising any such right, power or remedy at any later time or times. By accepting payment after the due date of any amount payable under this Agreement or under any of the other Credit Facility Documents, Fannie Mae shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement or under any of the other Credit Facility Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount. The payment by the Pledgor, the Company or any other Person and the acceptance by Fannie Mae or any other amount due and payable under the provisions of this Agreement or the other Credit Facility Documents at any time during which an Event of Default exists shall not in any way or manner be construed as a waiver of such Event of Default by Fannie Mae or preclude Fannie Mae from exercising any right of power or remedy consequent upon such Event of Default.

ARTICLE VII

MISCELLANEOUS

SECTION 7.1.  Course of Dealing; Amendment.  No course of dealing between Fannie Mae and the Pledgor shall be effective to amend, modify or change any provision of this Agreement or the other Credit Facility Documents.  Fannie Mae shall have the right at all times to enforce the provisions of this Agreement and the other Credit Facility Documents in strict accordance with the provisions hereof and thereof, notwithstanding any conduct or custom on the part of Fannie Mae in refraining from so doing at any time or times.  The failure of Fannie Mae at any time or times to enforce its rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom in any way or manner contrary to specific provisions of this Agreement or the other Credit Facility Documents or as having in any way or manner modified or waived the same.  This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by Fannie Mae and the Pledgor.

SECTION 7.2.  Waiver of Default.  Fannie Mae may, at any time and from time to time, execute and deliver to the Pledgor a written instrument waiving, on such terms and conditions as Fannie Mae may specify in such written instrument, any of the requirements of this Agreement or any Event of Default or Default and its consequences, provided, that any such waiver shall be for such period and subject to such conditions as shall be specified in any such instrument.  In the case of any such waiver, the Pledgor and Fannie Mae shall be restored to their former positions prior to such Event of Default or Default and shall have the same rights as they had hereunder.  No such waiver shall extend to any subsequent or other Event of Default or Default, or impair any right consequent thereto and shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 7.3.  Security Interest Absolute.  All rights and remedies of Fannie Mae hereunder and under applicable laws and all agreements and obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of, and shall not be released, discharged, impaired or affected by (a) any lack of validity or enforceability of the Loan Agreement, the Guaranty or any of the other Credit Facility Documents, (b) any change in the amount of any or all of the Obligations or any change in the time, manner or place of payment of any or all of the Obligations or any change of any other provision or term of any or all of the Obligations, (c) any amendment to, or modification or waiver of, consent to, or departure from, any of the provisions of the Loan Agreement, the Guaranty or the other Credit Facility Documents, (d) any exchange, substitution, release, addition or non-perfection of any collateral and security for any of the Obligations, (e) the release of, in whole or in part, any Person, including, without limitation, the Company or the Pledgor, obligated or liable for the payment of all or any part of the Obligations or any attempt, pursuit, enforcement or exhaustion of any rights or remedies Fannie Mae may have against any such Person or against any collateral and security for any or all of the Obligations, (f) the failure, omission, lack of diligence or delay by Fannie Mae to exercise or enforce any rights and remedies it may have under the Loan Agreement, the Guaranty, the other Credit Facility Documents or applicable laws, and (g) any other event or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of the Pledgor or of the Collateral.

SECTION 7.4.  Notices.  All notices, requests and demands to or upon the parties to this Agreement shall be deemed to have been given or made when delivered by hand, or on the third day after being deposited in the United States mail, postage prepaid, certified mail, return receipt requested, addressed as follows [in the case of Fannie Mae, and addressed to the address of the

08CV1976
JUDGE NORGLE
·MAGISTRATE JUDGE SCHENKIER

Pledgor set forth below the Pledgor's signature to this Agreement] or to such other address as may be hereafter designated in writing by one party to the other:

| | |
|---|---|
| Pledgor: | Eagle Homes, LLC<br>40424 N. Deep Lake Road<br>Antioch, Illinois 60002<br>Attention: Kenneth J. Wisniewski |
| With a copy to: | David Witheft<br>Boyle, Cordes, Witheft & Brown, LLC<br>301 East Lincoln Highway<br>DeKalb, Illinois 60115 |
| If to Fannie Mae, to: | Fannie Mae<br>3900 Wisconsin Avenue, N.W.<br>Mail Stop: 8H-306<br>Washington, DC 20016<br>Attention:    Portfolio Administration<br>              American Communities Fund |
| With a copy to: | General Counsel<br>Fannie Mae<br>American Communities Fund<br>3900 Wisconsin Avenue, N.W.<br>Washington, DC 20016 |

except in cases where it is expressly herein provided that such notice, request or demand is not effective until received by the party to whom it is addressed.

SECTION 7.5.   Performance for Pledgor.   The Pledgor hereby appoints Fannie Mae the attorney-in-fact of such Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument which Fannie Mae may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, Fannie Mae shall have the right, upon the occurrence and during the continuance of an Event of Default, with full power of substitution either in Fannie Mae's name or in the name of the Pledgor, (a) to ask for, demand, sue for, collect, receive, receipt and give acquittance for any and all moneys due or to become due and under and by virtue of any Collateral, (b) to endorse checks, drafts, orders and other instruments for the payment of money payable to the Pledgor representing any interest, dividend or other distribution payable in respect of the Collateral or any part thereof or on account thereof, (c) to give full discharge for all or any part of the Collateral, (d) to settle, compromise, prosecute or defend any action, claim or proceeding with respect to all or any part of the Collateral, (e) to sell, assign, endorse, pledge, transfer and make any agreement respecting all or any part of the Collateral, or (f) otherwise deal with all or any part of the Collateral as though Fannie Mae were the absolute owner thereof; provided, however, that nothing herein contained shall be construed as requiring or obligating Fannie Mae to make any commitment or to make any inquiry as to the nature or sufficiency of any

payment received by Fannie Mae, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or become due in respect thereof or any property covered thereby, and no action taken by Fannie Mae or omitted to be taken with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of the Pledgor or to any claim or action against Fannie Mae.

SECTION 7.6. Enforcement Costs. The Pledgor shall pay to Fannie Mae upon demand all Enforcement Costs together with interest thereon from the date incurred or advanced until paid in full at a per annum rate of interest equal at all times to the Default Rate (as defined in the Note). Enforcement Costs together with interest thereon shall be included in the Obligations secured hereby.

SECTION 7.7. Severability. If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Fannie Mae in order to carry out the intentions of the parties hereto as nearly as may be possible, (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction, and (c) the parties hereto shall endeavor in good faith negotiations to replace the invalid or unenforceable provisions with valid and enforceable provisions, the economic effect of which comes as close as possible to that of the invalid or unenforceable provisions.

SECTION 7.8. Assignment. Fannie Mae may, without notice to, or consent of, the Pledgor, sell, assign or transfer to any Person or Persons all or any part of the Obligations, and in the event of any such assignment, the rights and remedies of Fannie Mae hereunder shall extend to, and vest in, any such assignee or assignees who shall have the right to enforce the provisions of this Agreement as fully as Fannie Mae, provided that Fannie Mae shall continue to have the unimpaired right to enforce the provisions of this Agreement as to so much of the Obligations that it has not sold, assigned or transferred. The Pledgor will fully cooperate with Fannie Mae in connection with any such assignment and will execute and deliver such consents and acceptances to any such assignment and amendments to this Agreement in order to effect any such assignment (including, without limitation, the appointment of Fannie Mae as agent for itself and all assignees).

SECTION 7.9. Survival. All representations and warranties contained in or made under or in connection with this Agreement (a) shall survive the execution, delivery and performance of this Agreement, and (b) shall be true, correct and complete at all times during which any of the Obligations (or commitments therefor) are outstanding with the same effect as if such representations and warranties had been made at such times.

SECTION 7.10. Joint and Several Liability, Etc. If more than one Pledgor, the Person comprising the Pledgor shall be jointly and severally liable for the obligations and liabilities of the Pledgor under this Agreement. Fannie Mae may, without notice to or consent of the Pledgor and with or without consideration, release, discharge, comprise or settle with, waive, grant indulgences to, proceed against or otherwise deal with, the Pledgor and any Collateral given by such Pledgor without in any way affecting, limiting, modifying, discharging or releasing any of the obligations and liabilities under this Agreement or the other Credit Facility Documents of the other Person

comprising the Pledgor. Each Pledgor consents and agrees that (a) Fannie Mae shall be under no obligation to marshall any assets in favor of such Pledgor or against or in payment of any or all of the obligations and liabilities of such Pledgor under this Agreement or any of the other Credit Facility Documents, (b) any rights such Pledgor may have against any of the other Persons comprising the Pledgor for contribution, exoneration from payment or otherwise, in respect of any amounts paid by such Pledgor hereunder or which continue to be owing hereunder, shall be postponed until the Obligations have been indefeasibly paid in full and no commitments therefor are outstanding and (c) Fannie Mae may enforce and collect the obligations and liabilities of such Pledgor hereunder or under the other Credit Facility Documents irrespective of any attempt, pursuit, enforcement or exhaustion of any rights and remedies Fannie Mae may at any time have to collect the obligations and liabilities hereunder or under the other Credit Facility Documents of the other Persons comprising the Pledgor.

SECTION 7.11. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the Pledgor and Fannie Mae and their respective personal representatives, successors and assigns, except that the Pledgor shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Fannie Mae.

SECTION 7.12. <u>Continuing Agreement</u>. This Agreement and the security interests granted hereby shall be continuing and binding on the Pledgor regardless of how long before or after the date hereof any of the Obligations were or are incurred. This Agreement and the security interests granted hereby shall terminate when all of the Obligations have been indefeasibly paid in full and no commitments therefor are outstanding, at which time Fannie Mae will execute and deliver to the Pledgor all proper Uniform Commercial Code termination statements and other releases of the Collateral prepared by the Pledgor which are reasonably requested by the Pledgor to evidence such termination.

SECTION 7.13. <u>Applicable Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be construed and interpreted in accordance with the laws of the State of Illinois. The parties agree that personal jurisdiction and venue shall be proper only in the United States District Court for the Northern District of Illinois.

SECTION 7.14. <u>Duplicate Originals and Counterparts</u>. This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and all taken together shall constitute but one and the same instrument.

SECTION 7.15. <u>Exhibits and Schedules</u>. Any exhibits and schedules attached to this Agreement are an integral part hereof and are hereby incorporated herein and included in the term "this Agreement".

SECTION 7.16. <u>Headings</u>. Article and Section headings in this Agreement are included herein for convenience of reference only, shall not constitute a part of this Agreement for any other purpose and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

IN WITNESS WHEREOF, intending to be legally bound hereby, each of the parties hereto have executed and delivered this Agreement under their respective seals as of the day and year first written above.

WITNESS:                              EAGLE HOMES, LLC

By: _____ (SEAL)
                                     Name:  Kenneth J. Wisniewski
                                     Title:    Manager

ATTACHMENTS:

Exhibit 2.3 – Assignment of Membership Interest

STATE OF ILLINOIS, CITY/COUNTY OF _Antioch/Lake_, TO WIT:

    I HEREBY CERTIFY, that on this ___ day of _____, 2003, before me, a Notary Public of said State, personally appeared _____ who acknowledged himself to be the _____ of EAGLE HOMES, LLC, an Illinois limited liability company, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained as the duly authorized _____.

    WITNESS my hand and Notarial Seal.

"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires 10/10/04

_____
Notary Public

My Commission Expires: _10/10/2004_

Page 19

Intentionally

Left

Blank

<div align="right">**EXHIBIT 2.3**</div>

## ASSIGNMENT OF MEMBERSHIP INTEREST

KNOW THAT the undersigned ("Assignor") having an address at 40424 N. Deep Lake Road, Antioch, Illinois 60002, in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns and transfers to _____ (together with its successors and/or assigns, "Assignee"), having an office at _____, 100% of Assignor's membership interest in Eagle Homes-Prairie Springs, LLC, an Illinois limited liability company (the "Company"), all right, title and interest of Assignor as a member of the Company, including, without limitation, all rights of Assignor to receive distributions from the Company and all other rights of Assignor under the operating agreement of the Company, as amended (the "Membership Interest"), subject to the terms of said the operating agreement of the Company, as amended, and that certain Member Interest Pledge and Security Agreement dated as of _____, 2003 by and between Assignor and Fannie Mae.

TO HAVE AND TO HOLD the Membership Interest unto Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has executed this Assignment of Membership Interest as of the _____ day of _____, _____.

Assignor:

EAGLE HOMES, LLC

By: _____
Name: _____
Title: _____

STATE OF                          )
                                  )        ss.
COUNTY OF                         )

On this ____ day of _____, 200__, before me, the undersigned officer, personally
appeared _____, known to me to be the person whose name is subscribed to
the foregoing instrument, who acknowledged that ____ is the _____ of
_____, a
_____, and ____ acknowledged
to me that ____ being authorized to do so, executed the same for the purposes therein contained
on behalf of the _____.

In witness whereof, I hereunto set my hand and official seal.

(Notarial Seal)

"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires 10/10/04

Notary Public

My commission expires: 10/10/2004

**EXHIBIT C**

GUARANTY AGREEMENT

See Attached

# 269443 v3 KMA
010656-0255

C-1

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty Agreement") is made as of the 26 day of November, 2003, by and among EAGLE HOMES, LLC, an Illinois limited liability company ("Eagle Homes") KENNETH J. WISNIEWSKI ("K. Wisniewski") and LILLIAN F. WISNIEWSKI ("L. Wisniewski") (K. Wisniewski, L. Wisniewski and Eagle Homes are individually and collectively, the "Guarantor"), and FANNIE MAE, a corporation organized and existing under the laws of the United States of America ("Fannie Mae").

## RECITALS

WHEREAS, Fannie Mae has agreed to make a loan to Eagle Homes-Prairie Springs, LLC, an Illinois limited liability company (the "Borrower") in the maximum principal sum of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600) (the "Loan"), which Loan shall be evidenced by a Promissory Note in the amount of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600) (the "Note") and which shall be advanced by Fannie Mae pursuant to the terms and conditions of a Loan and Security Agreement of even date herewith by and between the Borrower and Fannie Mae (the "Loan Agreement"); and

WHEREAS, Fannie Mae is willing to make the Loan available to the Borrower upon the terms and conditions set forth in the Note and the Loan Agreement, but only if the Guarantor guarantees the Borrower's repayment of all sums due and owing under the Note and the Borrower's performance of its obligations under the Loan Agreement and the Credit Facility Documents described therein (the "Credit Facility Documents") in accordance with the terms and conditions of this Guaranty Agreement; and

WHEREAS, the Guarantor will benefit from the availability of the Loan to the Borrower and is willing to give the guaranty requested so as to induce Fannie Mae to make the Loan available to the Borrower.

NOW THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor gives the following guaranty of payment and of performance to Fannie Mae on behalf of the Borrower.

Section 1. Representations and Warranties of the Guarantor. Each Guarantor represents and warrants that:

(a)    He, she or it has a financial interest in the Borrower and the assumption of his obligations and liabilities hereunder will result in substantial financial benefits to him;

(b)    He, she or it has read or has had an opportunity to read all documents referred to herein or otherwise relating to the Note and the Credit Facility Documents, and this

Guaranty Agreement is his binding obligation and is fully enforceable against him in accordance with its terms;

(c)    There are (i) no provisions of any existing mortgage, indenture, contract or agreement binding on him, her or it or affecting his, her or its property (other than any such agreements with Fannie Mae), and (ii) to his, her or its knowledge no provision of law or order of court or of any administrative officer or administrative agency, binding upon him, her or its or his, or its property, either of which would conflict with or in any way prevent the execution, delivery or performance of the terms of this Guaranty Agreement or which would be in default or breached as a result of such execution, delivery or performance;

(d)    To each Guarantor's knowledge, his, her or its most recent financial statement heretofore delivered to Fannie Mae is true and correct as of the date thereof; except as disclosed to Fannie Mae, all assets listed thereon are held by the Guarantor personally and not in joint ownership (that is, subject to a right of survivorship) with his or her spouse or any other person; to the Guarantor's knowledge there has been no material adverse change in his financial position since the date of such financial statement and no such material adverse change is pending or threatened, except as otherwise disclosed to Fannie Mae;

(e)    To each Guarantor's knowledge, there are no proceedings pending, or so far as the Guarantor knows, threatened, before any court or administrative agency or officer which will adversely affect his financial position;

(f)    Eagle Homes is a limited liability company (i) validly existing in good standing under the laws of the State of Illinois, (ii) with the necessary power, authority and legal right to own its property and carry on the business now being conducted by it and to engage in the transactions contemplated by this Guaranty Agreement and the Credit Facility Documents, (iii) which has duly authorized the execution and delivery of this Guaranty Agreement, the Credit Facility Documents to which it is a party and the performance and observation of the terms, covenants, agreements and provisions thereof, and (iv) which will at all times perform all acts necessary to maintain its legal existence and continue its authority to act in accordance with the representations contained in this paragraph; and

(g)    To each Guarantor's knowledge, all of the Guarantor's representations and those of the Borrower made in obtaining the Loan from Fannie Mae are true and correct and not knowingly misleading and the Guarantor agrees to indemnify Fannie Mae from any loss or expense as a result of a breach of the foregoing warranty; and

(h)    The combined net worth of the Guarantor has been and will continue to equal at least Fifteen Million Dollars ($15,000,000).

Section 2.    Guaranty. Each Guarantor hereby fully, absolutely, unconditionally and irrevocably, jointly and severally guarantees to Fannie Mae all of the following obligations (collectively referred to as the "Guaranteed Obligations"):

(a)　　the full and prompt payment (not merely the collection) of all amounts due with respect to the Note, and the observance and performance by the Borrower of all of the Borrower's obligations under the Credit Facility Documents, including, but not limited to, the completion of the improvements described in the Loan Agreement;

(b)　　the full and prompt payment of any development and construction costs related to the Project which exceed the budgets approved by Fannie Mae;

(c)　　the full and prompt payment (not merely the collection) of all present and future liabilities and obligations of the Borrower to Fannie Mae of every kind and description, now existing or hereafter owing, matured or unmatured, direct or indirect, absolute or contingent or joint or several and the observance and performance by the Borrower of all of the Borrower's obligations with respect to the foregoing; and

(d)　　The payment of all expenses and charges (including all court costs and reasonable attorneys' fees) paid or incurred by Fannie Mae in realizing upon any of the obligations guaranteed above or in enforcing any of the Credit Facility Documents.

Section 3.　Nature of the Guaranty.　The guaranty of the Guarantor hereunder shall be direct, immediate, and primary and is one of payment and not just collection.　The liability of each Guarantor hereunder shall be both joint and several.　The liability of Guarantor hereunder shall remain unaffected by the provisions of the Intercreditor Agreement between Fannie Mae and Harris Bank dated of even date herewith.

Section 4.　Fannie Mae Need Not Pursue Against Borrower or Collateral.　Fannie Mae shall be under no obligation to pursue Fannie Mae's rights against the Borrower or any of the Borrower's collateral or any pledge agreement or any other instrument securing the Loan before pursuing Fannie Mae's rights against the Guarantor.

Section 5.　Rights of Fannie Mae to Deal with Borrower and Collateral.　Fannie Mae may without compromising, impairing, or in any way releasing the Guarantor from the Guarantor's obligations hereunder and without obtaining the prior approval of the Guarantor at any time or from time to time: (a) waive or excuse a default or defaults by the Borrower; (b) grant extensions of time for payment or performance by the Borrower; (c) release, substitute, or add collateral of the Borrower; (d) release the Borrower; and (e) modify, change or amend in any respect Fannie Mae's agreement with the Borrower.

Section 6.　Waivers by the Guarantor.　The Guarantor waives (a) presentment and demand for payment of any sum due from the Borrower and protest of nonpayment; (b) notice of default by the Borrower; (c) demand for performance by the Borrower; and (d) any right to a jury trial in any action brought at any time or from time to time on this Guaranty Agreement or any other Credit Facility Document.

Section 7.　Liability of Guarantor Unaffected by Third Party Bankruptcy and Insolvency Proceeding.　To the extent permitted by law, no modification, limitation or discharge of liability of any other guarantor of the Guaranteed Obligations or of the Borrower under any of the Credit

Facility Documents arising out of, or by virtue of, any bankruptcy, arrangement, reorganization or similar proceedings for release of debtors under federal or state law shall affect the liability of the Guarantor hereunder in any manner whatsoever, and the Guarantor hereby waives all rights and benefits which might accrue to him by reason of any such proceeding.

Section 8. <u>Covenants</u>. Each Guarantor hereby covenants and agrees:

(a)    To promptly notify Fannie Mae of any material adverse change in the financial condition of any Guarantor;

(b)    With respect to K. Wisniewski and L. Wisniewski to deliver to Fannie Mae (i) in a form approved by Fannie Mae within sixty (60) days after the close of each calendar year beginning with the calendar year ending on December 31, 2003, personal financial statements certified by the applicable Guarantor as accurate, and (ii) copies of the Guarantor's state and federal tax returns within ten (10) days after the same are filed;

(c)    With respect to Eagle Homes, To deliver to Fannie Mae (i) in a form approved by Fannie Mae within ninety (90) days after the close of each fiscal year beginning with the fiscal year ending on December 31, 2003, a balance sheet for itself as of the close of such fiscal year and statements of income and retained earnings and source and application of funds for the year then ended, in a form reasonably acceptable to Fannie Mae, prepared in conformity with generally accepted accounting principles, applied on a basis consistent with that of the preceding year (or containing a disclosure of the effect on financial position or results of operations of any change in the application of generally accepted accounting principles during the year), which financial reports shall be (A) prepared by a firm of independent certified public accountants acceptable to Fannie Mae, and (ii) copies of each Guarantor's state and federal tax returns within ten (10) days after the same are filed;

(c)    Upon obtaining knowledge thereof, promptly to give notice in writing to Fannie Mae of any litigation, pending or threatened, and of any proceeding before any governmental or regulatory agency or officer which might have a material, adverse effect on his financial position (any suit or suits in which the amount in controversy is less than $10,000 in the aggregate being hereby deemed not to be material);

(d)    <i>To pay and discharge, or cause to be paid or discharged, all taxes,</i> assessments and governmental charges or levies imposed upon any of the properties of the Guarantor, all claims for labor, supplies, rent and any other obligations, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a lien or charge upon any such properties; provided, however, that the Guarantor shall not be required to pay any such tax, assessment, charge, levy or claim so long as Fannie Mae has been given notice of the Guarantor's intention to institute any contest thereof and so long as, in the opinion of Fannie Mae, (i) the payment is being diligently contested in good faith by appropriate proceedings, (ii) the security for the Guaranteed Obligations hereunder is not impaired, and (iii) the Guarantor has effectively stayed or prevented the sale of such properties;

(e)    Not to acquire or hold any of his assets in, or to transfer the same to, joint ownership with his spouse or any other person; provided, however, that Fannie Mae shall not unreasonably withhold its consent to any transfer made for bona fide estate planning purposes, so long as (in the opinion of Fannie Mae) the security for the Guaranteed Obligations would not be impaired as a result of such transfer; and

(f)    Guarantor shall at all times maintain a combined net worth equal to at least Fifteen Million Dollars ($15,000,000).

Section 9.    Events Authorizing Acceleration of Guaranty.    Should any of the following Events of Default occur with respect to the Guarantor or with respect to the Borrower, Fannie Mae may, in Fannie Mae's sole and absolute discretion, immediately and without notice or demand accelerate and call due as to the Guarantor all Guaranteed Obligations: (a) the entry of a decree or order for relief by a court having jurisdiction against or with respect to the Guarantor or the Borrower in an involuntary case under the federal bankruptcy laws or any state insolvency or similar laws ordering the liquidation of the Guarantor or the Borrower or a reorganization of the Borrower or the Borrower's business and affairs or the appointment of a receiver, liquidator, assignee, custodian, trustee, or similar official for the Guarantor or the Guarantor's property or for the Borrower or any of the Borrower's property and the failure to have such decree, order, or appointment discharged or dismissed within sixty (60) days from the date of entry; (b) the commencement by the Guarantor or the Borrower of a voluntary case under the federal bankruptcy laws or any state insolvency or similar laws or the consent by the Guarantor or the Borrower to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, or similar official for the Guarantor or any of the Guarantor's property or for the Borrower or any of the Borrower's property or the making by the Guarantor or the Borrower of any assignment for the benefit of creditors; (c) the entry of a judgment in excess of $10,000 against the Guarantor or the Borrower and the failure to satisfy such judgment within thirty (30) days (either by payment or by the filing of a supersedeas bond) unless such judgment has been appealed in good faith and the legal effect of such appeal is to stay the obligation to satisfy such judgment until resolution of the appeal; (d) a default by the Borrower in payment or in performance of the Borrower's obligations under any of the Credit Facility Documents (together with the expiration of any applicable grace period); (e) a default by the Guarantor in any of the terms or provisions of this Guaranty Agreement not specifically referred to in paragraphs (a) through (d) above; provided, however, that with respect to curable defaults only the Guarantor shall have failed to cure the same within thirty (30) days following written notice from Fannie Mae; (f) the occurrence of any Event of Default as defined in any of the Credit Facility Documents.

Section 10.    Jurisdiction and Venue.    In any action brought by Fannie Mae under this *Guaranty Agreement, Guarantor consents to the exercise of personal jurisdiction over it by the* Courts of the State of Illinois and agrees that venue shall be proper in the United States District Court for the Northern District of Illinois, in addition to any other court where venue may be proper. The Guarantor waives and releases, to the extent permitted by law, all errors and all rights of exemption, appeal, stay of execution, inquisition and extension upon any levy on real estate or personal property to which the Guarantor may otherwise be entitled under the laws of the United States of America or of any State or Possession of the United States of America now in force or which may hereafter be passed, as well as the benefit of any and every statute, ordinance, or rule of

court which may be lawfully waived conferring upon the Guarantor any right or privilege of exemption, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against the Guarantor shall be exercisable concurrently in one or more jurisdictions and shall not be exhausted or extinguished by one or more exercises thereof, or by any imperfect exercise thereof or by any judgment entered pursuant thereto. Such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as Fannie Mae shall deem necessary or desirable, for all of which this Guaranty Agreement shall be sufficient warrant.

Section 11.  <u>Expenses of Collection</u>.  Should this Guaranty Agreement or any claim hereunder be referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, the Guarantor shall pay all of Fannie Mae's actual costs, fees (including actual attorneys' fees) and expenses resulting from such referral.

Section 12.  <u>Binding Nature</u>.  This Guaranty Agreement shall inure to the benefit of and be enforceable by Fannie Mae and Fannie Mae's successors and assigns, and shall be binding upon and enforceable against the Guarantor and the Guarantor's personal representatives, heirs and assigns.

Section 13.  <u>Fannie Mae May Assign; Termination of Guaranty</u>.  This Guaranty Agreement may be assigned by Fannie Mae, and shall terminate upon the performance by the Borrower and the Guarantor of all Guaranteed Obligations to Fannie Mae's full and complete satisfaction as evidenced by a written confirmation from Fannie Mae.

Section 14.  <u>Restrictions on Becoming a Creditor of the Borrower</u>.  The Guarantor hereby waives any claim, as that term is defined in the United States Bankruptcy Code, which the Guarantor might now have or might hereafter acquire against the Borrower, including, but not limited to, claims arising by way of subrogation, reimbursement, indemnity, exoneration, contribution, extensions of credit or equity contributions, it being the intent of the parties that the Guarantor shall not be a creditor of the Borrower under the United States Bankruptcy Code.

Section 15.  <u>Notices</u>.  All notices required or permitted hereunder shall be in writing and shall be personally delivered or mailed by certified or registered mail, return receipt requested, to the following addresses:

<u>If to the Guarantor:</u>

Kenneth J. and Lillian F. Wisniewski
Eagle Homes, LLC
40424 N. Deep Lake Road
Antioch, Illinois

With a copy to:     David Witheft
Boyle, Cordes, Witheft & Brown, LLC
301 East Lincoln Highway
DeKalb, Illinois 60115

If to Fannie Mae, to:  Fannie Mae
3900 Wisconsin Avenue, N.W.
Mail Stop: 8H-306
Washington, DC 20016
Attention:    Portfolio Administration
American Communities Fund

With a copy to:     General Counsel
Fannie Mae
Mail Stop: 8H-306
American Communities Fund
3900 Wisconsin Avenue, N.W.
Washington, DC 20016

Any party may change the address to which notices are to be sent by a writing directed to the other party in the manner aforesaid. Unless otherwise specifically provided, all notices hereunder delivered personally shall be deemed delivered upon such personal delivery, and all notices hereunder given by mail, as aforesaid, shall be deemed delivered three (3) days after deposited in a United States Post Office, general or branch, or an official mail depository, maintained by the U.S. Postal Service, enclosed in a registered or certified prepaid wrapper addressed as above provided, except notice of change of address shall be deemed served when received.

In connection with the delivery of any notice as described herein, the party giving such notice agrees to use reasonable efforts to also send such notice by facsimile transmission; provided, however, that delivery of notice by facsimile transmission shall not be a requirement in order to give effective notice hereunder.

Section 16. <u>Waiver</u>. No waiver of any power, privilege, right or remedy (hereinafter collectively referred to as "Rights") hereunder shall be effective unless in writing. No delay on the part of Fannie Mae in exercising any Rights hereunder, or under any other instrument executed by the Borrower or any other person in connection with the transaction (including the Credit Facility Documents) shall operate as a waiver thereof, and no single or partial exercise of any such Rights shall preclude other or further exercise thereof, or the exercise of any other Rights. Waiver by

# 229413 V3 NJP
010656-0181

Fannie Mae of any default by the Borrower, the Guarantor or any other person shall not constitute a waiver of any subsequent defaults, but shall be restricted to the default so waived. If any provision or part of any provision of this Guaranty Agreement shall be contrary to any law which Fannie Mae might seek to apply or enforce, or should otherwise be defective, the other provisions, or parts of such provisions, of this Guaranty Agreement shall not be affected thereby, but shall continue in full force and effect. All Rights of Fannie Mae hereunder are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all Rights given hereunder or in or by any other instruments or any laws now existing or hereafter enacted.

Section 17.   Choice of Law. This Guaranty Agreement shall be construed, interpreted and enforced in accordance with the law of the State of Illinois.

Section 18.   Tense, Gender, Captions. As used herein, the plural shall refer to and include the singular, and the singular, the plural and the use of any gender shall include and refer to any other gender as the context may require. All captions are solely for the purpose of convenience.

Section 19.   Terms of Documents. The Guarantor has read the Loan Agreement and other Credit Facility Documents and fully understands the terms thereof and the extent of his obligations in guaranteeing payment and performance by the Borrower thereunder.

**IN WITNESS WHEREOF,** and intending to be legally bound, the Guarantor has hereunto set his hand and seal as of the day and year first above written.

WITNESS:                                    GUARANTORS:

_____          _____ (SEAL)
                                            Kenneth J. Wisniewski

_____          _____ (SEAL)
                                            Lillian F. Wisniewski

                                            EAGLE HOMES, LLC

_____          By: _____ (SEAL)
                                            Name:  Kenneth J. Wisniewski
                                            Tile:    Manager

# 229413 V3 NJP
010656-0181

9

**STATE OF ILLINOIS, COUNTY/CITY OF** _Lake/Northbrook_, **to wit:**

    **I HEREBY CERTIFY,** that on this _____ day of _____, 2003, before me, the undersigned Notary Public of the State of Illinois, in and for the County/City of _____, personally appeared KENNETH J. WISNIEWSKI, known to me (or satisfactorily proved) to be the person who executed the foregoing Guaranty Agreement, and acknowledged that he executed the same in the capacity and for the purposes therein recited.

    **IN WITNESS WHEREOF,** I have hereunto set my hand and official seal.

> "OFFICIAL SEAL"
> MICHAEL J. SCHREIBER
> Notary Public, State of Illinois
> My Commission Expires 10/10/04

                                        Notary Public

My commission expires: _10/10/2004_

**STATE OF ILLINOIS, COUNTY/CITY OF** _Lake/Northbrook_, **to wit:**

    **I HEREBY CERTIFY,** that on this _____ day of _____, 2003, before me, the undersigned Notary Public of the State of Illinois, in and for the County/City of _____, personally appeared LILLIAN F. WISNIEWSKI, known to me (or satisfactorily proved) to be the person who executed the foregoing Guaranty Agreement, and acknowledged that he executed the same in the capacity and for the purposes therein recited.

    **IN WITNESS WHEREOF,** I have hereunto set my hand and official seal.

> "OFFICIAL SEAL"
> MICHAEL J. SCHREIBER
> Notary Public, State of Illinois
> My Commission Expires 10/10/04

                                        Notary Public

My commission expires: _10/10/2004_

STATE OF ILLINOIS, _County_ OF _Lake_ , TO WIT:

    I hereby certify that on this ____ day of _____, 2003, before me, the undersigned Notary Public of the State of Illinois, personally appeared Kenneth J. Wisniewski, Manager of Eagle Homes, LLC, and that he/she as such _____, being authorized so to do, executed the foregoing Power of Attorney on behalf of such limited liability company for the purposes therein contained by signing the name of said limited liability company by himself/herself as such Manager.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Notary Public

My commission expires: _10/10/2004_

"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires 10/10/04

# 229413 V3 NJP
010656-0181

11

# EXHIBIT D

ASSIGNMENT OF PROJECT DOCUMENTS

See Attached

## ASSIGNMENT OF PROJECT DOCUMENTS

**THIS ASSIGNMENT OF PROJECT DOCUMENTS** (the "Assignment") is made this _26th_ day of November, 2003, by **EAGLE HOMES-PRAIRIE SPRINGS, LLC,** an Illinois limited liability company (the "Borrower"), in favor of **FANNIE MAE,** a corporation organized and existing under the laws of the United States of America ("Fannie Mae").

## RECITALS

A.     The Borrower has entered into a loan facility in the maximum principal amount of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600) (the "Loan") to partially finance the acquisition of 145 acres in two phases and development of two hundred fifty-eight (258) single family detached homes in Malta, Illinois (the "Project").

B.     The Loan is evidenced and secured by various documents defined as "Credit Facility Documents" in that certain Loan and Security Agreement of even date herewith by and between Fannie Mae and the Borrower.

C.     The Borrower has contracted and intends to contract with third parties for various services, licenses, permits and other items, as evidenced by "Project Documents" (defined herein).

D.     Fannie Mae requires, as additional security for the Loan, that the Borrower assign all of its right, title and interest in and to the Project Documents, and the Borrower is willing to assign its rights therein.

**NOW, THEREFORE,** in consideration of the premises, and of the covenants contained herein, and in order to induce Fannie Mae to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby agrees with Fannie Mae as follows:

1.     <u>Assignment of Project Documents.</u>

(a)     To the extent assignable, the Borrower hereby assigns, transfers and conveys to Fannie Mae all of its right, title and interest in and to any and all rights which it may own, possess, use, enforce, have a license to use or from which it shall otherwise benefit with respect to the Project, any and all permits, approvals, licenses, title insurance binders or policies, insurance policies, letters of credit, performance and payment bonds, easements, restrictive covenants, utility connection agreements, site plans, construction contracts, design agreements, plans and specifications and appraisals (the "Project Documents").

(b)     Fannie Mae may, if it so elects, after the occurrence of a default or an Event of Default under any of the Credit Facility Documents, which default remains uncured following any applicable cure or grace periods, reassign all of its right, title and interest in and to the Project Documents to any persons or entities for the purpose of allowing and assisting such persons or entities to complete the Project as contemplated by the Credit Facility Documents.

2.      Fannie Mae may exercise the rights and remedies hereinabove granted only following the occurrence of a default or Event of Default by the Borrower under any of the Credit Facility Documents, which default remains uncured following any applicable cure or grace periods. Fannie Mae hereby grants the Borrower a license to use the Project Documents until the occurrence of a default or Event of Default under any of the Credit Facility Documents.

3.      Borrower further authorizes Fannie Mae, upon the occurrence of any default or Event of Default under the Credit Facility Documents and the expiration of any applicable grace or cure period, to then demand, receive and enforce all of the Borrower's rights under the Project Documents.

4.      This Assignment does not include the delegation of any of the Borrower's duties, responsibilities or obligations under the Project Documents and the Borrower specifically agrees to indemnify and forever hold Fannie Mae harmless from any claim or liability on account thereof, except for claims or liability resulting directly from Fannie Mae's gross negligence or willful misconduct.

5.      The Borrower warrants that it has not otherwise assigned, transferred or encumbered its interest in and to the Project Documents.

6.      The Borrower warrants and represents that there have been no other assignments of the Project Documents other than in connection with the Phase One Construction Loan and Phase Two Construction Loan (as each is defined in the Credit Facility Documents), that it has not otherwise transferred or encumbered its interest in and to the Project Documents and that the Project Documents are, to the best of the Borrower's knowledge, information and belief after due inquiry, the valid and enforceable obligations of the parties thereto, subject to the terms and conditions thereof. Following the occurrence of a default or an Event of Default under any of the Credit Facility Documents, which default or Event of Default remains uncured following any applicable cure or grace periods, the Borrower hereby irrevocably constitutes and appoints Fannie Mae as its attorney in fact under the terms and conditions herein set forth, to demand, receive and enforce all of the Borrower's rights under the Purchase Contracts and the Project Documents, to make any required payments under the Project Documents and to perform on behalf of and in the name of the Borrower following the occurrence of a default or an Event of Default.

7.      The Borrower hereby covenants and agrees to execute and deliver on request of Fannie Mae, any and all such reasonable and necessary instruments, authorizations or directions as may from time to time be requested by Fannie Mae in order to effectuate the purpose and intent of this Assignment.

8.      If any provision or part of any provision of this Assignment shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions or the remaining part of any effective provisions of this Assignment and this Assignment shall be construed as if such invalid, illegal, or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

9.    The Borrower hereby acknowledges, consents and agrees (a) that the provisions of this Assignment and the rights of all parties mentioned herein shall be governed by the laws of the State of Illinois and interpreted and construed in accordance with such laws, and (b) that the United States District Court for the Northern District of Illinois shall have jurisdiction in any proceeding instituted to enforce this Assignment.

10.    This Assignment shall terminate upon the payment of the Loan in full and the full and complete satisfaction by the Borrower of all its obligations under the Credit Facility Documents.

**WITNESS** the signature and seal of the Borrower on the day and year first above written.

**WITNESS/ATTEST:**                    **BORROWER:**

**EAGLE HOMES-PRAIRIE SPRINGS, LLC**

By: _____ (SEAL)
Name: Kenneth J. Wisniewski
Title:   Manager of the Managing Committee

## <u>EXHIBIT A TO ASSIGNMENT OF PROJECT DOCUMENTS</u>

1.    Construction Contract between Eagle Homes-Prairie Springs, LLC and Eagle Homes, LLC dated August 1, 2003.

2.    Architect's Agreement between Eagle Homes-Prairie Springs, LLC and Goldberg Downey Architects, Inc. dated June 19, 2003

**EXHIBIT E**

PENDING LITIGATION

NONE

**EXHIBIT F**

FORM OF INTERCREDITOR AGREEMENT

See Attached

# 269443 v3 KMA
010656-0255

F-1

## INTERCREDITOR AGREEMENT
### (Eagle Homes - Prairie Springs, LLC (ACF #AM097))

THIS INTERCREDITOR AGREEMENT (this "Agreement"), dated March 15, 2005, is entered into by FANNIE MAE, a corporation organized and existing under the laws of the United States of America (together with its successors and assigns, "Fannie Mae") and AMERICAN NATIONAL BANK OF DEKALB COUNTY, a National Banking Association ("Senior Lender").

WHEREAS, Eagle Homes - Prairie Springs, LLC, an Illinois limited liability company (the "Borrower") and Senior Lender have entered into that certain Loan Agreement ("Senior Loan Agreement") dated the date hereof and certain other Senior Loan Documents (as defined below);

WHEREAS, Borrower and Fannie Mae have entered into certain Fannie Mae Loan Documents (as defined below); and

WHEREAS, Senior Lender and Fannie Mae desire to set forth certain rights of the parties hereto as provided herein.

NOW, THEREFORE, the parties hereto agree as follows:

1.    Definitions. For purposes of this Agreement: (i) terms defined in the foregoing recitals have the meanings ascribed to them in the recitals; (ii) capitalized terms used in this Agreement without definition have the meanings ascribed to them in the Senior Loan Agreement; and (iii) the following terms shall have the following meanings:

"Affiliate" means, as to any Person, any Person which directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, family relationship or otherwise.

"Agreement" means this Intercreditor Agreement.

"Equity Interests in Borrower" means the stock, partnership interests, or membership interests, as applicable, in the Borrower as defined as "Collateral" in the Fannie Mae Pledge Agreement.

"Event of Default" means (i) in the case of the Senior Loan Documents, a default or an event of default (after expiration of any applicable notice and cure periods) under the Senior Loan Documents, or (ii) in the case of the Fannie Mae Loan Documents, a default or event of default (after expiration of any applicable notice and cure periods) under the Fannie Mae Loan Documents.

"Fannie Mae Debt" means all indebtedness now or at any time hereafter owing by Borrower to Fannie Mae arising under the Fannie Mae Loan Documents.

"Fannie Mae's Equity Interest" means, at any time, the Equity Interests in Borrower then held by Fannie Mae.

"Fannie Mae Loan Documents" mean, collectively, all agreements, instruments and documents (together with all amendments thereto and modifications and replacements thereof) now or hereafter executed by Borrower or any guarantor or indemnitor, which evidence, secure or otherwise support Borrower's obligations under or with respect to the Fannie Mae Debt, including, without limitation that certain Amended and Restated Promissory Note dated March 15      , 2005, in the original principal amount of One Million Six Hundred Thirty Three Thousand Six Hundred Dollars ($1,633,600).

"Fannie Mae Pledge Agreement" shall mean that certain Member Interest Pledge Agreement from all of the members, the Borrower which grants to Fannie Mae a security interest in all of such members' ownership interests in the Borrower.

"Lien" shall mean any lien, security interest, pledge, hypothecation, charge, encumbrance, right, option or other claim (in the nature of an "in rem" claim) in or with respect to any property, real, personal or mixed.

"Person" shall means an individual or a corporation, association, joint venture, general partnership, limited partnership, limited liability company, limited liability partnership or other private entity or a governmental agency.

"Project" shall mean the construction of 138 for-sale single family homes (Phase One) and 374 platted lots (Phase Two) on the Property.

"Property" means that certain real property located in Malta, Illinois, more particularly described in Exhibit A hereto.

"Senior Debt" means all indebtedness now or at any time hereafter owing by Borrower to Senior Lender arising under the Senior Loan Agreement and the other Senior Loan Documents, and any and all amendments, renewals, extensions, refinancings, o r r efundings t hereof, i ncluding b ut n ot l imited t o all p rincipal, i nterest, fees, a nd o ther s ums d ue w ith r espect thereto (including whether incurred or accruing before or after the commencement of any proceeding under the United States Bankruptcy Code).

"Senior Loan Documents" mean, collectively, all agreements, instruments and documents (together with all amendments thereto and modifications and replacements thereof) now or hereafter executed by Borrower or any guarantor or indemnitor, which evidence, secure or otherwise support Borrower's obligations under or with respect to the Senior Debt, including, without limitation the Senior Loan Agreement and the Loan Documents (as defined in the Senior Loan Agreement).

2.      Consent of Senior Lender. Subject to the terms and agreements made herein, the Senior Lender hereby consents to the Fannie Mae Debt and to the terms and provisions of the Fannie Mae Loan Documents subject to the terms and conditions hereof, including but not limited to the first-priority pledge of the Equity Interest in Borrower pursuant to the Fannie Mae Pledge Agreement and the grant of all other Liens contemplated by the Fannie Mae Loan Documents.

3.      Subordination. Until the Senior Debt is paid in full, the Fannie Mae Loan Documents are and shall continue to be expressly subject and subordinate to the Senior Debt and the Senior Loan Documents.

4.      Defaults Under Fannie Mae Loan Documents. Notwithstanding any provision of the Senior Loan Documents to the contrary, no Default or Event of Default under the Fannie Mae Loan Documents, nor, subject to the terms hereof, any exercise by Fannie Mae of any remedy available to it based thereon, shall constitute an Event of Default under the Senior Loan Documents; provided that this provision shall not prevent the independent occurrence of an Event of Default under the Senior Loan Documents based on the same set of occurrences or circumstances constituting such Default or Event of Default under the Loan Documents.

5.      Defaults Under Senior Loan Documents. Senior Lender shall deliver to Fannie Mae a copy of any notice of default delivered to Borrower pursuant to the Senior Loan Documents concurrently with the delivery thereof to Borrower. Fannie Mae shall have the right (but not the obligation) to cure any default by Borrower under the Senior Loan Documents, and Senior Lender shall (a) accept performance by Fannie Mae as if such performance were tendered by Borrower, and (b) not accelerate the Senior Debt by reason thereof, so long as Fannie Mae cures (1) any such monetary default within ten (10) days after receipt of written notice thereof, or (2) any such nonmonetary default within thirty (30) days after receipt of written notice thereof; provided, however, that (x) if such nonmonetary default cannot reasonably be cured within such thirty (30) day period, such period shall be extended so long as Fannie Mae commences to cure such default within such thirty (30) day period and thereafter diligently proceeds to cure such default until completion but in all cases within ninety days after receipt of the original written notice provided however that if such non-monetary default can result in a lien on the Property that is prior to the Senior Loan, the Fannie Mae's time to cure shall not extend past the time such lien attaches to the Property and/or Equity Interests in Borrower in such prior position; and (y) Fannie Mae shall not be required to cure (and Senior Lender shall waive with respect to Fannie Mae) defaults Fannie Mae is incapable of curing (e.g., covenants relating to the financial condition of Borrower) or that relate only to principals of Borrower. The Senior Lender's covenant to provide Fannie Mae with a copy of any notice of default delivered to Borrower pursuant to the Senior Loan Documents shall not in any way affect the obligations of Borrower nor give rise to any defense by Borrower under the Senior Loan Documents to any such default.

6.      Option to Purchase Senior Debt. Senior Lender hereby grants Fannie Mae an option to purchase the Senior Debt, at par (including outstanding principal and accrued and unpaid interest, fees and any other monetary obligations of Borrower under the Senior Loan Documents, and specifically including any and all prepayment penalties or premiums), at any time after the occurrence of an Event of Default under the Senior Loan Documents and prior to the foreclosure of the Lien of Senior Lender's deed of trust or mortgage.

7.      Exercise of Remedies by Fannie Mae. Upon Fannie Mae's receipt of any notice of default under the Senior Loan, Fannie Mae may notify the Senior Lender in writing (the "Fannie Mae Acquisition Notice") within thirty (30) days of receipt of the notice of default, of Fannie Mae's intention to acquire all of the issued and outstanding ownership interests in the Borrower by foreclosing on its security interest therein and taking title thereto in its own name or by accepting an assignment or conveyance of such ownership interests in lieu thereof (either such action being herein referred to as a "Fannie Mae Acquisition of Ownership"). Senior Lender agrees that it will not accelerate the Senior Loan or foreclose on any of the collateral securing the Senior Loan prior to the effective date on which the Fannie Mae Acquisition of Ownership shall occur; provided that (i) a Fannie Mae cure of the applicable Senior Loan default(s); (ii) the Fannie Mae Acquisition of Ownership shall be diligently pursued and completed within one hundred twenty (120) days of the date of the Fannie Mae Acquisition Notice (such period of time being herein referred to as the "Fannie Mae Acquisition Period"); and (iii) at all times during the Fannie Mae Acquisition Period, all principal, interest and other amounts payable to Senior Lender pursuant to the Senior Loan Documents shall be paid when due. As a material inducement to Senior Lender accepting the terms and provisions set forth in this paragraph, Fannie Mae represents, warrants, a cknowledges and a grees t hat a ny F annie M ae Acquisition of O wnership s hall n ot a lter, a mend or modify, in any

respect, any and all past, present and future obligations and liabilities of the Borrower set forth in the Senior Loan Documents, and that the Borrower shall fully and faithfully perform and observe each and every covenant and agreement of the Borrower set forth in the Senior Loan Documents from and after the effective date of the Fannie Mae Acquisition of Ownership. Nothing contained herein shall limit or restrict the right of Fannie Mae to exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any collateral other than the ownership interests in Borrower.

8.      Obligation to provide Partial Releases. Senior Lender agrees and acknowledges its obligation pursuant to (i) the Mortgage (With Future Advance Clause) given by Borrower to Senior Lender securing the $2,500,000 revolving construction loan, (ii) the Mortgage (With Future Advance Clause) given by the Borrower to Senior Lender securing the $7,600,000 acquisition and development loan, and (iii) the Senior Loan Agreement to provide partial releases upon the sale of housing units upon the satisfaction of the conditions and pursuant to the terms of Section 8.3 of the Senior Loan Agreement.

9.      Transferability of Fannie Mae Loan Documents. Fannie Mae may transfer its interest in the Fannie Mae Loan Documents subject to the terms hereof (a) in the event of a transfer to an Affiliate, without the consent of Senior Lender or (b) in all other events, with the consent of Senior Lender, which consent is not to be unreasonably withheld, delayed or conditioned.

10.     Modification of Senior Loan Documents. Senior Lender represents and warrants to Fannie Mae that it has provided Fannie Mae with true, correct and complete copies of all Senior Loan Documents. No material amendment or modification to the Senior Loan Documents shall be binding upon Fannie Mae unless Fannie Mae has been provided a copy of such amendment or modification, provided that, in the event such amendment or modification either adversely affects any security interest granted to Fannie Mae under the Fannie Mae Loan Documents or otherwise: materially impairs the rights of Fannie Mae under the Fannie Mae Loan Document or under this Agreement, such amendment or modification shall not be binding upon Fannie Mae without its prior written consent.

11.     Amendments and Waivers of this Agreement. Any provision of this Agreement may be amended if, and only if, such amendment is in writing and is signed by the parties hereto. Any waiver or consent hereunder shall be valid only if signed by the party against whom enforcement of such waiver or consent is sought.

12.     Parties Intended to be Benefited. All of the understandings, covenants, and agreements contained herein are solely for the benefit of the parties hereto and their respective successors and permitted assigns and no other Person (including Borrower) is intended to be benefited, in any way, by this Agreement.

13.     No Joint Venture. This Agreement is not intended to create any joint venture, partnership or similar arrangement among Senior Lender and Fannie Mae.

14.     Effect on Other Rights. Nothing contained in this Agreement is intended to affect or limit, in any way, the rights that any of the parties hereto may have against any Person not party to this Agreement or, except as expressly provided herein, the rights that any of the parties hereto may have under the Fannie Mae Loan Documents or the Senior Loan Documents.

15.     Rights of Fannie Mae in Other Capacities Not Affected. Fannie Mae, in its individual capacity, or any Affiliate of Fannie Mae, shall, in the event it becomes a participant and/or other owner of holder of any portion of the Senior Debt, be entitled to all of the rights set forth in this Agreement accorded to Senior Lender in respect of any interest in the Senior Debt a t any time h eld b y it, t o t he same extent as a ny o ther h older o f S enior D ebt, a nd nothing i n t his A greement s hall b e construed to deprive Fannie Mae, or any of its Affiliates, of any rights such Person may have as a Senior Lender.

16.     Notice. Any notice, request, demand, consent, approval or other communication provided or permitted hereunder, or that any party shall otherwise desire to give to another party in connection herewith, shall be in writing and be given by personal delivery, sent by nationally recognized private courier service or United States first class mail, postage prepaid, delivered or addressed to the party for whom it is intended at its address set forth below.

If to Senior Lender:                American National Bank of DeKalb County
                                    1985 DeKalb Avenue
                                    Sycamore, Illinois 60178
                                    Attn: Cathy Sundly
                                    Facsimile: (815) 776-2300

With a copy to:                     _____
                                    _____
                                    _____
                                    Attn: _____
                                    Facsimile: (_____) _____

# 269660v2 KMA
010656-0255

3

| | |
|---|---|
| If to Fannie Mae: | Fannie Mae<br>3900 Wisconsin Avenue, N.W.<br>Mail Stop 8H-306<br>Washington, DC 20016<br>Attn: General Counsel<br>Facsimile: (202) 752-6851 |
| With a copy to: | Gallagher Evelius & Jones LLP<br>218 N. Charles Street<br>Suite 400<br>Baltimore, Maryland 21201<br>Attn: Mark P. Keener, Esquire<br>Facsimile: (410) 468-2786 |

17.    Successors and Assigns; Limitations on Assignment. This Agreement shall be binding upon, and inure to the benefit of, the participants, transferees, successors and assigns of the parties hereto.

18.    Governing Law. THIS AGREEMENT AND ALL RIGHTS AND OBLIGATIONS OF FANNIE MAE AND SENIOR LENDER HEREUNDER SHALL BE GOVERNED BY, CONSTRUED UNDER, AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE DISTRICT OF COLUMBIA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

19.    Expenses. The Borrower agrees to pay to Senior Lender and/or Fannie Mae (as the case may be), on demand, all costs and expenses of every kind, including without limitation all reasonable attorneys' fees, that Senior Lender and/or Fannie Mae may incur in enforcing any of its rights under this Agreement.

20.    Counterparts. This Agreement may be signed in any number of counterparts, each of which will constitute an original, and all of which, taken together, shall constitute but one and the same agreement with the same effect as if the signatures thereon were upon the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth above.

AMERICAN NATIONAL BANK OF DEKALB COUNTY

By: _David W Wood_

Name: DAVID W. WOOD
Title: Executive Vice President

FANNIE MAE

By: _____

Name: _____
Title: _____

ACKNOWLEDGED AND AGREED:

EAGLE HOMES-PRAIRIE SPRINGS, LLC

By: _____

Kenneth J. Wisniewski,
Manager of Managing Committee

# 269660v2 KMA
010656-0255

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth above.

AMERICAN NATIONAL BANK OF DEKALB COUNTY

By: _____
       Name: _____
       Title: _____

FANNIE MAE

By: _____
       Name: _Wayne Curtis_
       Title: _Vice President_

ACKNOWLEDGED AND AGREED:

EAGLE HOMES-PRAIRIE SPRINGS, LLC

By: _____
       Kenneth J. Wisniewski,
       Manager of Managing Committee

STATE OF _____)

COUNTY OF _____)    ) SS.

I HEREBY CERTIFY that on this ____ day of _____; 2005, before me personally appeared _____, the _____ of FANNIE MAE, a corporation, to me known to be the same persons who signed the foregoing instrument as his act and deed as such _____ for the use and purpose therein mentioned, and that the said instrument is the act and deed of said company.

WITNESS my signature and official seal at _____, in the County of _____ and State of _____, the day and year last aforesaid.

(NOTARY SEAL)

_____
Notary Public
My Commission Expires:_____

STATE OF *Illinois* )

COUNTY OF *DeKalb* )    ) SS.

I HEREBY CERTIFY that on this *15th* day of *March*, 2005, before me personally appeared *DAVID W WOOD*, the *Exec Vice President* of AMERICAN NATIONAL BANK OF DEKALB COUNTY, an *National Banking Assn.*, to me known to be the same persons who signed the foregoing instrument as his act and deed as such _____ for the use and purpose therein mentioned, and that the said instrument is the act and deed of said company.

WITNESS my signature and official seal at *Sycamore*, in the County of *DeKalb* and State of *Illinois*, the day and year last aforesaid.

(NOTARY SEAL)

_____
Notary Public
My Commission Expires:_____

OFFICIAL SEAL
SUSAN M JOHNSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 06-18-07

# 269660v2 KMA
010656-0255

STATE OF _____ District of
                 Columbia ss:                    ) SS.

COUNTY OF _____

        I HEREBY CERTIFY that on this 21st day of March, 2005, before me personally appeared
_____, the _____ of FANNIE MAE, a corporation, to me known to be
the same persons who signed the foregoing instrument as his act and deed as such _____ for the use and purpose
therein mentioned, and that the said instrument is the act and deed of said company.

        WITNESS my signature and official seal at City of Columbia, in the County of _____ and State
of _____, the day and year last aforesaid.

(NOTARY SEAL)                           Beverly A. Doxie
                                        Notary Public
                                        My Commission Expires:_____    BEVERLY A. DOXIE
                                                                Notary Public District of Columbia
                                                                My Commission Expires: Jan 31, 2007


STATE OF _____                        ) SS.

COUNTY OF _____

        I HEREBY CERTIFY that on this ____ day of _____, 2005, before me personally appeared
_____, the _____ of AMERICAN NATIONAL BANK OF DEKALB
COUNTY, an _____, to me known to be the same persons who signed the foregoing
instrument as his act and deed as such _____ for the use and purpose therein mentioned, and that the said
instrument is the act and deed of said company.

        WITNESS my signature and official seal at _____, in the County of _____ and State
of _____, the day and year last aforesaid.


(NOTARY SEAL)                           _____
                                        Notary Public
                                        My Commission Expires:_____

**EXHIBIT A**
**Legal Description**

Parcel 1:
That part of the South Half of Section 22, Township 40 North, Range 3 East of the Third Principal Meridian, described as follows: Beginning at the Southwest corner of the Southeast Quarter of said Section 22; thence South 89 degrees 57 minutes 15 seconds East along the South line of the Southeast Quarter of said Section 22, a distance of 1323.09 feet to the East line of the West Half of the Southeast Quarter of said Section 22; thence North 00 degrees 04 minutes 18 seconds East along said East line, a distance of 2115.96 feet; thence North 89 degrees 57 minutes 15 seconds West parallel with the South line of the Southeast Quarter of said Section 22, a distance of 1801.17 feet to a line drawn southerly parallel with the East line of the West Half of said Section 22 from a point on the Southerly line of the Union Pacific Railroad Right of Way (formerly the Chicago and Northwestern Transportation Company Right of Way), said point being 848.96 feet Easterly of, as measured along said Southerly Right of Way line, the West line of the East Half of the Northwest Quarter of said Section 22; thence South 00 degrees 02 minutes 21 seconds East parallel with the East line of the West Half of said Section 22, a distance of 793.43 feet to the North line of the Southeast Quarter of the Southwest Quarter of said Section 22; thence North 89 degrees 58 minutes 55 seconds East along said North line, a distance of 473.98 feet to the West line of the East Half of said Section 22; thence South 00 degrees 02 minutes 21 seconds East along said West line, a distance of 1323.06 feet, to the place of beginning, in Malta Township, DeKalb County, Illinois.

Parcel 2:
Lot 2 in Block 1 in Sprague's Addition to the Village of Malta, situated in the County of DeKalb and State of Illinois.

Parcel 3:
Part of the East Half of Section 22 and part of the Northwest Quarter of Section 23 also being part of Tracts 2, 3, 4 and 5 of a certified survey plat dated on the 7th day of June, 1986 all in Township 40 North, Range 3 East of the Third Principal Meridian, bounded and described as follows: Beginning at a pinched pipe at the Southeast corner of the Northeast Quarter of said Section 22; thence South 90 degrees 00 minutes 00 seconds West along the South line of the Northeast Quarter of said Section 22, a distance of 1328.30 feet (1328.27 feet platted) to the Northeast corner of the West Half of the Southeast Quarter of said Section 22; thence South 00 degrees 01 minutes 45 seconds East along the East line of the West Half of said Southeast Quarter, a distance of 121.71 feet; thence North 88 degrees 42 minutes 12 seconds West, a distance of 279.08 feet; thence South 01 degrees 46 minutes 21 seconds West, a distance of 28.14 feet; thence North 88 degrees 50 minutes 59 seconds West, a distance of 106.89 feet; thence North 00 degrees 11 minutes 04 seconds East, a distance of 79.40 feet; thence North 49 degrees 45 minutes 20 seconds East, a distance of 63.83 feet; thence North 01 degrees 21 minutes 51 seconds West, a distance of 109.76 feet; thence North 88 degrees 12 minutes 24 seconds East, a distance of 100.60 feet; thence North 01 degrees 07 minutes 56 seconds East, a distance of 32.46 feet; thence North 85 degrees 08 minutes 08 seconds East, a distance of 239.25 feet to the East line of the West Half of the Northeast Quarter of said Section 22; thence South 00 degrees 17 minutes 46 seconds East along said East line, a distance of 111.88 feet; thence South 90 degrees 00 minutes 00 seconds East parallel with the South line of the Northeast Quarter of said Section 22, a distance of 1328.21 feet to the East line of said Section 22; thence North 00 degrees 26 minutes 55 seconds West along said East line, a distance of 4.40 feet; thence North 89 degrees 58 minutes 12 seconds East parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet; thence South 00 degrees 26 minutes 56 seconds East, a distance of 33.00 feet; thence South 89 degrees 58 minutes 12 seconds West parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet to the East line of said Section 22; thence South 00 degrees 26 minutes 55 seconds East along said East line, a distance of 4.40 feet to the point of beginning, situated in DeKalb County, Illinois.

Legal Description
(Continued)

Parcel 4:

That part of Section 22, and that part of the Northwest Quarter of Section 23, all in Township 40 North, Range 3 East of the Third Principal Meridian, described as follows: Beginning at the point of intersection of the East line of said Section 22, with the Southerly right of way line of the Chicago & Northwestern Transportation Company; thence Westerly along said Southerly right of way line 2653.24 feet to the East line of the West Half of said Section 22; thence continuing Westerly along said Southerly right of way line 474.0 feet to a point 848.98 feet Easterly of, as measured along said Southerly right of way line, the West line of the East Half of the Northwest Quarter of said Section 22; thence Southerly parallel with the East line of the West Half of said Section 1253.39 feet to a point a distance of 793.43 feet North of the North line of the Southeast Quarter of the Southwest Quarter of said Section 22; thence East parallel with the South line of said Quarter Section a distance of 1801.15 feet to the East line of the West Half of the Southeast Quarter of said Section 22; thence Northerly along said East line 528.85 feet to the North line of the Southeast Quarter of said Section 22; thence East along said North line 1328.27 feet to the East line of said Section 22; thence Northerly along said East line 4.4 feet to the South line of Lot 4 of Haish's Subdivision as recorded in Book "B" of Plats, page 126; thence Easterly along the South line of said Lot 4, 210.0 feet to the East line of said Lot 4; thence Northerly along said East line 600.97 feet to a line 66.5 feet Southerly of as measured at right angles therefrom and parallel with the Southerly right of way line of the Chicago & Northwestern Transportation Company; thence Easterly along said parallel line 184.96 feet; thence Northerly at right angle to the last described course 66.5 feet to said Southerly right of way line; thence Westerly along said right of way line 396.46 feet to the point of beginning; EXCEPTING THEREFROM THE FOLLOWING: Part of the East Half of Section 22 and part of the Northwest Quarter of Section 23 also being part of Tracts 2, 3, 4 and 5 of a certified survey plat dated on the 7th day of June, 1986 all in Township 40 North, Range 3 East of the Third Principal Meridian, bounded and described as follows: Beginning at a pinched pipe at the Southeast corner of the Northeast Quarter of said Section 22; thence South 90 degrees 00 minutes 00 seconds West along the South line of the Northeast Quarter of said Section 22, a distance of 1328.30 feet (1328.27 feet platted) to the Northeast corner of the West Half of the Southeast Quarter of said Section 22; thence South 00 degrees 01 minutes 45 seconds East along the East line of the West Half of said Southeast Quarter, a distance of 121.71 feet; thence North 88 degrees 42 minutes 12 seconds West, a distance of 279.08 feet; thence South 01 degrees 48 minutes 21 seconds West, a distance of 28.14 feet; thence North 88 degrees 50 minutes 59 seconds West, a distance of 106.89 feet; thence North 00 degrees 11 minutes 04 seconds East, a distance of 79.40 feet; thence North 49 degrees 45 minutes 20 seconds East, a distance of 63.83 feet; thence North 01 degrees 21 minutes 51 seconds West, a distance of 109.76 feet; thence North 55 degrees 12 minutes 24 seconds East, a distance of 100.80 feet; thence North 01 degrees 07 minutes 56 seconds East, a distance of 32.46 feet; thence North 85 degrees 08 minutes 02 seconds East, a distance of 239.23 feet to the East line of the West Half of the Northeast Quarter of said Section 22; thence South 00 degrees 17 minutes 46 seconds East along said East line, a distance of 111.88 feet; thence South 90 degrees 00 minutes 00 seconds East parallel with the South line of the Northeast Quarter of said Section 22, a distance of 1328.21 feet to the East line of said Section 22; thence North 00 degrees 26 minutes 55 seconds West along said East line, a distance of 4.40 feet; thence North 89 degrees 56 minutes 12 seconds East parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet; thence South 00 degrees 26 minutes 55 seconds East, a distance of 33.00 feet; thence South 89 degrees 58 minutes 12 seconds West parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.0 feet to the East line of said Section; thence South 00 degrees 26 minutes 55 seconds East along said line, a distance of 4.40 feet to the point of beginning, all situated in Malta Township, DeKalb County, Illinois.

## SCHEDULE 1

## INDEX OF DEFINED TERMS

"Affiliate": as defined in Section 1.

"Agreement": as defined in the Introduction.

"Borrower": as defined in the Recitals.

"Equity Interests in Borrower": as defined in Section 1.

"Event of Default": as defined in Section 1.

"Fannie Mae": as defined in the Introduction.

"Fannie Mae Acquisition Notice": as defined in Section 7.

"Fannie Mae Acquisition of Ownership": as defined in Section 7.

"Fannie Mae Acquisition Period": as defined in Section 7.

"Fannie Mae Acquisition Notice": as defined in Section 7.

"Fannie Mae Acquisition of Ownership": as defined in Section 7.

"Fannie Mae Debt": as defined in Section 1.

"Fannie Mae Loan Documents": as defined in Section 1.

"Fannie Mae Pledge Agreement": as defined in Section 1.

"Fannie Mae's Equity Interest": as defined in Section 1.

"Lien": as defined in Section 1.

"Person": as defined in Section 1.

"Property": as defined in Section 1.

"Senior Debt": as defined in Section 1.

"Senior Lender": as defined in the Introduction.

"Senior Loan Agreement": as defined in the Recitals.

"Senior Loan Documents": as defined in Section 1.

# EXHIBIT G

## INSURANCE REQUIREMENTS

### PROPERTY DAMAGE INSURANCE

**Construction Projects - Builder's Risk Property Insurance:**
1. Form: Evidence (Acord 28) or copy of certified policy
2. Minimum Best's Rating: A- / VI
3. Builder's Risk Special Form (All Risk) in an amount to cover full replacement value of improvements
4. Completed value form (note: reporting form is acceptable for single family project)
5. LLC/ Partnership is Named Insured
6. 30 day prior notice of cancellation
7. Location and improvements are accurately described
8. Acceptable Deductible – $25,000 maximum
9. No co-insurance (agreed amount endorsement)
10. Soft Cost Endorsement (6 months of interest payments)
11. Ordinance & Law coverage, if applicable (non-conforming use under current building, zoning or land use ordinances or laws), Sinkhole/ Mine Subsidence coverage, if applicable (areas prone to these geological phenomena)

**Completed Project – All Risk Property Insurance:**
1. Form: Evidence (Acord 28) or copy of certified policy
2. Minimum Best's Rating: A- / VI
3. Special Form (All Risk) in an amount to cover full replacement value of improvements and personal property
4. LLC/ Partnership is Named Insured
5. 30 day prior notice of cancellation
6. Location and improvements are accurately described
7. Acceptable Deductible - $25,000 maximum
8. No co-insurance (agreed amount endorsement)
9. Business Income/ Rent Loss coverage for 6 month's coverage
10. Ordinance and Law coverage, if applicable (non-conforming use under current building, zoning, land use ordinances or laws), Sinkhole/ Mine Subsidence coverage, if applicable (areas prone to these geological phenomena), Windstorm coverage, if applicable (areas prone to wind-related events), Boiler and Machinery coverage, if applicable (where any centralized HVAC equipment is in operation at the property and/or where there are boilers or other pressure-fired vessels that are required to be regulated by the state).

Construction or Completed Projects - Flood Insurance (when structures are located in Flood Zones A or V and in a participating community):
1. Form: Copy of the flood policy; copy of completed flood insurance application
2. LLC/ Partnership is Named Insured
3. Coverage must equal the lesser of the replacement cost of the improvements; or the

# 269443 v3 KMA
010656-0255

maximum amount of coverage allowed for the type of property under NFIP. If there is a gap between NFIP and replacement cost, consider an excess flood policy to cover the difference.

4. Location and improvements are accurately described
5. 30 day prior notice of cancellation
6. Acceptable Deductible – 5% of total insured value

## COMMERCIAL GENERAL LIABILITY INSURANCE

<u>Construction or Term Projects – LLC/ Partnership Liability Insurance:</u>
1. Form: Certificate of Insurance (Acord 25)
2. Minimum Best's Rating: A- / VI
3. LLC/ Partnership is Named Insured (or Additional Insured if insurance provided by Contractor or other 3rd party)
4. Minimum coverage per occurrence met (can combine primary coverage and excess or umbrella coverage to reach a combined single occurrence limit)
   a. Up to 3 stories:                    $2MM per occurrence
   b. 4 to 10 stories:                    $5MM per occurrence
   c. Greater than 10 stories:            $10MM per occurrence
5. 30 day prior notice of cancellation (10 days for non-payment of premium acceptable)
6. Acceptable deductible – not to exceed $5,000 maximum


<u>Construction Projects – Contractor's Liability Insurance:</u>
1. Form: Certificate of Insurance (Acord 25)
2. Minimum Best's Rating: A- / VI
3. Contractor is Named Insured
4. LLC/ Partnership is named Additional Insured
5. Minimum coverage per occurrence met (can combine primary coverage and excess or umbrella coverage to reach a combined single occurrence limit)
   a. Up to 3 stories:                    $2MM per occurrence
   b. 4 to 10 stories:                    $5MM per occurrence
   c. Greater than 10 stories:            $10MM per occurrence
6. 30 day prior notice of cancellation (10 days for non-payment of premium acceptable)
7. Acceptable deductible – not to exceed $5,000 maximum


## **Construction Projects – Worker's Compensation (from Contractor, or LLC/ Partnership if they are the general contractor):**
1. Statutory minimum based on state law
2. Employer's Liability with a limit of $1MM

# EXHIBIT H

ENVIRONMENTAL INDEMNITY AGREEMENT

See Attached

## ENVIRONMENTAL INDEMNITY AGREEMENT

THIS ENVIRONMENTAL INDEMNITY AGREEMENT (this "Agreement"), made as of *November 26*, 2003, by EAGLE HOMES – PRAIRIE SPRINGS, LLC, an Illinois limited liability company ("Prairie Springs"), EAGLE HOMES, LLC, an Illinois limited liability company ("Eagle Homes"), KENNETH J. WISNIEWSKI ("K. Wisniewski") and LILLIAN F. WISNIEWSKI ("L. Wisniewski") (collectively referred to herein as, the "Indemnitor") in favor of FANNIE MAE, a corporation organized under the laws of the United States of America ("Fannie Mae").

RECITALS:

Prairie Springs and Fannie Mae have entered into that certain Loan Agreement dated November __, 2003 ("Loan Agreement") pursuant to which Fannie Mae has agreed to make a mezzanine loan to Prairie Springs (the "Loan") with a maximum aggregate principal amount of One Million Six Hundred Thirty-Three Thousand Six Hundred Dollars ($1,633,600) (which Loan Agreement, as the same may from time to time be amended, restated, or otherwise modified, is herein called the "Loan Agreement"). Prairie Springs' obligation to repay the Loan is evidenced by a Promissory Note dated November __, 2003 (which Note, as the same may from time to time be extended, replaced, substituted for, amended, restated, or otherwise modified, is herein called the "Note"). The indebtedness, obligations and liabilities of Prairie Springs under and in connection with the Loan Agreement are guaranteed by Eagle Homes, K. Wisniewski and L. Wisniewski, pursuant to a separate Guaranty Agreement dated November __, 2003 to Fannie Mae (the Guaranty Agreement, as the same has or may at any time and from time to time be amended, restated, supplemented or otherwise modified, is herein called the "Guaranty". Prairie Springs will use the proceeds of the Loan in connection with the acquisition of approximately 145 acres of land more particularly described on Exhibit A attached hereto and made a part hereof (the "Land") and located in Malta, Illinois upon which Prairie Springs will develop 258 single family homes in two (2) phases (the "Project").

Fannie Mae requires that, as a condition to making the Loan, Indemnitor indemnify Fannie Mae against any violations of any Applicable Environmental Laws (as herein defined), relating to the Land and the Project, and all buildings and improvements now or hereafter situated on the Land (collectively, the "Property").

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals, and as an inducement to Fannie Mae to make the Loan, the Indemnitor agrees with Fannie Mae as follows:

1.    As used herein, the term "Applicable Environmental Laws" shall mean any applicable federal, state or local laws, statutes, ordinances, rules or regulations pertaining to health or the environment, or petroleum products, or radon radiation, or oil or hazardous substances, including, without limitation, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as codified at 42 U.S.C. § 9601 et seq.,

(b) the Resource Conservation and Recovery Act of 1976 ("RCRA"), (c) the Solid Waste Disposal Act, 42 U.S.C. §6901 et seq., (d) the Hazardous Materials Transportation Act, 49 U.S.C. §1801 et seq., (e) the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., (f) the Clear Air Act, 42 U.S.C. §7401 et seq., (g) the Toxic Substances Control Act, 15 U.S.C. §2601 et. seq., (h) the Safe Drinking Water Act, 42 U.S.C. §300f et seq. and (i) the Federal Emergency Planing and Community Right-To-Know Act of 1986, all as may be from time to time amended. The terms "hazardous substance" and "release" shall have the meanings specified in CERCLA, and the terms "solid waste," "disposal," "dispose," and "disposed" shall have the meanings specified in RCRA, except that if such acts are amended to broaden the meanings thereof, the broader meaning shall apply herein prospectively from and after the date of such amendments; notwithstanding the foregoing, provided, to the extent that the laws of the State where the Property is located establish a meaning for "hazardous substance" or release" which is broader than that specified in CERCLA, as CERCLA may be amended from time to time, or a meaning for "solid waste," "disposal," and "disposed" which is broader than specified in RCRA, as RCRA may be amended from time to time, such broader meanings under said state law shall apply in all matters relating to the laws of such State.

2.    Indemnitor agrees to defend, indemnify and hold harmless Fannie Mae, any persons owned or controlled by, owning or controlling, or under common control or affiliated with, Fannie Mae, the directors, officers, employees and agents of Fannie Mae and the heirs, personal representatives, successors and assigns of each of the foregoing (each an "Indemnified Person" and collectively the "Indemnified Persons") from and against, and shall reimburse each Indemnified Person for, any and all loss, claims, liability, damages, judgments, penalties, injunctive relief, injury to person, property or natural resource, cost, expense, action or cause of action arising in connection with or as the result of any past, present, or future existence, use, handling, storage, transportation, manufacture, release, or disposal of any hazardous substance in, on or under the Property, whether foreseeable or unforeseeable, regardless of the source, the time of occurrence or the time of discovery (hereinafter collectively referred to as "Loss"). The foregoing indemnification against Loss includes, without limitation, indemnification against all costs in law or in equity of removal, response, investigation, or remediation of any kind, and disposal of such hazardous substances, all costs of determining whether the Property is in compliance with, and of causing the Property to be in compliance with, all Applicable Environmental Laws, all costs associates with claims for damages to persons, property or natural resources, and Fannie Mae's attorneys' and consultants' fees, court costs and expenses incurred in connection with any thereof. Without limiting the foregoing, upon any allegation that such a violation may exist, the Indemnitor shall: (a) upon Fannie Mae's reasonable written request cause to be conducted such investigations, tests or analyses of the Property by environmental professionals reasonably approved by Fannie Mae and provide Fannie Mae the written results of such investigations, tests or analyses, and (b) promptly remedy in accordance with any Applicable Environmental Laws any violation that may exist, and (c) if required by applicable law, promptly report any alleged violation to any federal, state or local agency having jurisdiction over such matters. If the Indemnitor fails to promptly comply with Fannie Mae's written request as aforesaid or fails to take such other action as so required above, Fannie Mae may, at its option, but shall have no obligation to, do any of the foregoing, and the Indemnitor will promptly reimburse Fannie Mae for all reasonable costs and expenses incurred by Fannie

Mae. Fannie Mae and its agents shall have access to the Property, for the purposes of conducting any such investigations, tests or analyses.

3.     This Agreement shall survive any foreclosure or acceptance by Fannie Mae of any collateral for the payment and performance of the obligations described in the Loan Agreement and other documents executed by Prairie Springs, K. Wisniewski and L. Wisniewski in connection with the Loan; provided, however, the Indemnitor shall not indemnify Fannie Mae with respect to any violation which Indemnitor can establish results from wastes, substances or materials being placed on, above or under the Property during any period Fannie Mae, or any successor in interest to Fannie Mae, is in possession of the Property and provided such violation is not due to the actions of Indemnitor. Except as expressly provided in the immediately preceding sentence, this Agreement shall remain in full force and effect, including with respect to hazardous substances which are discovered or released in, on or under the Property after Fannie Mae, or any successor in interest to Fannie Mae, is in possession of the Property, but which were introduced in, on or under the Property prior to such possession and with respect to the migration or release of hazardous substances previously introduced in, on, under or near the Property.

4.     Indemnitor agrees to pay to each Indemnified Person all reasonable charges, expenses, attorney's fees and costs incurred by such Indemnified Person in connection with the Indemnified Person's enforcement of this Agreement, including charges, expenses, attorney's fees and costs upon any appeal and in any bankruptcy proceedings.

5.     This Agreement shall be binding upon the Indemnitor, its successors and assigns, and shall inure to the benefit of Fannie Mae, each Indemnified Person, and their respective successors and assigns. In the event more than one person is named as Indemnitor hereunder, each such person shall be jointly and severally liable for the performance of the obligations provided for herein and each person waives any and all defenses to enforcement arising from Lender's election to enforce this Agreement against less than all of the persons named as Indemnitor.

6.     In the event that any provision hereof is deemed to be invalid by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Agreement shall be construed as not containing such provision and the invalidity of such provision shall not affect other provisions which are otherwise lawful and valid and shall remain in full force and effect.

7.     **THE PARTIES HERETO AGREE THAT THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS. THE PARTIES AGREE THAT PERSONAL JURISDICTION AND VENUE SHALL BE PROPER ONLY IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS.**

8.     **THE INDEMNITOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE**

OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF FANNIE MAE AND/OR THE INDEMNITOR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**IN WITNESS WHEREOF,** the undersigned has caused this Agreement to be properly executed and delivered as of the day and year first above written.

WITNESS:

EAGLE HOMES – PRAIRIE SPRINGS, LLC

By: _____ (SEAL)
Name: Kenneth J. Wisniewski
Title:   Manager of the Managing Committee

EAGLE HOMES, LLC

By: _____
Name: Kenneth J. Wisniewski
Title:   Manager

_____
KENNETH J. WISNIEWSKI

_____
LILLIAN F. WISNIEWSKI

STATE OF ILLINOIS, COUNTY of                    :

    I HEREBY CERTIFY that on _____, 2003, before me, a Notary Public of said State, personally appeared _____ in his capacity as _____ of Eagle Homes, LLC, the sole member of Eagle Homes – Prairie Springs, LLC, is known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained.

    WITNESS my hand and Notarial Seal.

> "OFFICIAL SEAL"
> MICHAEL J. SCHREIBER
> Notary Public, State of Illinois
> My Commission Expires 10/10/04

_____
Notary Public

My Commission Expires: _10_/_10_/_2004_

    I HEREBY CERTIFY that on _____, 2003, before me, a Notary Public of said State, personally appeared _____ in his capacity as _____ of Eagle Homes, LLC, is known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained.

    WITNESS my hand and Notarial Seal.

> "OFFICIAL SEAL"
> MICHAEL J. SCHREIBER
> Notary Public, State of Illinois
> My Commission Expires 10/10/04

_____
Notary Public

My Commission Expires: _10_/_10_/_2004_

STATE OF ILLINOIS, COUNTY of                    :

    I HEREBY CERTIFY that on _____, 2003, before me, a Notary Public of said State, personally appeared Kenneth J. Wisniewski, is known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained.

    WITNESS my hand and Notarial Seal.

> "OFFICIAL SEAL"
> MICHAEL J. SCHREIBER
> Notary Public, State of Illinois
> My Commission Expires 10/10/04

_____
Notary Public

My Commission Expires: _10_/_10_/_2004_

#229413 v3 NJP
010656-0181

6

STATE OF ILLINOIS, COUNTY of                          :

I HEREBY CERTIFY that on _____, 2003, before me, a Notary Public of said State, personally appeared Lillian F. Wisniewski, is known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained.

WITNESS my hand and Notarial Seal.

"OFFICIAL SEAL"
MICHAEL J. SCHREIBER
Notary Public, State of Illinois
My Commission Expires 10/10/04

_____
Notary Public

My Commission Expires: 10/10/2004

EXHIBIT A

**Description of the Land**

*Phase One Land*

## PROPERTY DESCRIPTION

The land referred to in this Commitment is described as follows:

That part of the South Half of Section 22, Township 40 North, Range 3 East of the Third Principal Meridian, described as follows: Beginning at the Southwest corner of the Southeast Quarter of said Section 22; thence South 89 degrees 57 minutes 15 seconds East along the South line of the Southeast Quarter of said Section 22, a distance of 1323.09 feet to the East line of the West Half of the Southeast Quarter of said Section 22; thence North 00 degrees 04 minutes 18 seconds East along said East line, a distance of 2115.96 feet; thence North 89 degrees 57 minutes 15 seconds West parallel with the South line of the Southeast Quarter of said Section 22, a distance of 1801.17 feet to a line drawn southerly parallel with the East line of the West Half of said Section 22 from a point on the Southerly line of the Union Pacific Railroad Right of Way (formerly the Chicago and Northwestern Transportation Company Right of Way), said point being 848.96 feet Easterly of, as measured along said Southerly Right of Way line, the West line of the East Half of the Northwest Quarter of said Section 22; thence South 00 degrees 02 minutes 21 seconds East parallel with the East line of the West Half of said Section 22, a distance of 793.43 feet to the North line of the Southeast Quarter of the Southwest Quarter of said Section 22; thence North 89 degrees 58 minutes 55 seconds East along said North line, a distance of 473.98 feet to the West line of the East Half of said Section 22; thence South 00 degrees 02 minutes 21 seconds East along said West line, a distance of 1323.06 feet, to the place of beginning, in Malta Township, DeKalb County, Illinois.

03/20/2003 10:51 FAX 8157    ☑008/009

First American Title Insurance Company

Commitment Number:  00013936

PRAIRIE SPRINGS
(HARKNESS FARM)

SCHEDULE C
PROPERTY DESCRIPTION
BOTH PHASE I & PHASE II

The land referred to in this Commitment is described as follows:

That part of Section 22, and that part of the Northwest Quarter of Section 23, all in Township 40 North, Range 3
East of the Third Principal Meridian, described as follows: Beginning at the point of intersection of the East line
of said Section 22 with the Southerly right of way line of the Chicago & Northwestern Transportation Company;
thence Westerly along said Southerly right of way line 2653.24 feet to the East line of the West Half of said
Section 22; thence continuing Westerly along said Southerly right of way line 474.0 feet to a point 848.96 feet
Easterly of, as measured along said Southerly right of way line, the West line of the East Half of the Northwest
Quarter of said Section 22; thence Southerly parallel with the East line of the West Half of said Section 22,
2046.57 feet to the North line of the Southeast Quarter of the Southwest Quarter of said Section 22; thence
Easterly along said North line 473.92 feet to said West line of the East Half of said Section 22; thence Southerly
along said West line 1323.13 feet to the South line of the Southeast Quarter of said Section 22; thence Easterly
along said South line 1323.06 feet to the East line of the West Half of the Southeast Quarter of said Section 22;
thence Northerly along said East line 2645.47 feet to the North line of the Southeast Quarter of said Section 22;
thence Easterly along said North line 1328.27 feet to the East line of said Section 22; thence Northerly along
said East line 4.4 feet to the South line of Lot 4 of Halsh's Subdivision as recorded in Book "B" of Plats, page
128; thence Easterly along the South line of said Lot 4, 210.0 feet to the East line of said Lot 4; thence Northerly
along said East line 600.97 feet to a line 66.5 feet Southerly of as measured at right angles therefrom and
parallel with the Southerly right of way line of the Chicago & Northwestern Transportation Company; thence
Easterly along said parallel line 184.96 feet; thence Northerly at right angle to the last described course 66.5
feet to said Southerly right of way line; thence Westerly along said right of way line 396.46 feet to the point of
beginning; EXCEPTING THEREFROM THE FOLLOWING: Part of the East Half of Section 22 and part of the
Northwest Quarter of Section 23 also being part of Tracts 2, 3, 4 and 5 of a certified survey plat dated on the 7th
day of June, 1986 all in Township 40 North, Range 3 East of the Third Principal Meridian, bounded and
described as follows: Beginning at a pinched pipe at the Southeast corner of the Northeast Quarter of said
Section 22; thence South 90 degrees 00 minutes 00 seconds West along the South line of the Northeast Quarter
of said Section 22, a distance of 1328.30 feet (1328.27 feet platted) to the Southeast corner of the West Half of
the Southeast Quarter of said Section 22; thence South 00 degrees 01 minutes 45 seconds East along the East
line of the West Half of said Southeast Quarter, a distance of 121.71 feet; thence North 88 degrees 42 minutes
12 seconds West, a distance of 279.08 feet; thence South 01 degrees 46 minutes 21 seconds West, a distance
of 28.14 feet; thence North 88 degrees 50 minutes 59 seconds West, a distance of 106.89 feet; thence North 00
degrees 11 minutes 04 seconds East, a distance of 79.40 feet; thence North 49 degrees 45 minutes 20 seconds
East, a distance of 63.83 feet; thence North 01 degrees 21 minutes 51 seconds West, a distance of 109.76 feet;
thence North 88 degrees 12 minutes 24 seconds East, a distance of 100.60 feet; thence North 01 degrees 07
minutes 56 seconds East, a distance of 32.46 feet; thence North 85 degrees 08 minutes 08 seconds East, a
distance of 239.23 feet to the East line of the West Half of the Northeast Quarter of said Section 22; thence
South 00 degrees 17 minutes 46 seconds East along said East line, a distance of 111.88 feet; thence South 90
degrees 00 minutes 00 seconds East parallel with the South line of the Northeast Quarter of said Section 22, a
distance of 1328.21 feet to the East line of said Section 22; thence North 00 degrees 26 minutes 55 seconds
West along said East line, a distance of 4.40 feet; thence North 89 degrees 58 minutes 12 seconds East parallel
with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet; thence South 00
degrees 26 minutes 56 seconds East, a distance of 33.00 feet; thence South 89 degrees 58 minutes 12 seconds
West parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet to the
East line of said Section 22; thence South 00 degrees 26 minutes 55 seconds East along said East line, a
distance of 4.40 feet to the point of beginning, all situated in Malta Township, DeKalb County, Illinois.

ALTA Commitment
Schedule C

(00013936.PFD/00013936/13)

**SCHEDULE 1**

Phase One Land

Parcel 1:

That part of the South Half of Section 22, Township 40 North, Range 3 East of the Third Principal Meridian, described as follows: Beginning at the Southwest corner of the Southeast Quarter of said Section 22; thence South 89 degrees 57 minutes 15 seconds East along the South line of the Southeast Quarter of said Section 22, a distance of 1323.09 feet to the East line of the West Half of the Southeast Quarter of said Section 22; thence North 00 degrees 04 minutes 18 seconds East along said East line, a distance of 2115.96 feet; thence North 89 degrees 57 minutes 15 seconds West parallel with the South line of the Southeast Quarter of said Section 22, a distance of 1801.17 feet to a line drawn southerly parallel with the East line of the West Half of said Section 22 from a point on the Southerly line of the Union Pacific Railroad Right of Way (formerly the Chicago and Northwestern Transportation Company Right of Way), said point being 848.96 feet Easterly of, as measured along said Southerly Right of Way line, the West line of the East Half of the Northwest Quarter of said Section 22; thence South 00 degrees 02 minutes 21 seconds East parallel with the East line of the West Half of said Section 22, a distance of 793.43 feet to the North line of the Southeast Quarter of the Southwest Quarter of said Section 22; thence North 89 degrees 58 minutes 55 seconds East along said North line, a distance of 473.98 feet to the West line of the East Half of said Section 22; thence South 00 degrees 02 minutes 21 seconds East along said West line, a distance of 1323.06 feet, to the place of beginning, in Malta Township, DeKalb County, Illinois.

**SCHEDULE 2**

Phase Two Land

Parcel 2:
Lot 2 in Block 1 in Sprague's Addition to the Village of Malta, situated in the County of DeKalb and State of Illinois.

Parcel 3:
Part of the East Half of Section 22 and part of the Northwest Quarter of Section 23 also being part of Tracts 2, 3, 4 and 5 of a certified survey plat dated on the 7th day of June, 1986 all in Township 40 North, Range 3 East of the Third Principal Meridian, bounded and described as follows: Beginning at a pinched pipe at the Southeast corner of the Northeast Quarter of said Section 22; thence South 90 degrees 00 minutes 00 seconds West along the South line of the Northeast Quarter of said Section 22, a distance of 1328.30 feet (1328.27 feet platted) to the Northeast corner of the West Half of the Southeast Quarter of said Section 22; thence South 00 degrees 01 minutes 45 seconds East along the East line of the West Half of said Southeast Quarter, a distance of 121.71 feet; thence North 88 degrees 42 minutes 12 seconds West, a distance of 279.08 feet; thence South 01 degrees 46 minutes 21 seconds West, a distance of 28.14 feet; thence North 88 degrees 50 minutes 59 seconds West, a distance of 106.89 feet; thence North 00 degrees 11 minutes 04 seconds East, a distance of 79.40 feet; thence North 49 degrees 45 minutes 20 seconds East, a distance of 63.83 feet; thence North 01 degrees 21 minutes 51 seconds West, a distance of 109.76 feet; thence North 88 degrees 12 minutes 24 seconds East, a distance of 100.60 feet; thence North 01 degrees 07 minutes 56 seconds East, a distance of 32.46 feet; thence North 85 degrees 08 minutes 08 seconds East, a distance of 239.25 feet to the East line of the West Half of the Northeast Quarter of said Section 22; thence South 00 degrees 17 minutes 46 seconds East along said East line, a distance of 111.88 feet; thence South 90 degrees 00 minutes 00 seconds East parallel with the South line of the Northeast Quarter of said Section 22, a distance of 1328.21 feet to the East line of said Section 22; thence North 00 degrees 26 minutes 55 seconds West along said East line, a distance of 4.40 feet; thence North 89 degrees 58 minutes 12 seconds East parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet; thence South 00 degrees 26 minutes 56 seconds East, a distance of 33.00 feet; thence South 89 degrees 58 minutes 12 seconds West parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet to the East line of said Section 22; thence South 00 degrees 26 minutes 55 seconds East along said East line, a distance of 4.40 feet to the point of beginning, situated in DeKalb County, Illinois.

Phase Two Land
(Continued)

Parcel 4:

That part of Section 22, and that part of the Northwest Quarter of Section 23, all in Township 40 North, Range 3 East of the Third Principal Meridian, described as follows: Beginning at the point of intersection of the East line of said Section 22 with the Southerly right of way line of the Chicago & Northwestern Transportation Company; thence Westerly along said Southerly right of way line 2653.24 feet to the East line of the West Half of said Section 22; thence continuing Westerly along said Southerly right of way line 474.0 feet to a point 848.98 feet Easterly of, as measured along said Southerly right of way line, the West line of the East Half of the Northwest Quarter of said Section 22; thence Southerly parallel with the East line of the West Half of said Section 1253.39 feet to a point a distance of 793.43 feet North of the North line of the Southeast Quarter of the Southwest Quarter of said Section 22; thence East parallel with the South line of said Quarter Section a distance of 1801.15 feet to the East line of the West Half of the Southeast Quarter of said Section 22; thence Northerly along said East line 528.85 feet to the North line of the Southeast Quarter of said Section 22; thence Easterly along said North line 1328.27 feet to the East line of said Section 22; thence Northerly along said East line 4.4 feet to the South line of Lot 4 of Haish's Subdivision as recorded in Book "B" of Plats, page 126; thence Easterly along the South line of said Lot 4, 210.0 feet to the East line of said Lot 4; thence Northerly along said East line 600.97 feet to a line 66.5 feet Southerly of as measured at right angles therefrom and parallel with the Southerly right of way line of the Chicago & Northwestern Transportation Company; thence Easterly along said parallel line 184.96 feet; thence Northerly at right angle to the last described course 66.5 feet to said Southerly right of way line; thence Westerly along said right of way line 396.46 feet to the point of beginning; EXCEPTING THEREFROM THE FOLLOWING: Part of the East Half of Section 22 and part of the Northwest Quarter of Section 23 also being part of Tracts 2, 3, 4 and 5 of a certified survey plat dated on the 7th day of June, 1986 all in Township 40 North, Range 3 East of the Third Principal Meridian, bounded and described as follows: Beginning at a pinched pipe at the Southeast corner of the Northeast Quarter of said Section 22; thence South 90 degrees 00 minutes 00 seconds West along the South line of the Northeast Quarter of said Section 22, a distance of 1328.30 feet (1328.27 feet platted) to the Northeast corner of the West Half of the Southeast Quarter of said Section 22; thence South 00 degrees 01 minutes 45 seconds East along the East line of the West Half of said Southeast Quarter, a distance of 121.71 feet; thence North 88 degrees 42 minutes 12 seconds West, a distance of 279.08 feet; thence South 01 degrees 48 minutes 21 seconds West, a distance of 28.14 feet; thence North 88 degrees 50 minutes 59 seconds West, a distance of 106.89 feet; thence North 00 degrees 11 minutes 04 seconds East, a distance of 79.40 feet; thence North 49 degrees 45 minutes 20 seconds East, a distance of 63.83 feet; thence North 01 degrees 21 minutes 51 seconds West, a distance of 109.76 feet; thence North 55 degrees 12 minutes 24 seconds East, a distance of 100.80 feet; thence North 01 degrees 07 minutes 56 seconds East, a distance of 32.46 feet; thence North 85 degrees 08 minutes 02 seconds East, a distance of 239.23 feet to the East line of the West Half of the Northeast Quarter of said Section 22; thence South 00 degrees 17 minutes 46 seconds East along said East line, a distance of 111.88 feet; thence South 90 degrees 00 minutes 00 seconds East parallel with the South line of the Northeast Quarter of said Section 22, a distance of 1328.21 feet to the East line of said Section 22; thence North 00 degrees 26 minutes 55 seconds West along said East line, a distance of 4.40 feet; thence North 89 degrees 56 minutes 12 seconds East parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.00 feet; thence South 00 degrees 26 minutes 55 seconds East, a distance of 33.00 feet; thence South 89 degrees 58 minutes 12 seconds West parallel with the South line of the Northwest Quarter of said Section 23, a distance of 210.0 feet to the East line of said Section; thence South 00 degrees 26 minutes 55 seconds East along said line, a distance of 4.40 feet to the point of beginning, all situated in Malta Township, DeKalb County, Illinois.

# 269443 v3 KMA
010656-0255

# EXHIBIT D

# MILES & STOCKBRIDGE P.C.

**Linda V. Donhauser**
(410) 385-3684
ldonhauser@milesstockbridge.com

January 24, 2008

**VIA FEDERAL EXPRESS,**
**CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED,**
**AND FIRST-CLASS MAIL**

Kenneth J. Wisniewski
Lillian F. Wisniewski
Eagle Homes, LLC
40424 N. Deep Lake Road
Antioch, Illinois 60002

Re: *$1,822,790 Loan (the "Loan") from Fannie Mae ("Fannie Mae") to Eagle Homes-Prairie Springs, LLC (the "Borrower"), as evidenced by an Amended and Restated Promissory Note in the principal amount of $1,822,790, dated March 15, 2005 (the "Note"); an Amended and Restated Loan and Security Agreement dated March 15, 2005 (the "Loan Agreement"); a Guaranty Agreement dated November 26, 2003 (the "Guaranty"); a Member Interest Pledge and Security Agreement dated November 26, 2003 (the "Pledge"); and an Assignment of Membership Interest dated November 26, 2003 (the "Assignment") (collectively, the "Loan Documents")*

### NOTICE OF DEFAULT, ACCELERATION AND DEMAND FOR PAYMENT- AMENDED AND RESTATED PROMISSORY NOTE DATED AS OF MARCH 15, 2005

Dear Mr. Wisniewski and Mrs. Wisniewski:

Capitalized terms defined in the Loan Documents, which are used herein, shall have the same meanings as set forth in the Loan Documents unless otherwise specified. We are sending you this letter in your individual capacity as the Guarantor of the above-referenced Note and as members of Eagle Homes, LLC, also a Guarantor of the Note. Fannie Mae hereby provides notice to the Guarantor that certain Events of Default have occurred and are continuing under the Note and Loan Agreement.

NOTICE IS HEREBY GIVEN of the occurrence and continuation of Events of Default under the Loan Documents, including, but not limited to, the following:

Pursuant to Section 6.1(a) of the Loan Agreement, the Borrower has failed to make payment of the Asset Management Fee provided for under Section 6 of the Note.

Client Document:4825-9991-2450v1|03162-000061|1/16/2008
10 Light Street, Baltimore, MD 21202-1487 • 410.727.6464 • Fax: 410.385.3700 • www.milesstockbridge.com

Cambridge, MD • Columbia, MD • Easton, MD • Frederick, MD • McLean, VA • Rockville, MD • Towson, MD

Kenneth J. Wisniewski
Lillian F. Wisniewski
Eagle Homes, LLC
January 24, 2008
Page 2

MILES & STOCKBRIDGE P.C.

Pursuant to Section 6.1(d) of the Loan Agreement, there has been an Event of Default under the Borrower's loans with The American National Bank of DeKalb County ("American National"), which default(s) has not been cured within the applicable cure period.

Other Events of Default may also exist. As a result of the occurrence of the Events of Default, Fannie Mae hereby declares the entire unpaid balance of principal, the Fannie Mae Return, plus an undetermined amount of asset management fees and any other sums due under the Loan Documents, immediately due and payable.

According to the notice Fannie Mae received from American National, we understand that the default under the American National loan occurred on or before September 16, 2007. Accordingly, please be advised that the Default Rate as set forth in the Note will be assessed as of October 1, 2007.

As of February 1, 2008, the total amount due and owing to Fannie Mae under the Note is *$1,764,482.00*, which amount is comprised of principal and interest at the Fannie Mae Return (26% XIRR) totaling $1,750,546.00, and interest at the Default Rate from October 1, 2007 (29% XIRR) of $13,936.00, plus continuing interest at the Default Rate, Expenses of Collection (as that term is defined in the Note), an undetermined amount of asset management fees and any other costs and expenses, including attorneys' fees, as permitted by the Loan Documents and applicable law.

Demand is hereby made upon the Guarantor to immediately pay the full amount of *$1,764,482.00*, plus continuing interest at the Default Rate, Expenses of Collection, the unpaid asset management fees and all attorneys' fees and expenses incurred by Fannie Mae. If the Borrower does not pay the full amount of principal and the Fannie Mae Return within fifteen (15) days, then without limiting any of the rights and remedies of Fannie Mae, a late payment charge equal to five percent of any unpaid amount will be immediately due and owing on the Note.

Payment shall be made in immediately available funds to the order of "Fannie Mae" and shall be delivered to Fannie Mae, at the address specified below. Please be advised that if the Guarantor does not remit payment in full as and when requested by this letter, including, without limitation, all Expenses of Collection and attorneys' fees and expenses, we may seek appropriate legal action on behalf of Fannie Mae, including, but not limited to, the institution of legal proceedings. Please direct all further communications regarding this matter to the undersigned.

This notice is not intended and shall not be construed as an election of remedies or a waiver of Fannie Mae's right to exercise any prejudgment or self-help rights or remedies or any *other rights or remedies which may now or hereafter be available to Fannie Mae pursuant to the* terms of the Note, the Loan Agreement, the Pledge, the Assignment, the Guaranty, and/or the

Kenneth J. Wisniewski
Lillian F. Wisniewski
Eagle Homes, LLC
January 24, 2008
Page 3

MILES & STOCKBRIDGE P.C.

Loan Documents, or that are otherwise available at law or in equity.  No delay by Fannie Mae in exercising any rights or remedies shall operate as a waiver of any rights or remedies Fannie Mae may have.  Any and all rights and remedies available to Fannie Mae shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of Fannie Mae.

Furthermore, the acceptance by Fannie Mae of any future payments to the extent they do not represent timely or full payment of all amounts due under the Note, including all accrued and unpaid interest, late fees, Expenses of Collection, attorneys' fees or other reimbursable expenses, shall not constitute a waiver by Fannie Mae of any defaults which may exist under the Note, the Loan Agreement, the Pledge, the Assignment, the Guaranty, and/or the Loan Documents.

From this date forward, all payments on the Note should be sent to the following address:

Fannie Mae
3900 Wisconsin Avenue, NW
Mailstop 11H-407
Washington, DC  20016
Attn: George Trippe, Director Asset Management

This written notice is being transmitted as a courtesy to the Guarantor and is not an admission that any written notice is otherwise due to the Guarantor.  If you have any questions concerning this matter, please contact me at (410) 385-3684 immediately.

Very truly yours,

Linda V. Donhauser

cc:    George Trippe, Director Asset Management (via email)
       Sara Todd, Esquire (via email)
       David Witheft, Esquire (via facsimile)